# EXHIBIT 1

EFiled: Aug 31 2026 05:00PM EDT
Transaction ID 80509082
Case No. N26C-08-455 KMM CCLD

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DEUTSCHE FINANCE AMERICA LLC and DF DEUTSCHE FINANCE HOLDING AG d/b/a DEUTSCHE FINANCE GROUP, | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. |
| BAYERISCHE VERSORGUNGSKAMMER, | ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) | |

## COMPLAINT

Plaintiffs Deutsche Finance America LLC and DF Deutsche Finance Holding AG d/b/a Deutsche Finance Group, by and through their undersigned counsel, bring this Complaint against Defendant and allege as follows:

## NATURE OF THE ACTION

1. This case is about a sophisticated institutional investor that made bad investments and then tried to save face and mislead its beneficiaries by disparaging and defaming its partner. Defendant Bayerische Versorgungskammer ("BVK"), Germany's largest public-law pension group, mismanaged and ruined its multibillion-dollar portfolio of investments in U.S. real estate. In late 2024, BVK's misconduct came to light, and because its actions not only betrayed severe incompetence but also violated German law, BVK looked for others to take the fall.

Its chosen scapegoats were Plaintiffs Deutsche Finance America LLC ("DFA") and DF Deutsche Finance Holding AG d/b/a Deutsche Finance Group ("DFG") (collectively, "DF"), the asset managers for BVK's investments. In statements to the press, the Bavarian Parliament, regulatory authorities, and its millions of beneficiaries, BVK falsely branded DF as responsible for failures that BVK itself had caused. DF now seeks to hold BVK accountable.

2. As stated, BVK is Germany's largest public-law pension group, managing pension capital for approximately 2.8 million individuals. Starting in the mid-2010s, BVK invested nearly $2 billion in U.S. real estate. Under applicable German law, BVK's tax status did not permit it to control those investments directly—that was the job of various managers. Yet unbeknownst to regulators, the public, or its beneficiaries, BVK systematically and purposefully violated those rules by excluding the entities required by German law to control the investments and exerting direct control over the investments at every level.

3. The pattern was consistent across all of BVK's U.S. acquisitions: BVK would evaluate the properties, approve investments, and negotiate fees without its managers and then communicate its decision to those who should have been in charge so they could handle the administrative implementation of a decision BVK had already made. Afterwards, BVK would exercise control over the leasing, construction, financing, pricing, and capital decisions at individual properties—all

of which were operational matters that BVK was under-equipped and not institutionally competent to handle.

4. Because of BVK's overreach, DF's ability to execute its asset-management responsibilities at the properties depended entirely on approvals and capital that only BVK could provide. From funding tenant improvements to executing leases to covering operating shortfalls, DF could not operate unilaterally. BVK overstepped its bounds, so it had to *act* to keep its portfolio afloat. But it did not do so. Instead, BVK methodically harmed its own investments by failing to approve operating budgets, maintenance and development measures, refinancing decisions, and proposed leases across all of its properties. Those failures may amount to an estimated €853 million in total losses across the BVK portfolio.

5. Eventually, BVK's staggering losses broke to the public, in no small part because of a lawsuit surrounding them, and the press ran with the story. BVK had to find cover immediately as anything revealing how active and inept it had been would have exposed conduct raising serious regulatory issues and tax consequences at home. Given its agreement to release DF's partner, Michael Shvo, from any associated liability, BVK's big idea was to construct a false, disparaging, and defamatory narrative that BVK was not an operationally active investor at all but merely a passive participant in funds managed by DF and that DF was the party responsible for the losses.

6. Amidst a sea of public statements—including statements to German regulatory authorities—peddling this defamatory story, an illustrative set of false statements occurred in an August 31, 2025 interview of BVK's CEO. In the interview, BVK's CEO referred to "[t]he fund manager Deutsche Finance," stated that "[t]he alternative investment fund manager of the target fund is responsible for selecting local business partners in these investments," and stated that he "clearly assume[d] that project partners who do not meet expectations will be parted with as quickly as possible." Those statements were not true. BVK made itself, not DF, responsible for selecting local business partners in the investments. And BVK, not DF, was the entity that utterly failed to meet expectations.

7. Over the ensuing months, BVK escalated this narrative, including by denying DF's statements correcting the record; by doubling down, on its Q&A webpage, that "the project partners did not meet the expectations placed on them"; and by stating in a March 21, 2026 interview that it was DF, rather than BVK, who "identified the individual investment properties" that ended up failing so badly.

8. That disparagement and defamation caused DF great harm. DF's entire business depends on the confidence of the institutions and investors that entrust it with capital and mandates. Once publicly smeared by a large institutional backer as incompetent and responsible for the loss of hundreds of millions of dollars, DF's

ability to raise and invest capital and continue its ongoing operations was, for all practical purposes, put to an end.

9. At the same time, and as is the subject of a pending arbitration in which BVK's counsel has acknowledged that DF could sue BVK separately, BVK used its financial leverage to strip DF of tens of millions of dollars in management fees that DF was contractually owed. On December 31, 2025, BVK's counsel demanded that DF exit the management structure of the Transamerica Pyramid in San Francisco "with immediate effect and without receiving any compensation payment" and advised that BVK would provide no further funding while DF remained. BVK then withheld fees already due until DF consented to a sale of the Transamerica Pyramid that BVK had negotiated without DF's knowledge or involvement. And after that sale triggered a bargained-for guarantee of $31,384,061 in fees to DF through 2028, BVK has refused to pay—despite paying a co-manager, under an identical termination-protection provision, the fees owed to him upon termination of his role.

10. Through this action, DF seeks to hold BVK accountable. It asserts claims for defamation, deceptive trade practices, breach of contractual non-disparagement obligations, and tortious interference with contract and with prospective business relations, and it seeks compensatory damages, interest, and costs. For those claims, DF demands a trial by jury.

## THE PARTIES AND RELEVANT NON-PARTIES

11. Plaintiff Deutsche Finance America LLC is a Delaware limited liability company and majority-owned subsidiary of Plaintiff DFG. Established in 2018, DFA functions as DFG's private equity platform for U.S. real estate: it sources, structures, and manages direct real estate investments in the U.S. on behalf of DFG's institutional client accounts and managed funds. Plaintiff DFA's principal place of business is in Denver, Colorado.

12. Plaintiff DF Deutsche Finance Holding AG is a Munich-based global investment management firm that specializes in private market real estate and infrastructure investments. DFG serves tens of thousands of German retail investors and insurance companies.

13. Defendant Bayerische Versorgungskammer is Germany's largest public-law pension group and an authority of the Free State of Bavaria, itself a political subdivision of the Federal Republic of Germany. BVK is the beneficial owner of the properties at issue in this suit, investing through non-parties Universal Investment-Luxembourg S.A. ("UIL"), Universal Investment-Gesellschaft mbH and its successor UI BVK KVG (collectively with UIL, "UI"), and BAYVK Immobilien-Dachfonds 1 SCS SICAV-SIF Subfonds Elektra 2 SCS SICAV-FIS ("Elektra 2").

14. Non-party Elektra 2 is a closed-end special Alternative Investment Fund ("AIF") organized as société en commandite simple under the laws of

Luxembourg. It serves as the central vehicle through which BVK's capital is deployed for selected international real estate investments, including in the properties at issue in this suit.

15. Non-party Universal Investment-Gesellschaft mbH is a regulated German Alternative Investment Fund Manager ("AIFM") that administered BVK's Special Master Fund—the intermediary vehicle through which BVK's pension capital flowed into Elektra 2. Under the European Union Directive 2011/61/EU, AIFMs bear legal responsibility for the fund's investment decisions, risk management, and regulatory compliance in the EU.

16. Non-party UI BVK KVG is a licensed AIFM that replaced Non-party Universal Investment-Gesellschaft mbH as administrator of BVK's Special Master Fund in or around 2024.

17. Non-party UIL is the licensed AIFM in Luxembourg that formally manages Elektra 2.

## JURISDICTION AND VENUE

18. BVK is a foreign state within the meaning of 28 U.S.C. § 1603 because it is a political subdivision of the Federal Republic of Germany. Accordingly, subject matter jurisdiction over this action, personal jurisdiction over BVK, and venue in this Court hinge on whether the Foreign Sovereign Immunities Act's ("FSIA") requirements are satisfied. *See* 28 U.S.C. §§ 1330(b), 1604; *Argentine*

*Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989) (holding that the FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts"); *CC/Devas (Mauritius) Ltd. v. Antrix Corp.*, 605 U.S. 223, 233 (2025) (under the FSIA, "subject matter jurisdiction plus service of process equals personal jurisdiction") (citation omitted). Due process restrictions on personal jurisdiction do not apply to BVK. *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 29 (2025) (Thomas, J., concurring in the judgment) (explaining, for personal jurisdiction purposes, that "foreign states are not entitled to the protections of the Due Process Clause," and collecting authorities) (citation omitted).

19. Subject-matter and personal jurisdiction exist because BVK is not entitled to sovereign immunity under the FSIA with respect to the claims asserted in this action.

20. The FSIA's waiver exception applies. As outlined below, Elektra 2 is BVK's agent or alter ego. On September 11, 2024, BVK's alter ego, Elektra 2, signed a Term Sheet with DF governing BVK's U.S. investment properties out of which this case arises. The Term Sheet is governed by Delaware law. Agreeing that the law of a U.S. state should govern a dispute is an implied waiver of foreign sovereign immunity. H.R. Rep. No. 94-1487, at 18 (1976).

21. The FSIA's commercial-activity exception to sovereign immunity applies. 28 U.S.C. § 1605(a)(2). That exception provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case … in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

22. Commercial activity is defined as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). When this Complaint uses the term "commercial activity" under the FSIA, it refers to both "a regular course of commercial conduct" and individual "particular commercial transaction[s] or act[s]."

23. Plaintiffs' claims against BVK are "based upon" BVK's commercial activity carried on in the United States because their claims arise out of BVK's investments in U.S. real property, its mismanagement of those properties, its interference with Plaintiffs' contractual rights and business opportunities stemming from those same investments in U.S. real estate, and its defamatory statements relating to those properties. Investing in real estate and mismanaging those investments are things private actors routinely perform and are not uniquely sovereign activities.

24. Plaintiffs' claims against BVK are also "based upon" the above actions that BVK took in the United States in connection with its commercial activity in Germany—specifically, its management of investments for German pension funds.

25. Plaintiffs' claims against BVK are also "based upon" BVK's actions outside the United States to interfere with U.S. investments in connection with BVK's commercial activities in Germany, and these actions had a direct effect on the value of U.S. investments.

26. Plaintiffs' claims against BVK are also "based upon" BVK's defamation for commercial gain that reached U.S. media outlets and affected DF's asset management and investments in the U.S.

27. For the avoidance of doubt, Plaintiffs allege and incorporate herein all commercial activities alleged in this Complaint for purposes of satisfying all three clauses of the FSIA's commercial activity exception. BVK's personnel had repeated contacts for commercial purposes with the United States that were related to BVK's U.S. investments. All of BVK's actions had a direct effect on the value of its U.S. investments and on DF's ability to conduct business in the United States.

28. The FSIA does not impose any restrictions on venue for a complaint filed as an original matter in state court. BVK does not reside in any county in this State, and so venue is proper in this Court under Delaware law.

## FACTUAL ALLEGATIONS

### A. The Structure Of BVK's Investments

29. BVK is Germany's largest public-law pension group, managing pension capital for approximately 2.8 million individuals. In the mid-2010s, BVK

embarked on a multibillion-dollar push into international real estate. By 2020, BVK had invested approximately $2 billion in U.S. real property, which it considered its own crowning achievement. BVK deployed its capital through a chain of intermediary entities over which it exercised total control, with those intermediaries serving as alter egos or agents of BVK. This level of control is inconsistent with the role of an investor within an externally managed fund structure.

30. At the top of the chain, BVK's pension capital was held in a Special Master Fund administered by Universal Investment-Gesellschaft mbH. One step down the chain, that Special Master Fund invested BVK's consolidated real estate capital into Elektra 2, and UIL served as Elektra 2's AIFM, the regulated entity responsible for overseeing and approving all of Elektra 2's investments. Directive 2011/61/EU, Arts. 5-6; ESMA, Guidelines on Key Concepts of the AIFMD, ESMA/2013/611 (Aug. 13, 2013).

31. The relevant regulatory framework did not prohibit BVK from monitoring its investments or expressing investor views, but it did require that the AIFM—not BVK—retain and exercise the independent portfolio-management, risk-management, and decision-filtering role assigned to it by law. Specifically, German and EU law set out a distinct framework for BVK's real-estate investments and related tax privileges concerning income from such investments. Responsibility for, and decision-making authority regarding, all investment decisions, as well as

portfolio management and risk management, must reside with the fund's AIFM, not with investors like BVK. Beyond the formal structures, the legality of such investments also depends on BVK, as a functional, operational matter, limiting its role to that of an investor—without assuming project-level steering functions, which would otherwise usurp proper governance by external managers.

32. As set out below, BVK violated those rules. While maintaining a fig leaf of legal compliance, it overreached into operational matters that it was not equipped or competent to handle. BVK's personnel systematically influenced investment structuring, made investment decisions, directed capital commitments, negotiated fees, inspected properties, reviewed and approved proposed leases, and drove operational strategy across the portfolio—all without competently and reliably following through, while sidelining and, indeed, disabling the regulated fund managers who were meant to exercise independent portfolio-management, risk-management, and oversight functions.

33. DF, with its partner Michael Shvo, then served as the on-the-ground asset manager for BVK's U.S. properties—the entity responsible for the day-to-day work of operating, leasing, and maintaining the buildings. DF did not hold discretionary authority over the investments themselves. It did not have the power to select the investments in its own discretion, to make the binding investment decisions, or to commit or control BVK's capital. DF's role, along with Mr. Shvo's,

was just to manage the assets that BVK chose to acquire pursuant to contractual arrangements that BVK approved and for fees that BVK agreed to pay.

34. DF's ability to execute its management responsibilities at those properties depended entirely on approvals and capital that only BVK, because of its overreach, could provide. DF could not operate unilaterally, including as to matters such as funding tenant improvements, executing leases, and covering operating shortfalls. When BVK later withheld the necessary approvals and funding, DF could not simply go around it. And when BVK then blamed DF publicly for the resulting underperformance, it blamed DF for failures caused by BVK's own obstruction and mismanagement.

**B. BVK's Acquisition And Control Over Its U.S. Real Estate Investments**

35. As explained, BVK's actions show that it went beyond ordinary investor oversight and into project-level steering. When BVK entered the U.S. real estate market, it selected individual properties, approved each investment on a project-by-project basis, and deployed capital through intermediaries in a series of targeted commitments. Between 2018 and 2020, BVK invested in several properties at which non-party Michael Shvo and his entity SHVO Concept LLC served as the operating partner responsible for development and construction and DFA, along with Shvo, served as the asset manager. Mr. Shvo was introduced to BVK by Serdar

Bilgili, and from the outset, BVK engaged and vetted him—including through a Crumpton Group background check.

36. BVK exercised operational control over the portfolio from the beginning. For each of BVK's seven U.S. real estate acquisitions, the pattern was the same: before UI was even contacted, BVK's internal investment committee evaluated the property, approved the investment, and communicated its decision to DF and Shvo, who it knew was involved with all of the properties. UI was then informed after the fact and asked to handle the "administrative implementation" of a decision BVK had already made.

37. BVK's investment in the "685 Fifth Avenue" property in New York is illustrative. BVK personnel began evaluating the property with DF in February 2018. On April 17, 2018, BVK personnel confirmed by email that the investment would be proposed to others at BVK. No one from UI was involved. On April 19, 2018, DF confirmed to Shvo that BVK's investment committee had approved the investment in principle. UI was still not involved. On May 23, 2018, BVK personnel officially confirmed BVK's board decision to proceed with the 685 Fifth investment and then asked DF to contact UI to discuss "administrative implementation." UI was first contacted on May 24, 2018, three months after BVK had begun evaluating the transaction and more than a month after BVK's board had approved it.

38. The same pattern repeated for every subsequent acquisition.

39. For example, at the Raleigh Hotel in Miami, BVK personnel requested detailed construction cost information from DF in November 2018 to prepare a recommendation to BVK's investment committee. UI was not involved.

40. For 711 Fifth Avenue (the Coca-Cola building), BVK personnel wrote a "Proof of Funds" letter directly to Coca-Cola on behalf of BVK in May 2019, committing BVK to the purchase. UI did not appear in BVK's letter, although, as BVK's own fund manager, it should have been the entity making that commitment.

41. For the Transamerica Pyramid in San Francisco, when UI had not yet signed off on the capital payment in October 2020, BVK personnel told DF that if UI could not process the payment in time, "the money would have to go to the USA first without UI's signatures."

42. BVK was thus prepared to bypass its own licensed fund manager entirely rather than delay a transaction BVK had already decided to make.

43. UI's own personnel recognized that they were being excluded. On September 9, 2020, UI personnel wrote to DF asking about a deposit adjustment and closing timeline for 711 Fifth Avenue—a transaction that BVK and DF had already negotiated and agreed upon without UI's knowledge. UI asked DF to identify which BVK personnel had been involved, because UI itself did not know. UI was not

independently managing the fund. It was learning about BVK's decisions after they were made.

44. By the end of 2020, BVK had unilaterally committed approximately $2 billion of capital through Elektra 2 in seven U.S. properties, in each case approving the investment before notifying UI.

45. BVK's control extended beyond simply acquiring the various properties. It exerted direct influence over the operations and business of its investments.

46. For example, on March 6, 2020, BVK personnel personally authorized DFA's co-managing partner by direct email to lock in the interest rate on the debt financing for 711 Fifth Avenue.

47. This was not a passive investor reviewing a fund manager's recommendation. This was a BVK employee directly instructing the co-managing partner on a specific financing decision, with no UI involvement.

48. BVK personnel also regularly directed capital commitments and releases for individual properties.

49. For example, BVK personnel approved or withheld capital increases for the Transamerica Pyramid (multiple rounds from 2022 through 2024), the 9200 Wilshire property in Beverly Hills (the months-long delay described below), and 711 Fifth Avenue.

50. In each instance, UI processed the payments only after BVK had decided what to do.

51. On December 12, 2019, BVK's head of real estate investment management told DF that he would "release the investment without signatures from the investment committee, to not hold up the process"—BVK's head of real estate investment management thus unilaterally released capital without even his own board's formal sign-off.

52. BVK also weighed in on pricing, sales, and fee negotiations at the individual property level. BVK personnel were regularly updated on, and expressed views about, individual apartment sales at 685 Fifth Avenue in New York and 9200 Wilshire, specific rental rates at the Transamerica Pyramid, and the commercial terms of asset management fee arrangements across the portfolio.

53. Further, BVK had extensive contacts with its partners in the United States.

54. BVK personnel traveled to the United States repeatedly to inspect properties, tour construction sites, meet operating partners, and attend leasing presentations—in many cases without UI present.

55. For instance, on June 12, 2018, BVK personnel requested that their upcoming visit to 685 Fifth Avenue in New York include meetings with "Shvo's personnel, the broker, advisors, the general contractor, and prospective tenants."

56. BVK wanted to personally meet operationally active people on the project.

57. BVK personnel visited 685 Fifth Avenue on June 18, 2018, and met DFA's co-managing partner in person for the first time.

58. UI did not attend.

59. On November 19, 2018, BVK personnel visited the Raleigh Hotel. Again, UI did not attend or conduct its own on-site due diligence.

60. On April 12, 2019, the entire senior leadership of BVK traveled to Beverly Hills to inspect the 9200 Wilshire property and meet with DFA's co-managing partner in person. UI personnel attended this visit, but the visit was organized by BVK, and BVK's investment committee members conducted their own evaluation of the property.

61. On December 9, 2019, BVK leadership conducted a multi-day tour of properties in New York and Miami, meeting at the co-managing partner's offices in New York and visiting the Raleigh project in Miami.

62. UI did not attend.

63. In June 2022, BVK attended and collaborated on a five-day "U.S. Property Tour" spanning New York, Chicago, and San Francisco.

64. The tour included property visits to 685 Fifth Avenue, 711 Fifth Avenue, 530 Broadway, 333 South Wabash, and the Transamerica Pyramid; a capex

presentation with Foster + Partners at Transamerica; a leasing tour with the JLL leasing team; and a working lunch portfolio overview at the co-managing partner's office.

65. BVK's own CEO would eventually admit in public that BVK personnel had an "inappropriate proximity relationship" with parties in the U.S.

66. That admission was an understatement. The evidence shows that BVK personnel did not merely maintain relationships—they directed operations.

67. Accordingly, and as supported by hundreds of communications from 2018 through 2024, BVK personnel made investment decisions before UI was even informed, conducted on-site property inspections that UI did not attend, maintained direct operational relationships with U.S. parties, and exercised control over financing, pricing, capital, leasing, and fee decisions at the individual property level. UI—the entity that EU law required to independently manage BVK's investments in the Elektra 2 fund—was systematically excluded from substantive decision-making and reduced to an administrative processor of decisions BVK had already made. BVK crossed the legal line from the position of a passive investor within an externally managed fund structure into a functionally steering role that undermined the AIFM architecture and thereby exposed the tax assumptions underlying BVK's privileged status.

### C. BVK And Its Affiliates Tank The Investments

68. The same control that BVK exercised to acquire these properties meant that when market conditions deteriorated, only BVK could authorize the decisions necessary to protect them, but BVK refused to act.

69. Between 2020 and 2024, the U.S. commercial real estate market started to decline. BVK's portfolio was caught in this same current, and the crisis demanded active, decisive management from what should have been UI. Under applicable regulations, no refinancing could proceed, no additional capital could be called, and no strategic pivot could be executed without UI's consent. But BVK usurped UI's role, and as market conditions worsened, it proved unable or unwilling to make the timely decisions that its own dominant position demanded.

70. Instead, BVK's problematic relationship with German regulations and regulators led it, beginning at least as early as the start of 2024, to act underhandedly and even irrationally. In particular, although BVK improperly stepped into a steering role, it faltered in that role and systematically harmed its investments by failing to approve operating budgets, maintenance and development measures, refinancing decisions, and proposed leases across all of its properties.

71. BVK's failure to act on operating budgets, maintenance and development measures, refinancing decisions, proposed leases, and project-related actions was not occasional or inadvertent. It was systematic, spanned every property

in the BVK-DF portfolio, and interfered with many of DF's actual or proposed operations.

72. The first major obstruction arose at the 9200 Wilshire Boulevard property in Beverly Hills, a 54-unit luxury residential development.

73. A $200 million construction loan was set to mature on February 9, 2024.

74. DF identified the issue in October 2023 and requested that BVK approve the capital needed to refinance.

75. BVK personnel requested, reviewed, and commented on multiple business plan scenarios.

76. It had four months, all necessary information, and sole authority over the funding decision.

77. But rather than act, BVK sent DF through round after round of redundant memo revisions, sensitivity analyses, and approval requests. DF had no alternative but to comply with each request because only BVK could authorize the capital that would save the project.

78. BVK never intended to approve the funding. If it had, it would have acted on the answers it received. Instead, BVK ran out the clock.

79. On January 30, 2024, ten days before maturity, BVK responded to DF's Business Plan Update with "Looks good. I have no further comments."

80. No approval followed.

81. The loan defaulted.

82. By never formally refusing to fund or approving it, BVK ensured that when the loan defaulted there was no decision to point to, only DFA and its operating partner left holding the blame for losses that BVK's inaction caused.

83. In an attempt to salvage the situation, DF helped facilitate a $210 million replacement loan with JP Morgan, which assembled a lending group, completed its approval process, and was ready to close by June 2024.

84. The only step remaining was BVK's approval.

85. JP Morgan spent months waiting.

86. BVK provided no timeline and never gave assent.

87. By November 2024, JP Morgan informed DFA that it considered the relationship "closed."

88. Personal relationships of many years between DFA and the JP Morgan bankers involved were ruptured as a result.

89. The 9200 Wilshire property was thus surrendered to the lender through a deed in lieu of foreclosure in February 2025.

90. In Miami, BVK's inaction ruined a sale at 1757 James Avenue, a part of the Raleigh property.

91. DF had negotiated the deal and executed the contract with the buyer, pending investor approval.

92. BVK delayed this approval for months until the buyer walked away entirely.

93. Because of BVK's inaction, at 685 Fifth Avenue in New York, by mid-2024, 46 of 65 condominium units remained unsold, and the project faced a potential default on its inventory loan, which the project partners had twice extended through forbearance agreements funded by their own emergency capital contributions, putting DFA at significant risk of insolvency.

94. At the Transamerica Pyramid in San Francisco, BVK obstructed multiple leases by refusing to give timely approvals, jeopardizing the success of the project and undermining its asset managers.

95. For instance, Morgan Lewis & Bockius LLP, one of the largest law firm tenancies in San Francisco and a critical anchor for the Transamerica Pyramid's repositioning, signed a letter of intent to lease on November 22, 2024.

96. That letter required a lease to be signed by December 18, 2024.

97. While Morgan Lewis was ready to finalize, that deadline passed because of BVK's delays. DFA's reputation was thus damaged, and Morgan Lewis threatened to sue DFA on February 18, 2025.

98. The lease was ultimately signed on March 6, 2025, thanks to DFA's efforts, and despite BVK's misbehavior.

99. BVK also refused to approve capital expenditure budgets across the portfolio.

100. At Transamerica, BVK ignored DF's repeated requests to approve the 2025 capital expenditure budget after DF updated and submitted its business plan seven times over six weeks: on April 23, 2025; May 5, 2025; May 12, 2025; May 19, 2025; May 28, 2025; June 2, 2025; and June 5, 2025. Seven submissions. Zero responses.

101. At 711 Fifth Avenue, the same pattern repeated.

102. DF sent memos requesting approved business plans on November 27, 2024, and December 8, 2024.

103. No approval was received.

104. Because the business plan was not approved, leasing activities at 711 Fifth Avenue were paused entirely on January 2, 2025.

105. DF continued and submitted budget memoranda to BVK to secure the required investor approval of the 2025 capital expenditure budget on June 2, 2025; July 14, 2025; July 17, 2025; August 1, 2025.

106. Still no approval was received.

107. BVK's refusal to approve a budget did not merely delay leasing—it shut it down.

108. The obstruction was not limited to budgets.

109. Meanwhile, the 2023 audit for 9200 Wilshire (along with all subsequent audits) could not be completed because the investor funding was never provided.

110. Even routine, low-dollar operational approvals were met with silence.

111. BVK's poor management, along with challenging economic conditions, led to substantial underperformance across the investment portfolio.

112. Total losses across BVK's U.S. real estate portfolio may potentially reach an estimated €853 million.

113. BVK's investments failed largely because BVK's interference caused loan defaults, killed transactions, and blocked the leasing activity that its own asset managers needed to succeed. BVK's inaction, after years of exerting almost total control, was causing investments to fail.

114. But BVK could not come clean and tell the truth when that happened. Disclosing the facts of just how active and intrusive it had been would have blown the whistle on its noncompliance at home—exposing conduct that raised serious regulatory issues and corresponding tax consequences.

### D. BVK Scapegoats DF In The Press And Before The German Authorities For Its Own Investment Failures

115. Despite BVK's central role in (mis)managing the investment portfolio, that role was not widely known outside the investment structure.

116. That changed in June 2024 when a then-tenant of two of the portfolio's properties, Core Club, filed suit in New York Supreme Court against BVK, Shvo, and others, claiming approximately $600 million in damages.

117. Among other things, the complaint alleged that BVK exercised actual operational influence and control over the investments as the economically dominant, majority investor in the projects.

118. German media quickly picked up the story and began reporting about the lawsuit.

119. For BVK, a tax-exempt public pension authority whose privileged status depended on maintaining a passive investor role, the public exposure of its operational involvement was an existential threat.

120. That gave BVK a powerful motive to recharacterize its role and to find someone else to blame. And BVK's reaction was swift and dramatic.

121. BVK imposed an internal travel ban prohibiting employees from traveling to the United States.

122. BVK severed all direct communication with both DF and Shvo, cutting off the operational channels that had functioned for years.

123. BVK terminated or reassigned two senior officials who had been centrally involved in the U.S. investments, both of whom were subsequently accused of compliance violations.

124. And BVK began constructing a new (false) public narrative: BVK was not an operationally active investor at all. It rather was merely a passive participant in funds managed by DF and its alleged confidant, Shvo.

125. On September 9, 2024, Business Insider, a U.S. media outlet, published an article stating that a BVK "representative said in an email [to Business Insider] that '[BVK's] investment in [the 9200 Wilshire property] in question has been indirect[] and in accordance with the German regulations applicable to us for investments in foreign projects.'"

126. That statement was a lie, intended to shield BVK from scrutiny and imply that failures in the investment projects were DF's responsibility.

127. As explained above, BVK's actions were anything but "in accordance with the German regulations applicable to" it.

128. On September 26, 2024, a prominent German newspaper, Abendzeitung München ("AZ"), published a major investigative article about BVK's U.S. real estate losses.

129. The article repeated BVK's false assertions that it had "no influence over decisions taken on the ground" at its investments.

130. The article also inaccurately described the flow of funds from BVK, stating that money flows from "the pension authority[,] to the capital management company Universal Investment in Luxembourg, and is then allocated by the fund manager Deutsche Finance, based on Leopoldstrasse in Munich."

131. This description positioned DF—not BVK—as the entity directing capital allocation, precisely the opposite of what actually happened.

132. Apart from those false statements, the article also chronicled the numerous trips, "some by private jet," that BVK personnel took to the United States (including Las Vegas, where BVK did not invest in any property).

133. On July 29, 2025, a new article published by AZ signaled that BVK was seeking to separate from DF, "possibly prematurely."

134. The article also contained non-public information about internal personnel changes at DF, characterized DF as "BVK's investment vehicle," and described at least three of BVK's U.S. projects as failing.

135. On information and belief, that non-public information came from BVK.

136. Those statements implied that DF was responsible for failed investments, rather than BVK.

137. The next day, DFG's Chief Investment Officer wrote an email to BVK's CEO protesting that the article contained information, including non-public

information, "clearly attributable" to BVK and noting that Elektra 2 and BVK's own counsel at A&O Shearman had confirmed to DF in writing on July 17, 2025, that "no information would be provided to the press."

138. BVK broke that agreement within two weeks.

139. DF warned BVK that it would "no longer accept being used as a projection screen for [BVK's] internal or political conflicts" and expressly reserved the right to pursue legal claims based on BVK's public misstatements.

140. DF stated that BVK's characterization of DF's role, particularly regarding operational responsibility, structuring, and management of the investments, was "selective, one-sided, and in parts incorrect."

141. BVK did not change course. It escalated. Within days, the same narrative appeared in multiple trade publications on both sides of the Atlantic.

142. On information and belief, BVK or its agents supplied the information to the publications.

143. On August 7, 2025, the publication Bisnow publicly identified DF by name as the entity responsible for managing BVK's investments.

144. As reported in the article, "BVK has repeatedly said that it has no direct, contractual relationship with Shvo. Instead, its capital was put in a fund managed by Deutsche Finance America, alongside other German funds, which in turn is

invested in real estate projects." DFA does not sponsor, maintain, or manage any investment fund; it acts only as an asset manager.

145. The article quoted BVK as claiming that it was "not unusual to seek a separation [from partners], possibly prematurely, depending on the performance of an investment, the overall market, or the existing interest of third parties."

146. On the same day, Immobilien Zeitung, a prominent German real estate trade journal, published a parallel article describing DF as BVK's "Asset-Manager."

147. The article repeated BVK's "separation" language.

148. And as reported in the article, BVK stated: "It is generally not uncommon for a capital management company like Universal Investment to seek a separation depending on the development of an investment."

149. The article also discussed purported contractual agreements between DF and BVK: "Deutsche Finance's asset management contract with BVK for US real estate runs until 2028 – but perhaps even shorter."

150. The Real Deal, a U.S. media outlet, thereafter repeated, on August 8, 2025, that BVK's capital sat in a "fund managed by Deutsche Finance America."

151. This public repositioning was a lie. DFA does not sponsor, maintain, or manage any investment fund, and it was BVK's own employees who had conducted on-site inspections, attended project meetings, held independent

discussions with financing banks, requested and reviewed alternative business plan scenarios, and directed the structuring of the investment vehicles.

152. But the Core Club lawsuit had exposed the gap between BVK's formal posture and its actual conduct, and BVK tried to close that gap by rewriting history and leaving DF with the fallout.

153. The next step in BVK's strategy was a sustained public campaign to shift blame onto DFA by expressly lying to the media, German authorities, and others that DFA caused the portfolio's underperformance, and that BVK played no part in the portfolio's management.

### E. BVK Publicly Defames And Disparages DF

154. BVK had been seeding the narrative, after which BVK made a batch of false public statements on August 31, 2025, in an interview of BVK's CEO by Welt am Sonntag ("WAMS"), a national German outlet. The relevant part of the interview states:

> WAMS: This was not the only reason why the four projects have problems. Her business partner in the USA seems a bit dubious. After all, it is not an unwritten page in terms of tax law.
>
> [BVK CEO]: **The alternative investment fund manager of the target fund is responsible for selecting local business partners in these investments.** There are formal review procedures for this, which also include trustworthiness and have not revealed any objections.
>
> WAMS: The name of the U.S. real estate developer you're talking about is Michael Shvo. Did your house have direct contact with him?

[BVK CEO]: I personally met him briefly once during a property inspection at the end of 2023. As I said, **Mr. Shvo's selection was not made via BVK. We have made our contributions through the capital management company, which in turn invests in the target funds.** After the first press reports about a lawsuit, this is an occasion for us to take a closer look. We have launched an in-depth investigation, which also involves external auditors. Result: There were violations. We therefore immediately drew conclusions. The signal is clear: such situations will not be tolerated.

…

WAMS: Security is a good keyword. The Bavarian state parliament dealt with some special investments of your company. Why did you invest more than 800 million euros in four dubious, poorly performing real estate projects in the USA?

[BVK CEO]**:** Firstly, we have been investing in US real estate for around 20 years – with success. Secondly, we are talking about 0.7 per cent of our total capital under management. Thirdly, it is not clear to me what is "dubious" about investing in real estate projects in attractive locations. These investments were made before the pandemic, the Ukraine war and the interest rate turnaround. These are developments that no one could have foreseen, they have affected the entire industry. But I don't want to sugarcoat anything here. These projects did not meet our expectations. In the United States, we immediately initiated internal investigations. We take such processes very seriously.

WAMS: What does that mean in concrete terms?

[BVK CEO]: Violations of compliance by external experts have been identified. **They give indications of what we consider to be an inappropriate proximity relationship. We are pursuing something like this hard and it leads to immediate consequences**. In addition, we ourselves informed the public prosecutor's office – not under pressure from third parties, but proactively. We ensure maximum clarification here. It is not possible to say at present whether this is relevant under criminal law.

> WAMS: Let's get down to business: The investments you've gambled away with are in attractive locations such as Miami Beach, San Francisco or New York. Have there been meetings between BVK employees and Mr. Shvo that were attended by family members, friends or other close people and that sound more like a pleasure trip?
>
> …
>
> [BVK CEO]: We are invested in almost all of these projects together with other institutional investors. **The fund manager Deutsche Finance** has also invested in many of the properties itself through retail funds, so that numerous private investors have also contributed capital.
>
> WAMS: Your story is reminiscent of "Stupid German Money" and the banking crisis of 2008, when German financial institutions put their money into US subprime real estate they had no idea about because of low interest rates.
>
> [BVK CEO]: No, it's not comparable. We are talking about a very small part of our total assets – 0.7 percent as of today. **There have been mistakes, yes, and we are learning from them. An example: I clearly assume that project partners who do not meet expectations will be parted with as quickly as possible.** Here you have to put your finger in the wound, and rightly so.

(emphasis added).

155. Those statements were false and implied additional false statements of fact.

156. BVK made itself, not an AIFM or DF, "responsible for selecting local business partners in these investments."

157. BVK was intimately involved in selecting Mr. Shvo, and, on information and belief, BVK's CEO had met him on several occasions.

158. And DF was not the entity that failed to meet expectations. BVK dropped the ball.

159. Following on those false statements, on December 12, 2025, BVK issued a press release that publicly quantified BVK's equity exposure "with Deutsche Finance and SHVO" at approximately €1.6 billion, reported €163 million in write-downs with further exposure bringing the potential total to approximately €853 million, asserted that compliance violations had occurred, and announced tightened partner and know-your-customer measures.

160. The losses BVK quantified were losses that BVK caused its U.S. real-estate portfolio, and the "compliance violations" it asserted were BVK's own improper involvement in investments.

161. But the obvious, undeniable, and false implication of this press release, especially when coupled with its interview and press campaign, was that the losses were caused by DF and that DF committed the violations. Again, that was not true.

162. On January 5, 2026, in response to BVK's false narrative, DF issued a press release to the media correcting the record.

163. DF explained that it had not selected the U.S. investments and had not made the investment decisions; no DF entity was an underlying-fund manager or held authority to select, direct, or approve the investments—those were BVK's decisions.

164. Notwithstanding DF's statement, on January 19, 2026, BVK sent a letter to its members telling them that U.S. losses were attributable in part to "project partners" that "have not fulfilled the expectations placed in them," and that "compliance violations" had been "uncovered."

165. The letter directed members to BVK's website for further detail.

166. Again, that was false. The losses were BVK's fault, not DF's. And the compliance violations were its own doing.

167. The next month, on February 5, 2026, BVK, on information and belief, issued a similar false statement to Immobilien Zeitung. The publication states:

> BVK itself presents itself as a passive, indirect investor without decision-making authority: "BVK only indirectly holds shares in a fund, which in turn invests indirectly passively and together with other investors in the corresponding properties via various target funds. The investment decisions in these target funds and the selection of the service providers involved were mainly made by the AIFM in cooperation with Deutsche Finance. There is no participation in the management of this fund for legal and regulatory reasons."

Like the previous statements in the same vein, those statements were false.

168. Also in February 2026, BVK updated its Q&A webpage with false information.

169. Regarding its U.S. investments, BVK stated that the AIFM "selects … the investment objects, is responsible for the examination and ultimately the specific investment, in this case the respective property."

170. That statement was false. BVK selected the investments and was responsible for the specific investment of all the properties.

171. When discussing the causes of "losses in US real estate investments with Deutsche Finance and SHVO," BVK claimed that one "reason is that the project partners have not fulfilled the expectations placed in them."

172. That statement again falsely blamed DF for its losses in a communication addressed to 2.8 million pension beneficiaries of BVK.

173. These statements were intended and understood to refer to DF.

174. DF and Shvo are named nine times on that webpage, including in four question headings.

175. Next, on March 21, 2026—more than two months after DF had publicly corrected the record—BVK's CEO repeated and escalated the false narrative in a question-and-answer interview published in Münchner Merkur initially and in other outlets shortly thereafter.

176. Asked whether BVK saw itself as a "victim," BVK's CEO said that BVK "had project partners who did not meet our expectations."

177. Although he prefaced the remark by claiming he would "explicitly not nam[e] any names," the interview identified DF by name throughout.

178. BVK's refusal to name DF was thus an empty formalism, born of a guilty conscience and designed to avoid liability. It was clear that all comments were directed at DF.

179. When the interviewer put DF's own position to him—that DF "had nothing to do with the selection of the projects"—BVK's CEO rejected DF's claim.

180. He told readers that DF's statement "irritates us very much," invoking the adage that "success has many fathers, failure only one" and asserting that DF "was significantly involved in the investments in various roles."

181. He incorrectly told readers that "Deutsche Finance and Shvo had already identified the individual investment properties in advance," while dishonestly casting BVK as a passive investor that had merely "invested in US real estate … via a fund of funds structure" and had "no direct contractual relations."

182. Again, these statements were all lies, designed to mislead the German pensioners that BVK had failed and shield BVK's officers from accountability for their disastrous governance.

### F. BVK Lies To German Authorities To Distance Itself From Its U.S. Real Estate Investments

183. In addition to those public false statements, BVK and its officers lied to the German authorities responsible for regulating it, including in a series of public parliamentary statements designed to shield them from accountability, mislead German pensioners, and blame DF.

184. DF includes these statements in this Complaint for purposes of proving BVK's malice and intended meaning behind its public statements.

185. In response to parliamentary inquiries, the Bavarian State Ministry of the Interior ("StMI"), which directly controls and runs BVK, falsely represented to Parliament that BVK played no operational role in the U.S. investments. When making those false statements, the StMI was relying on false information supplied to it by BVK.

186. First, on October 13, 2025, the second parliamentary inquiry into BVK's investment decisions was published as part of the Bavarian Official Record Drs. 19/8108. The inquiry's title captured its subject: "Bayerische Versorgungskammer: Who controls the inspectors?"

187. In this inquiry, the StMI represented this time that "[a]n instruction [for the StMI] to terminate the contracts is legally not possible, ***as the pension funds are not contractual partners of the fund managers***, but the respective capital management company." (emphasis added).

188. In other words, StMI told Parliament that it could not control BVK's fund managers because not even BVK had such a contractual relationship with the fund manager—while BVK, in practice, already exercised control to retain, and terminate, fund managers.

189. Again, that statement was false.

190. Second, on October 20, 2025, the third parliamentary inquiry into BVK's investment decisions was published as part of the Bavarian Official Record Drs. 19/8140.

191. The StMI at this point, in articulating the passive role of BVK in its US real estate investments, stated: "In the case of such indirect investments, there is also no possibility for investors such as the pension institutions in this case to actively participate in the operational activities on site — ***including construction and leasing activities as well as tenant matters.***" (emphasis added).

192. That statement was false. As set forth herein, BVK's own personnel participated in precisely those activities—construction decisions, leasing approvals, tenant negotiations—for years.

193. BVK's reporting to StMI also framed the matter as "real estate investments by Deutsche Finance." That characterization was calculated to shift ownership of the investment failures from BVK to DF.

194. The StMI, again relying on information supplied by BVK, also represented that "the respective management of the properties is currently involved in numerous rental initiatives in order to conclude further leases ***as quickly as possible***." (emphasis added).

195. That was a lie too. At the very time BVK made that representation, it was withholding the budget approvals that DF needed in order to execute those leasing initiatives—as described above.

196. Third, on November 18, 2025, the fourth parliamentary inquiry into BVK's investment decisions was published as part of the Bavarian Official Record Drs. 19/8521. The inquiry revealed that a preliminary investigation by the Munich I Public Prosecutor's Office was focused on "whether there is an initial suspicion of criminal offences, in particular embezzlement."

197. Fourth, in a parliamentary answer provided on March 23, 2026, the StMI stated that in its relationship with DF, BVK "acted merely as a fund investor" and that "[t]he investment decisions in these target funds were taken principally via the Alternative Investment Fund Manager (AIFM), with the participation of the Deutsche Finance Group." The answer likewise provided that "[t]he investment decisions in these target funds, as well as the selection of the service providers involved, were, according to information from [BVK] effected principally via the respective AIFM with the participation of the Deutsche Finance Group or companies affiliated with it," and "[a]ccording to its own information, [BVK] was not involved in matters of the operational day-to-day business of the real estate management of the target funds."

198. For the reasons stated above, those statements were false.

199. BVK's misrepresentations to the Bavarian Parliament were not merely an exercise in blame shifting. Every statement BVK made to Parliament—that it had no involvement in construction, leasing, or tenant matters; that the investments were "Deutsche Finance's"; that BVK's role was limited—was calculated to build a public record that BVK could later point to if German tax authorities or other authorities questioned whether BVK had crossed the line from passive investor to active manager.

200. BVK's campaign extended beyond Parliament to a second arm of the German state. Beginning on or about August 13, 2025, and continuing through additional submissions in early 2026, BVK wrote to the German Federal Financial Supervisory Authority (Bundesanstalt für Finanzdienstleistungsaufsicht, or "BaFin") and urged the regulator to open a supervisory investigation directed at DF.

201. In its submissions to the regulator, BVK asserted that DF—not BVK—controlled the investment structures, and suggested that DF had exploited that control to create self-serving and effectively interminable fee arrangements and to engage in undisclosed self-dealing at investors' expense.

202. Those assertions were false.

203. As set forth above, it was BVK, not DF, that controlled the investments: DF did not select the properties, did not make the investment decisions, and did not control BVK's capital. BVK knew as much when it made these representations, yet

it made them anyway—to a German financial regulator—in order to recast DF as the party responsible for BVK's own losses.

204. That BVK was willing to press this false narrative, including before a financial regulator, confirms that its conduct was neither inadvertent nor isolated; it was a deliberate campaign to deflect responsibility onto DF and to damage DF before every audience that mattered.

**G. The U.S. And Foreign Press Repeat BVK's False Narrative**

205. Numerous publications all over the world, including in the United States, picked up on and repeated as fact BVK's false narrative.

206. On September 4, 2025, the Real Deal again repeated that BVK's capital sat in a "fund managed by Deutsche Finance America." As previously noted, DFA does not sponsor, maintain, or manage any investment fund.

207. On December 16, 2025, Institutional Money reported on BVK's December 2025 press release.

208. On December 18, 2025, BVK's false December 12, 2025 press release was reproduced in English for an international audience by European Pensions.

209. On January 28, 2026, BVK's false member letter from January 19 blaming "project partners" was carried into the U.S. market by the San Francisco Standard.

210. On February 2, 2026, the U.S. financial press picked up BVK's narrative when Bloomberg described the approximately €1.6 billion of equity BVK had invested in U.S. real estate "with Deutsche Finance and Shvo" and reported that, "according to BVK," the losses on those investments reflected not only the post-pandemic market but also "project partners" that were "not meeting expectations." To Bloomberg's U.S. readership of investors and real-estate professionals, that statement conveyed that DF was a responsible partner in, and a cause of, the losses on those investments.

211. On February 3, 2026, a Bisnow article repeated much of the same story. So too did the Promote, an English-language real-estate newsletter, the next day. As did the San Francisco Standard on February 25, 2026.

212. Also on February 25, 2026, the German outlet New York Aktuell incorrectly reported, based on the false statements in the August 2025 interview of BVK's CEO, that DF selected Shvo to manage assets. Though that was a technical misquote, it demonstrates the clear implications of BVK's false narrative.

213. On May 13, 2026, in an article reporting that BVK had "lost $1B on a risky U.S. real estate bet," the Real Deal carried into the United States the March 2026 false statement by BVK's CEO that DF and Shvo had "identified the [investment] properties in advance of BVK's investment."

214. DF put the Ministry of the Interior as the supervisory body of BVK and the Budget and Finance Committee on written notice by letters of April 30 and May 18, 2026, identifying the false statements. BVK's Q&A nonetheless remained unchanged, still naming DF among the causes of the losses. Meanwhile, BVK's Co-CEO privately acknowledged to DF that BVK—not DF—had decided to execute the Transamerica sale even as BVK publicly distanced itself.

215. Over the course of this entire time span, DF received numerous press inquiries, including from many U.S. outlets, regarding BVK and its U.S. investments.

* * *

216. The narrative BVK presented to the public and regulatory authorities was false. BVK was not a passive investor. It was the primary decision-maker over its U.S. real estate investments—from the initial acquisition of each property through the ongoing management of the portfolio. The voluminous documentary record shows that BVK personnel made investment decisions before UI was even informed, conducted on-site property inspections that UI did not attend, maintained direct operational relationships with the co-managing partner that BVK later denied existed, and exercised control over financing, pricing, capital, and fee decisions at the individual property level. DF reserves the right to plead additional facts to establish any of these points.

### H. BVK's Campaign Inflicted Direct And Lasting Harm On DF's Business And Reputation

217. DF's business is the sponsorship and management of private-market real estate investments, and its livelihood depends on the confidence of the institutions and investors that entrust it with capital and mandates. Those constituencies include the pension funds, insurers, and other institutional investors that commit large mandates; the tens of thousands of retail investors to whom DFG markets its funds; the distribution partners and placement agents through which those funds are sold; the lenders that finance the assets DF manages; and the consultants and gatekeepers who screen managers before capital is committed.

218. In an industry in which reputation is the principal asset, a manager publicly branded by a marquee institutional backer as incompetent and responsible for the loss of hundreds of millions of dollars is, as a practical matter, disqualified in the eyes of the allocators and gatekeepers on whom its business depends.

219. As alleged, BVK did not confine its false narrative to a private dispute. It published that narrative to the world. BVK's narrative appeared in the German, European, and United States real estate and financial trade press that DF's investors, distribution partners, and financing counterparties read and rely upon—including Immobilien Zeitung, a leading German real estate trade journal that identified DF by name as BVK's "Asset-Manager," and Bisnow, a leading U.S. real estate publication that identified DF by name as the entity responsible for managing BVK's

investments, as well as Bloomberg. BVK broadcast the same message to a national German audience through Welt am Sonntag and Münchner Merkur, communicated it directly to its 2.8 million pension beneficiaries through its own website, and ensured that more media outlets would pick up the story by repeating it in parliamentary inquiries.

220. The audiences BVK chose were not incidental; they were DF's market.

221. The messages those audiences received were unmistakable and damaging: that DF had mismanaged billions of dollars of investments while BVK stood passively by, and that BVK—DF's most prominent institutional client—was severing its relationship with DF, "possibly prematurely," because of DF's failures.

222. Repeated across multiple outlets on both sides of the Atlantic—and reinforced by BVK's public suggestion that DF's management contract, though nominally running through 2028, might end sooner—the statements signaled to DF's entire market that its flagship institutional backer regarded it as incompetent and was terminating it for cause.

223. No institutional allocator, distribution partner, or financing counterparty could read that message and remain indifferent to it.

224. The consequences were concrete. Before BVK's campaign began in the fall of 2024, DF and its affiliates maintained an established and ongoing fundraising and business-development franchise, having successfully sponsored,

placed, and managed a series of real estate funds and investment mandates. After BVK launched and escalated its campaign, DF and its affiliates were unable to raise new capital and win new mandates in the ordinary course of business.

225. For instance, in the United States, a financing relationship with JP Morgan, the largest U.S. commercial bank, was lost. Similarly, the IF24 Austin Logistics fund was in active placement for DF in late 2025, but in the immediate environment of the 2025 statements, and due to the BVK controversy, only a fraction of the target volume was raised. The public portrayal of DF in the United States likewise undermined a partner's confidence in a 2025 partnership for Austin Logistics.

226. In Europe, DFG's asset-manager rating was placed under review for possible downgrade and was ultimately withdrawn, and major distribution partners, including listed companies and banks, curtailed or withheld business pending resolution of the BVK matter, with DFG's retail distribution declining in step with BVK's public statements and in several instances explicitly because of them.

227. This harm is distinct from, and in addition to, the project-level losses that BVK's operational obstruction caused. It did not flow from market conditions or from the performance of any individual property; it flowed from BVK's false public statements about DF's competence and responsibility. The timing confirms the causal link: DF's fundraising and business-development difficulties followed

the onset of BVK's campaign in the fall of 2024 and tracked its escalation across outlets and audiences thereafter.

228. The harm is also continuing. DF's capital-raising franchise remains impaired, and DF has been forced to divert resources to responding to and containing BVK's false narrative among its investors, distribution partners, financing counterparties, and other institutional stakeholders.

### I. BVK Attempts To Strip DF Of Its Contractually Guaranteed Management Fees

229. Against this backdrop of systematic obstruction across multiple properties and public scapegoating of DF, BVK escalated to try to force DF out of the management of various properties in the investment structure. Specifically, it sought to deprive DF of its contractually owed management fees for the Transamerica Pyramid.

230. In October 2020, DFA (through an affiliate) entered into an Asset Management Agreement with non-party BHSD Pyramid JVCo LLC to serve as asset manager for the Transamerica Pyramid. Under that agreement, DFA's management obligations were advisory in nature: it was to "recommend, advise and assist" the joint venture on leasing, construction, financing, and operational matters. For these services, DFA would be paid a "Management Fee." Under a separate agreement executed the same day, DFA's co-manager, Shvo, was also entitled to receive (until

his later termination) a management fee, leasing fee, property management fee, and construction fee for related services at the Transamerica Pyramid.

231. In September 2024, DFA, Elektra 2, and other non-parties amended this agreement. In a new "Term Sheet," DF agreed to receive substantially less in fees across the portfolio by terminating its management of certain properties and making other management agreements terminable in years to come. In return, DF insisted on a critical fee protection for its management of the Transamerica Pyramid: If DF's affiliate, the "Transamerica Managing Member," was "terminated before December 31, 2028," which would in the ordinary course deprive DF of its ability to collect fees, DF would nonetheless "be entitled to receive … all fees that would have been payable to DF through December 31, 2028 had such termination not occurred … and during such time DF shall be deemed a consultant entitled to be paid for such fees."

232. Over a year later, on December 31, 2025, BVK's counsel sent DFA an Information Notice stating that the "Fund's investor" "will not provide any further funding" to the Transamerica investment while DFA remains in the management structure. It demanded that, within five days, DF exit "with immediate effect and without receiving any compensation payment." DF declined.

233. By January 2026, the Transamerica Pyramid had also accumulated approximately $8 million in overdue construction payables (the majority 60-90 days

past due); multiple contractors were threatening liens; a tenant had issued a Payment Notice; and critical vendors were threatening to reduce staffing.

234. By the end of 2025, the property owed $4.8 million in unsecured debts, which continued to increase in January 2026.

235. In addition, a $3.2 million debt service payment was due on February 10, 2026, and failure to make that payment would constitute an event of default under the loan, putting the entire project, including a DF-managed retail investment of more than $100 million, at risk of total loss.

236. Without consulting DFA, on January 27, 2026, BVK, through Elektra 2, together with its advisor and a co-managing partner, negotiated the sale of the Transamerica Pyramid.

237. BVK, through its affiliates, then withheld the management fees that became due on January 1, 2026, until DF consented to the Purchase and Sale Agreement of the property on February 11, 2026.

238. That sale had critical import for DFA under the Term Sheet. The sale resulted in the termination of DF's affiliate, the Transamerica Managing Member, from its managing role. The Purchase and Sale Agreement does not allow for the Transamerica Managing Member to maintain its position after the sale. Accordingly, this termination triggered the Term Sheet's provision that "DF shall be

entitled to receive … all fees that would have been payable to DF through December 31, 2028 had such termination not occurred."

239. Those total fees amount to $31,384,061.

240. But BVK has fought tooth and nail to prevent DF from receiving its fees under the Term Sheet. Through its counsel, BVK demanded that DFA exit the management role without any fees, and it threatened to withhold all funding until it did so. In an email on February 4, 2026, BVK's counsel also asked all relevant parties for consent for the sale's escrow agent to send proceeds directly to upper-tier investors, including entities controlled by Elektra 2, thereby bypassing the entity within the Transamerica Pyramid investment structure that was responsible for paying DF. DF did not consent.

241. In the end, the parties agreed that all funds could be held by a third party pending an arbitration between Elektra 2 and DF of the parties' various claims to these funds.

242. That arbitral proceeding is ongoing. But BVK is not a party to it and has refused to produce documents or witnesses relating to the arbitration.

### J. Elektra 2 Acted As BVK's Agent And Alter Ego In The Transactions At Issue

243. Elektra 2 is not an independent economic actor. It is the vehicle that BVK created, funded, staffed at the decision-making level, and controlled in order to hold and deploy BVK's capital in U.S. real estate. Throughout the events

described above, Elektra 2 acted as BVK's agent, with BVK's authority and at BVK's direction, in making the investment decisions at issue and in negotiating, executing, and refusing to perform the Term Sheet. In the alternative, BVK so dominated Elektra 2 and so disregarded its separate existence that Elektra 2 was BVK's alter ego.

244. Elektra 2 carries BVK's name. Its full legal name is BAYVK Immobilien-Dachfonds 1 SCS SICAV-SIF Subfonds Elektra 2 SCS SICAV-FIS. The "BAYVK" in that name stands for Bayerische Versorgungskammer. Elektra 2 is a sub-fund of BAYVK Immobilien-Dachfonds 1, a fund organized to hold BVK's capital, and BVK is the only investor in that fund.

245. Elektra 2 exists for one purpose: to deploy BVK's pension capital into the international real estate investments BVK selects. On information and belief, Elektra 2 has no other line of business, no independent investment program, no third-party capital, and no employees, offices, or operations of its own. The administrative functions nominally performed at the fund level were carried out by UI, which as alleged above acted only after BVK had decided what would be done.

246. BVK bore the entire economics of Elektra 2's investments in the properties at issue. BVK supplied the equity, BVK was entitled to the distributions, and BVK absorbed the losses. When the Transamerica Pyramid was sold in March 2026, the sale proceeds ran to BVK. Elektra 2 was, as a matter of economic

substance, a conduit for enriching BVK and, when the investments failed, a conduit for BVK's losses.

247. Most tellingly, BVK staffs and chairs the organ through which Elektra 2's investment decisions are made. Andre Heimrich, BVK's Chief Investment Officer, is the Chairman of Elektra 2's Investment Committee. The written decision recommendations of that Investment Committee were the instrument by which the investments at issue were authorized, and Mr. Heimrich executed them in Munich, at BVK's seat. For example, on or about December 6, 2019, the Investment Committee of "BAYVK Real Estate Fund of Funds 1 — Elektra 2" issued a written recommendation authorizing an equity increase of approximately $206.3 million for the acquisition of 530 Broadway in New York. The vote was executed by "Heimrich (Chairman)" at "Munich" and returned to UI in Luxembourg for processing.

248. BVK itself did not distinguish between its own decisions and Elektra 2's. BVK described an investment authorization issued by Elektra 2's Investment Committee concerning the Transamerica Pyramid as a "positive vote from BVK."

249. UI treated BVK, rather than Elektra 2 or itself, as the party whose approval was required before the fund could act. In December 2024, UI reported that "Universal expects formal approval from BVK by December 18, 2024, allowing them to sign the subscription agreement." The regulated manager could not execute the fund's subscription documents until BVK signed off.

250. BVK did not merely accept or reject proposals put to it. It dictated the terms on which the fund would invest. In February 2024, in connection with the refinancing of 9200 Wilshire, BVK's personnel instructed DF that "BVK's approval is subject to" DF and Shvo first injecting $13 million of their own capital, the subordination of DF's and Shvo's preferred equity to BVK's preferred equity, and a guarantee that BVK's Investment Committee would regard as "rock solid" and capable of being "easily … enforced and encashed." Those are the demands of a principal setting deal terms, not the observations of a passive limited partner.

251. When the formal chain of authority was inconvenient, BVK went around it. As alleged above, BVK issued a proof-of-funds letter directly to a seller committing BVK to a purchase, told DF that funds "would have to go to the USA first without UI's signatures," instructed an operating partner by direct email to lock in the interest rate on project financing, and released capital without obtaining the signatures of its own investment committee. Elektra 2 and UI conformed to each of those decisions after the fact.

252. Moreover, in the first half of 2025, BVK, acting through Elektra 2, required the partnership holding four of BVK's properties to assume payment obligations to Mr. Shvo arising under a February 28, 2025 agreement to which neither the partnership nor its manager—a DF affiliate—was a party and into which neither had any insight. Shortly after DF's affiliate declined to release the payment,

the partnership was renamed and the DF affiliate was replaced by Elektra 2 Investment GP SARL (the "Elektra 2 General Partner")—an entity whose sole corporate purpose, fixed a month earlier, was to serve as general partner of this partnership and whose registered office is the address of BVK's AIFM in Luxembourg. On July 30, 2025, the Elektra 2 General Partner caused the partnership to accede to the February 28 agreement, and an $85.3 million payment to Mr. Shvo followed.

253. DF's contemporaneous documents were addressed to BVK as the principal, because BVK was the principal. DF submitted investment and refinancing memoranda addressed "To: BVK Anlageausschuss." In June 2024, DF's senior executives wrote directly to three BVK officials about the 9200 Wilshire refinancing, described institutional tenants then negotiating to lease space "in one of your buildings," and expressly distinguished between "BVK's internal real estate team" and "its AIFM, Universal Investment."

254. The AIFM structure did not operate as an independent check on BVK. BVK required a recommendation from UI as a procedural predicate to BVK's own decision, and no investment, refinancing, capital call, disposition, or lease at issue in this Complaint was ever authorized over BVK's objection or without BVK's approval. Elektra 2 never took a position contrary to a decision BVK had made.

255. BVK's control extended to the Term Sheet itself. BVK negotiated the Term Sheet, on behalf of its alter ego, Elektra 2. After execution, BVK's own counsel, rather than counsel for Elektra 2, communicated the fund's positions to DF, including the December 31, 2025 Information Notice demanding that DF exit the Transamerica management structure without compensation and the February 4, 2026 request to reroute sale proceeds around the entity obligated to pay DF.

256. BVK likewise directed the conduct that terminated DF's role. Without consulting DFA, BVK, through Elektra 2, negotiated the sale of the Transamerica Pyramid, and BVK's Co-CEO privately acknowledged to DF that BVK—not DF and not Elektra 2—had decided to execute that sale.

257. BVK accepted and retained the benefits of the Term Sheet, including DF's agreement to relinquish fees and to make certain management agreements terminable across the portfolio. BVK thereby authorized and ratified Elektra 2's execution of the Term Sheet.

258. For all of these reasons, Elektra 2 acted as BVK's agent, with BVK's actual authority, in the transactions and agreements at issue, and BVK is bound by and responsible for Elektra 2's acts and undertakings.

259. In the alternative, Elektra 2 was BVK's alter ego for the same reasons, and observing the fiction of separateness would work an injustice: It would permit BVK to take the benefits of contracts made in the United States and of U.S. property

held for its exclusive economic account, while disclaiming the obligations those contracts impose and publicly denying to regulators, to the press, and to its own beneficiaries the very relationship through which it directed them.

## CLAIMS FOR RELIEF

## COUNT I
### Breach Of Contract

260. Plaintiffs incorporate and re-allege each preceding paragraph as if fully set forth herein.

261. In September 2024, DFA and Elektra 2 signed a Term Sheet governing the management of the properties out of which this claim arises.

262. Plaintiff DFA is a party to the Term Sheet. Plaintiff DFG is entitled to enforce the Non-Disparagement Clause quoted below, which by its terms protects each party's "Affiliates," and DFG is an Affiliate of DFA.

263. That Term Sheet contains a "Non-Disparagement Clause," which provides, in full:

> Each party agrees not to disparage any other party, or any other party's attorneys, directors, managers, partners, employees, agents and Affiliates, in relation to the transactions contemplated by this Term Sheet in any manner likely to be harmful to them or their business, business reputation or personal reputation; provided that any party may respond accurately and fully to any question, inquiry or request for information when required by legal process, regulation or governmental inquiry.

264. As alleged above, BVK breached that clause by making multiple defamatory statements about DF. This public campaign by BVK conveyed that DF had mismanaged billions of dollars in investments while BVK stood passively by, and that BVK was now distancing itself from DF because of those failures.

265. That breach injured DF, and DF's injury is continuing and is not limited to the lost business already identified. DF has incurred, and continues to incur, additional costs to respond to and contain BVK's campaign among its investors, distribution partners, financing sources, and other institutional stakeholders, and DF's capital-raising franchise remains impaired going forward. DF is entitled to recover these actual damages in an amount to be determined at trial.

266. That contractual breach is imputed to BVK. As alleged above, Elektra 2 acted as BVK's agent, with BVK's authority, in negotiating and executing the Term Sheet; BVK negotiated the agreement; a BVK executive executed it on Elektra 2's behalf; and BVK authorized and ratified it and accepted its benefits. In the alternative, Elektra 2 was BVK's alter ego. Under either theory, BVK is bound by the Term Sheet's Non-Disparagement Clause and is liable for its breach.

267. Finally, BVK, through Elektra 2, breached its contractual duties to pay DF its fees owed upon termination of the agreement. This Complaint does not seek to litigate this separate breach, which is being litigated in the pending arbitration against Elektra 2. But upon conclusion of the arbitration, DF reserves the right to

amend the Complaint to seek enforcement of any arbitration award that issues against BVK under an alter ego, agent, or other theory.

## COUNT II
**Defamation**

268. Plaintiffs incorporate and re-allege each preceding paragraph as if fully set forth herein.

269. As alleged above, BVK made multiple defamatory statements about DF. This public campaign by BVK conveyed a single, false message to industry readers: that DF had mismanaged billions of dollars in investments while BVK stood passively by, and that BVK was now distancing itself from DF because of those failures.

270. These statements were false and defamatory. BVK—not DF—was the primary decision-maker over its U.S. real estate investments and it exercised direct control over every aspect of its holdings. BVK was responsible for its own investment failures, not DF.

271. BVK made these statements knowing that they were false, or with reckless disregard for their truth or falsity. BVK's own personnel selected the properties, approved each investment, directed capital commitments, and controlled leasing, financing, and pricing decisions, so BVK knew that its public attribution of those decisions to DF was false when it made it. DF further put BVK on written notice that the statements were false—publicly on January 5, 2026, and by letters of

April 30 and May 18, 2026—and BVK persisted. At a minimum, BVK acted negligently, and to the extent DF is treated as a limited-purpose public figure, BVK acted with actual malice.

272. These defamatory statements were published in widely read journals and platforms all over the world, including in the United States. And they referred to DF explicitly and by name.

273. Readers understood the defamatory character of these statements. That is why the statements caused fundraising to dry up for DF.

274. BVK's statements are defamatory per se. They do not concern an isolated error in a single transaction; they impugn DF's basic integrity, honesty, and competence in the very conduct of its trade and business by falsely charging DF with general incompetence and unfitness as an asset manager and with responsibility for the mismanagement of billions of dollars of investments. Such statements, directed at a professional asset manager in the exercise of its profession, are actionable without proof of special damages, and injury to DF is presumed.

275. Beyond the injury that the law presumes, DF suffered substantial actual harm as alleged above.

276. DF's injury is continuing and is not limited to the lost business already identified. DF has incurred, and continues to incur, additional costs to respond to and contain BVK's campaign among its investors, distribution partners, financing

sources, and other institutional stakeholders, and DF's capital-raising franchise remains impaired going forward.

277. DF is entitled to recover these actual damages in an amount to be determined at trial.

## COUNT III
### Deceptive Trade Practices Under The Delaware Deceptive Trade Practices Act

278. Plaintiffs incorporate and re-allege each preceding paragraph as if fully set forth herein.

279. In the course of explaining its business—specifically, the underperformance of its investments—BVK made multiple false statements of fact about DF. As alleged above, they conveyed a false message that DF mismanaged billions of dollars in investments while BVK stood passively by and that BVK was now distancing itself from DF because of those failures.

280. These false statements disparaged the asset management services of DF: claiming that DF performed work it did not do, and that it was responsible for failings attributable instead to BVK.

281. BVK's violations were willful. BVK knew, or should have known, that the conduct described above was of the nature prohibited by the Act. 6 *Del. C.* § 2533(b), (e).

282. As a result of these false statements, DF lost business and suffered reputational injury. DF is a person likely to be damaged by BVK's continuing deceptive trade practices and is entitled to reasonable attorneys' fees under 6 *Del. C.* § 2533(b) and to trebling of any damages awarded on its common-law claims under 6 *Del. C.* § 2533(c).

**COUNT IV**
**Tortious Interference With Contract (By DFA Only)**

283. Plaintiffs incorporate and re-allege each preceding paragraph as if fully set forth herein. This Count is alleged in the alternative if this Court were to find that Elektra 2 was not BVK's agent or alter ego.

284. DFA has a binding contract—the Term Sheet—with non-party Elektra 2 and other non-parties that entitles it to management, leasing, property, and construction fees. Specifically, the Term Sheet guarantees that if the "Transamerica Managing Member" was "terminated before December 31, 2028," DF would "be entitled to receive … all fees that would have been payable to DF through December 31, 2028 had such termination not occurred." The sale of the Transamerica Pyramid on March 26, 2026, terminated the Transamerica Managing Member. And DF is owed the fees that it would have received through December 31, 2028.

285. Defendant BVK knew of this contract. The Term Sheet was signed by non-party Elektra 2, BVK's central vehicle for capital investments, and BVK's

attorney referenced the agreement in a December 31, 2025 letter to DF asking it to exit the management role without payment.

286. BVK intentionally acted in such a way as to cause Elektra 2 to violate the Term Sheet and prevent DF from obtaining its fees. Specifically, BVK's attorney demanded that DF exit the management of the Transamerica Pyramid without any fee payments, and through Elektra 2, it refused to offer any more funds to the project while DF remained. And in an email on February 4, 2026, BVK's counsel sought to reroute funds payable to DF to entities controlled by Elektra 2, essentially guaranteeing that DF would not receive payment. These actions were a significant factor in causing Elektra 2 to repudiate its obligations under the Term Sheet and claim, in a March 9, 2026 letter, that DF would not receive any fees after the sale of the Transamerica Pyramid.

287. BVK had no legitimate reason to interfere with DF's contractually owed payments. Instead, consistent with its own false narrative, BVK sought to scapegoat DF as the cause for the substantial underperformance of BVK's investments. Tellingly, BVK did not try to block Elektra 2 from paying Michael Shvo $45,063,452 for the same categories of fees (along with carried interest) under an identical termination-protection provision covering the termination of his role in the management of the Transamerica Pyramid.

288. BVK's interference with DFA's contractual rights has prevented DFA from receiving the $31,384,061 in fees it is entitled to under the Term Sheet.

289. BVK tortiously interfered with DFA's contract rights in bad faith. BVK arranged for Elektra 2 to pay Shvo $45,063,452 for the same categories of fees (plus carried interest) under an identical termination-protection provision, while insisting DF exit for nothing. There is no good faith basis to treat the two parties any differently.

**COUNT V**
**Tortious Interference With Prospective Business Relations**

290. Plaintiffs incorporate and re-allege each preceding paragraph as if fully set forth herein.

291. DF had a reasonable probability of entering into and continuing specific business relationships, including its financing relationship with JP Morgan; the placement of the IF24 Austin Logistics fund, which was in active placement in late 2025; a 2025 partnership for Austin Logistics; and mandates and allocations from the institutional investors, distribution partners, placement agents, consultants, gatekeepers, and lenders identified above.

292. BVK intentionally interfered with DF's business opportunities by deliberately delaying approval and obstructing business decisions to thwart any chance of success.

293. BVK also intentionally interfered with those prospective relationships by publishing the false statements described above to the very audiences on which DF's business depends—institutional allocators, distribution partners, placement agents, consultants, and lenders. BVK knew of those prospective relationships, and its interference was wrongful and without justification.

294. BVK made its intentional interference perfectly clear in its demand that DFA exit the management structure—without any payment of applicable fees: It would use its control over the portfolio to squeeze DF for funds until it complied.

295. As a result of BVK's actions, DFA lost substantial revenue. DFA also lost valuable goodwill and personal relationships that are critical to DFA's long-term operational viability and success.

## PRAYER FOR RELIEF

Plaintiffs respectfully demand a trial by a jury of twelve persons and request entry of judgment in favor of Plaintiffs and against Defendant, and that the Court grant the following relief:

a. a money judgment awarding Plaintiffs compensatory damages in an amount to be determined at trial;

b. trebling, under 6 *Del. C.* § 2533(c), of the damages awarded to Plaintiffs on their common-law claims;

c. pre-judgment interest as permitted by law, accruing from the date each of Plaintiffs' claims arose, and post-judgment interest;

d. Plaintiffs' costs of suit and reasonable attorneys' fees, including under 6 *Del. C.* § 2533(b); and

e. such other and further relief as the Court deems just and proper.

*/s/ Michael A. Barlow*

Michael A. Barlow (#3928)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
500 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 302-4000
michaelbarlow@quinnemanuel.com

*Attorneys for Plaintiffs Deutsche Finance America LLC and DF Deutsche Finance Holding AG d/b/a Deutsche Finance Group*

OF COUNSEL:

Alex H. Loomis
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, Massachusetts 02199
(617) 712-7100

Derek L. Shaffer
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
555 13th Street NW, Suite 600
Washington, D.C. 20004
(202) 538-8000

Dated: August 31, 2026

# SUPERIOR COURT
# CIVIL CASE INFORMATION STATEMENT (CIS)

EFiled: Aug 31 2026 05:00PM EDT
Transaction ID 80509082
Case No. N26C-08-455 KMM CCLD

COUNTY: **N** x K S CIVIL ACTION NUMBER:____________________

| | |
|---|---|
| Caption:<br>Deutsche Finance America LLC;<br>DF Deutsche Finance Holding AG d/b/a<br>Deutsche Finance Holding AG,<br>Plaintiffs,<br>v.<br>Bayerische Versorgungskammer,<br>Defendant | Civil Case Code: CCLD<br>Civil Case Type: Complex Commercial Litigation<br>(SEE REVERSE SIDE FOR CODE AND TYPE)<br>MANDATORY NON-BINDING ARBITRATION (MNA) No<br>Name and Status of Party filing document:<br>Plaintiffs Deutsche Finance America LLC;<br>DF Deutsche Finance Holding AG<br>Document Type:(E.G.; COMPLAINT; ANSWER WITH COUNTERCLAIM)<br>Complaint<br>JURY DEMAND: YES X NO ______ |
| ATTORNEY NAME(S):<br>Michael A. Barlow<br>ATTORNEY ID(S):<br>#3928<br>FIRM NAME:<br>Quinn Emanuel Urquhart & Sullivan<br>ADDRESS:<br>500 Delaware Avenue, Suite 1400<br>Wilmington, DE 19801<br>TELEPHONE NUMBER:<br>(302) 302-4000<br>FAX NUMBER:<br>(302) 302-4010<br>E-MAIL ADDRESS:<br>michaelbarlow@quinnemanuel.com | IDENTIFY ANY RELATED CASES NOW PENDING IN THE SUPERIOR COURT OR ANY RELATED CASES THAT HAVE BEEN CLOSED IN THIS COURT WITHIN THE LAST TWO YEARS BY CAPTION AND CIVIL ACTION NUMBER INCLUDING JUDGE'S INITIALS:<br>None<br>EXPLAIN THE RELATIONSHIP(S):<br>N/A<br>OTHER UNUSUAL ISSUES THAT AFFECT CASE MANAGEMENT:<br>Defendant is a foreign state (28 U.S.C. § 1603); service must be made under 28 U.S.C § 1608(a) via Hague Convention<br>(IF ADDITIONAL SPACE IS NEEDED, PLEASE ATTACH PAGE) |

**THE PROTHONOTARY WILL NOT PROCESS THE COMPLAINT, ANSWER, OR FIRST RESPONSIVE PLEADING IN THIS MATTER FOR SERVICE UNTIL THE CASE INFORMATION STATEMENT (CIS) IS FILED. THE FAILURE TO FILE THE CIS AND HAVE THE PLEADING PROCESSED FOR SERVICE MAY RESULT IN THE DISMISSAL OF THE COMPLAINT OR MAY RESULT IN THE ANSWER OR FIRST RESPONSIVE PLEADING BEING STRICKEN.**

# SUPERIOR COURT CIVIL CASE INFORMATION STATEMENT (CIS) INSTRUCTIONS

## CIVIL CASE TYPE

Please select the appropriate civil case code and case type (e.g., **CODE - AADM** and **TYPE - Administrative Agency**) from the list below. Enter this information in the designated spaces on the Case Information Statement.

**APPEALS**
AADM - Administrative Agency
ABOA - Board of Assessment
ACER - Certiorari
ACMB - Commission Marijuana Board
ACCP - Court of Common Pleas
AIAB - Industrial Accident Board
APSC - Public Service Commission
APCA - Purchaser Card JP Court Appeal
AUIB - Unemployment Insurance Appeal Board

**COMPLAINTS**
CABT - Abatement
CASB - Asbestos
CAAA - Auto Arb Appeal
CMIS - Civil Miscellaneous
CACT - Class Action
CCON - Condemnation
CCLD - Complex Commercial Litigation Division **(NCC ONLY)**
CDBT - Debt / Breach of Contract
CDEJ - Declaratory Judgment
CDEF - Defamation
CEJM - Ejectment
CATT - Foreign & Domestic Attachment
CFJG - Foreign Judgment
CFRD - Fraud Enforcement
CINT - Interpleader
CLEM - Lemon Law
CLIB - Libel
CMAL - Malpractice
CMED - Medical Malpractice
CPIN - Personal Injury
CPIA - Personal Injury Auto
CPRL - Products Liability
CPRD - Property Damage
CRPV - Replevin
CSPD - Summary Proceedings Dispute
CCCP - Transfer from CCP
CCHA - Transfer from Chancery
CWCC - Wrongful Conviction Compensation

**MASS TORT**
CABI - Abilify Cases
CBEN - Benzene Cases
CDEP - Depo Provera
CFAR - Farxiga Cases
CFIB - FiberCel Cases
CGLP - GLP1 Receptor Agonist
CHON - Honeywell Cases
CJLI – Juul Labs, Inc
CMON - Monsanto Cases
COCC - Occidental Chemical Cases
CPEL - Pelvic Mesh Cases
CPLX - Plavix Cases
CPPI - PPI Cases
CPQT - Paraquat Cases
CTAL - Talc Cases
CTAX - Taxotere Cases

**MASS TORT Cont.**
CXAR - Xarelto Cases
CZAN - Zantac Cases

**INVOLUNTARY COMMITMENTS**

INVC- Involuntary Commitment

**MISCELLANEOUS**
MAGM - AG Motion - Civil/Criminal Investigations *
MADB - Appeal from Disability Board *
MAFF - Application for Forfeiture
MAAT - Appointment of Attorney
MGAR - Appointment of Guardianship
MCED - Cease and Desist Order
MCON - Civil Contempt/Capias
MCVP - Civil Penalty
MSOJ - Compel Satisfaction of Judgment
MSAM - Compel Satisfaction of Mortgage
MCTO - Consent Order
MIND - Destruction of Indicia of Arrest *
MESP - Excess Sheriff Proceeds
MHAC - Habeas Corpus
MTOX - Hazardous Substance Cleanup
MFOR - Intercept of Forfeited Money
MISS - Issuance of Subpoena
MLEX - Lien Extension
MMAN - Mandamus
MWIT - Material Witness *
MWOT - Material Witness - Out of State
MRAT - Motion for Risk Assessment
MROP - Petition for Return of Property
MCRO - Petition Requesting Order
MROD - Road Resolution
MSEL - Sell Real Estate for Property Tax
MSEM - Set Aside Satisfaction of Mortgage
MSSS - Set Aside Sheriff's Sale
MSET - Structured Settlement
MTAX - Tax Ditches
MREF - Tax Intercept
MLAG - Tax Lagoons
MVAC - Vacate Public Road
MPOS - Writ of Possession
MPRO - Writ of Prohibition

**MORTGAGES**
MCOM - Mortgage Commercial
MMED - Mortgage Mediation
MORT - Mortgage Non-Mediation (Res.)

**MECHANICS LIENS**
LIEN - Mechanics Lien

*** Not e-Filed**

## DUTY OF THE PLAINTIFF

Each plaintiff/counsel shall complete the attached Civil Case Information Statement (CIS) and file it <u>with</u> the complaint.

## DUTY OF THE DEFENDANT

Each defendant/counsel shall complete the attached Civil Case Information Statement (CIS) and file it <u>with</u> the answer and/or first responsive pleading.

EFiled: Aug 31 2026 05:00PM EDT
Transaction ID 80509082
Case No. N26C-08-455 KMM CCLD

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| DEUTSCHE FINANCE AMERICA LLC; DF DEUTSCHE FINANCE HOLDING AG d/b/a DEUTSCHE FINANCE HOLDING AG, | ) | |
| *Plaintiffs*, | ) | C.A. No. ______________ |
| v. | ) | |
| BAYERISCHE VERSORGUNGSKAMMER, | ) | |
| *Defendant*. | ) | |

**PRAECIPE**

**TO:** Prothonotary
Superior Court of the State of Delaware
Leonard J. Williams Justice Center
500 North King Street
Wilmington, Delaware 19801

**PLEASE ISSUE A SUMMONS** as to the below-named Defendant, together with a copy of this Praecipe and the Complaint, directing the Defendant to appear and file an answer to the Complaint.

Defendant Bayerische Versorgungskammer is a foreign state within the meaning of 28 U.S.C. § 1603. Service of process must therefore be made in accordance with the Foreign Sovereign Immunities Act, 28 U.S.C. § 1608(a). Because there is no special arrangement for service between the parties and the Federal Republic of Germany is a party to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters,

service will be effected through the Central Authority of the Federal Republic of Germany pursuant to that Convention. *See* 28 U.S.C. § 1608(a)(2).

Accordingly, Plaintiffs do not request service by the Sheriff. Plaintiffs respectfully request that the issued Summons be returned to undersigned counsel so that Plaintiffs may transmit the Summons, this Praecipe, the Complaint, a Notice of Suit conforming to 22 C.F.R. § 93.2, and certified German translations of each to the Central Authority of the Federal Republic of Germany for service upon the Defendant under 28 U.S.C. § 1608(a)(2):

Bayerische Versorgungskammer
Denninger Straße 37
81925 München, Germany

*/s/ Michael A. Barlow*
Michael A. Barlow (#3928)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
500 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 302-4000
michaelbarlow@quinnemanuel.com

*Attorneys for Plaintiffs Deutsche Finance America LLC and DF Deutsche Finance Holding AG d/b/a Deutsche Finance Group*

OF COUNSEL:

Alex H. Loomis
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, Massachusetts 02199
(617) 712-7100

Derek L. Shaffer
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
555 13th Street NW, Suite 600
Washington, D.C. 20004
(202) 538-8000

Dated: August 31, 2026

EFiled: Aug 31 2026 05:00PM EDT
Transaction ID 80509082
Case No. N26C-08-455 KMM CCLD

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| DEUTSCHE FINANCE AMERICA LLC; DF DEUTSCHE FINANCE HOLDING AG d/b/a DEUTSCHE FINANCE HOLDING AG, *Plaintiffs*, | ) | C.A. No. ______________ |
| v. | ) | |
| BAYERISCHE VERSORGUNGSKAMMER, *Defendant*. | ) | |

**MOTION FOR APPOINTMENT OF SPECIAL PROCESS SERVER**

Plaintiffs Deutsche Finance America LLC and DF Deutsche Finance Holding AG d/b/a Deutsche Finance Holding AG (together, "Plaintiffs") respectfully move, pursuant to Superior Court Civil Rule 4, for an Order appointing Quinn Emanuel Urquhart & Sullivan, LLP as Special Process Server for the purpose of effecting service of the Summons, Complaint, and any other suit papers requiring service upon Defendant Bayerische Versorgungskammer ("BVK"). The grounds for this Motion are as follows:

1. BVK is a foreign state within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1603. Service of process upon a foreign state is governed exclusively by 28 U.S.C. § 1608(a), which prescribes the manner of service in the courts of the United States and of the States alike.

2. Because there is no special arrangement for service between the parties and the Federal Republic of Germany is a party to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Convention"), service will be effected pursuant to 28 U.S.C. § 1608(a)(2) by transmitting the Summons, Complaint, a Notice of Suit conforming to 22 C.F.R. § 93.2, and certified German translations of each to the Central Authority of the Federal Republic of Germany, which will serve BVK in accordance with German law.

3. Superior Court Civil Rule 4 provides that service of process shall be made by the Sheriff "or by some person specially appointed by the Court for that purpose." Super. Ct. Civ. R. 4(d). Rule 4(d)(1) authorizes the appointment of a special process server where "some other exigent reason is shown why the Sheriff cannot or will not accomplish service." Super. Ct. Civ. R. 4(d)(1)(iv). The Sheriff of New Castle County cannot accomplish service upon BVK, a foreign sovereign located in the Federal Republic of Germany that must be served abroad through the German Central Authority under the FSIA and the Hague Convention. That is an exigent reason within the meaning of Rule 4(d)(1)(iv).

4. Rule 4(f)(1)(VI) confirms this result, providing that where a statute prescribes service "upon a party not an inhabitant of or found within the State,

service shall be made under the circumstances and in the manner prescribed by the statute”—in this case, 28 U.S.C. § 1608(a)(2).

5. Because the Sheriff cannot effect service upon BVK abroad, appointment of a Special Process Server is necessary to accomplish service. Plaintiffs request that Quinn Emanuel Urquhart & Sullivan, LLP be appointed for the limited purpose of effecting service upon BVK by transmitting the Summons, Complaint, Notice of Suit, and certified translations to the Central Authority of the Federal Republic of Germany pursuant to 28 U.S.C. § 1608(a)(2).

6. In accordance with Rule 4(d)(1), Plaintiffs are serving the Sheriff of New Castle County with notice of this Motion, and the Sheriff may offer any reason why the Sheriff should not be disqualified from making service.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter the accompanying proposed Order appointing Quinn Emanuel Urquhart & Sullivan, LLP as Special Process Server for the purpose of effecting service upon Defendant Bayerische Versorgungskammer pursuant to 28 U.S.C. § 1608(a)(2) and the Hague Convention.

*/s/ Michael A. Barlow*
Michael A. Barlow (#3928)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
500 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 302-4000
michaelbarlow@quinnemanuel.com

*Attorneys for Plaintiffs Deutsche Finance America LLC and DF Deutsche Finance Holding AG d/b/a Deutsche Finance Group*

OF COUNSEL:

Alex H. Loomis
QUINN EMANUEL URQUHART & SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, Massachusetts 02199
(617) 712-7100

Derek L. Shaffer
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 13th Street NW, Suite 600
Washington, D.C. 20004
(202) 538-8000

Dated: August 31, 2026

EFiled: Aug 31 2026 05:00PM EDT
Transaction ID 80509082
Case No. N26C-08-455 KMM CCLD

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| DEUTSCHE FINANCE AMERICA LLC; DF DEUTSCHE FINANCE HOLDING AG d/b/a DEUTSCHE FINANCE HOLDING AG, | ) | |
| *Plaintiffs*, | ) | C.A. No. ______________ |
| v. | ) | |
| BAYERISCHE VERSORGUNGSKAMMER, | ) | |
| *Defendant*. | ) | |

**SUMMONS**

**THE STATE OF DELAWARE**

**TO: QUINN EMANUEL URQUHART & SULLIVAN, LLP**
**(Plaintiffs' Counsel)**

**YOU ARE COMMANDED:**

To summon the above named defendant, Bayerische Versorgungskammer pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1608(a) so that, within 60 days after service hereof, exclusive of the day of service, defendant shall serve upon Michael A. Barlow, plaintiffs' attorney, whose address is 500 Delaware Avenue, Suite 1400, Wilmington, Delaware 19801, an answer to the complaint.

______________________________
Prothonotary

______________________________
Per Deputy

**TO THE ABOVE NAMED DEFENDANT:**

In case of your failure, within 60 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint (and, if the complaint contains a specific notation requiring the defendant to answer any or all allegations of the complaint by affidavit, an affidavit of defense), judgment by default will be rendered against you for the relief demanded in the complaint.

____________________________

Prothonotary

____________________________

Per Deputy

EFiled: Aug 31 2026 05:00PM EDT
Transaction ID 80509082
Case No. N26C-08-455 KMM CCLD

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| DEUTSCHE FINANCE AMERICA LLC; DF DEUTSCHE FINANCE HOLDING AG d/b/a DEUTSCHE FINANCE HOLDING AG, | ) | |
| *Plaintiffs*, | ) | C.A. No. ____________ |
| v. | ) | |
| BAYERISCHE VERSORGUNGSKAMMER, | ) | |
| *Defendant*. | ) | |

**[PROPOSED] ORDER GRANTING**
**MOTION FOR APPOINTMENT OF SPECIAL PROCESS SERVER**

Plaintiffs Deutsche Finance America LLC and DF Deutsche Finance Holding AG d/b/a Deutsche Finance Holding AG (together, "Plaintiffs") having moved the Court, pursuant to Superior Court Civil Rule 4(d), for an Order appointing their attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, as special process server to serve defendant Bayerische Versorgungskammer with a copy of the Summons, Complaint and related suit papers pursuant to Superior Court Civil Rule 4(f)(1)(III) and the Foreign Sovereign Immunities Act, 28 U.S.C. § 1603(a), and the Court having considered Plaintiffs' motion and for good cause shown:

IT IS HEREBY ORDERED this ____ day of ____________, 2026, that the motion shall be, and hereby is, GRANTED.

______________________________
Superior Court Judge

EFiled: Aug 31 2026 05:00PM EDT
Transaction ID 80509082
Case No. N26C-08-455 KMM CCLD

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| DEUTSCHE FINANCE AMERICA LLC; DF DEUTSCHE FINANCE HOLDING AG d/b/a DEUTSCHE FINANCE HOLDING AG, | ) | |
| *Plaintiffs*, | ) | C.A. No. _____________ |
| v. | ) | |
| BAYERISCHE VERSORGUNGSKAMMER, | ) | |
| *Defendant*. | ) | |

**NOTICE OF MOTION FOR**
**APPOINTMENT OF SPECIAL PROCESS SERVER**

**PLEASE TAKE NOTICE** that Plaintiffs' Motion for Appointment of Special Process Server will be presented at the convenience of the Court.

*/s/ Michael A. Barlow*
Michael A. Barlow (#3928)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
500 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 302-4000
michaelbarlow@quinnemanuel.com

*Attorneys for Plaintiffs Deutsche Finance America LLC and DF Deutsche Finance Holding AG d/b/a Deutsche Finance Group*

OF COUNSEL:

Alex H. Loomis
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, Massachusetts 02199
(617) 712-7100

Derek L. Shaffer
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
555 13th Street NW, Suite 600
Washington, D.C. 20004
(202) 538-8000

Dated: August 31, 2026

# EXHIBIT 2

EFiled: Sep 15 2026 06:29PM EDT
Transaction ID 80651787
Case No. N26C-08-455 KMM CCLD

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| DEUTSCHE FINANCE AMERICA LLC and DF DEUTSCHE FINANCE HOLDING AG d/b/a DEUTSCHE FINANCE GROUP, | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. N26C-08-455 KMM CCLD |
| BAYERISCHE VERSORGUNGSKAMMER, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) | |

## AMENDED COMPLAINT

Plaintiffs Deutsche Finance America LLC and DF Deutsche Finance Holding AG d/b/a Deutsche Finance Group, by and through their undersigned counsel, bring this Complaint against Defendant and allege as follows:

## NATURE OF THE ACTION

1. This case is about a sophisticated institutional investor that made bad investments and then tried to save face and mislead its beneficiaries by disparaging and defaming its partner. Defendant Bayerische Versorgungskammer ("BVK"), Germany's largest public-law pension group, mismanaged and ruined its multibillion-dollar portfolio of investments in U.S. real estate. In late 2024, BVK's misconduct came to light, and because its actions not only betrayed severe incompetence but also violated German law, BVK looked for others to take the fall.

Its chosen scapegoats were Plaintiffs Deutsche Finance America LLC ("DFA") and DF Deutsche Finance Holding AG d/b/a Deutsche Finance Group ("DFG") (collectively, "DF"), the asset managers for BVK's investments. In statements to the press, the Bavarian Parliament, regulatory authorities, and its millions of beneficiaries, BVK falsely branded DF as responsible for failures that BVK itself had caused. DF now seeks to hold BVK accountable.

2. As stated, BVK is Germany's largest public-law pension group, managing pension capital for approximately 2.8 million individuals. Starting in the mid-2010s, BVK invested nearly $2 billion in U.S. real estate. Under applicable German law, BVK's tax status did not permit it to control those investments directly—that was the job of various managers. Yet unbeknownst to regulators, the public, or its beneficiaries, BVK systematically and purposefully violated those rules by excluding the entities required by German law to control the investments and exerting direct control over the investments at every level.

3. The pattern was consistent across all of BVK's U.S. acquisitions: BVK would evaluate the properties, approve investments, and negotiate fees without its managers and then communicate its decision to those who should have been in charge so they could handle the administrative implementation of a decision BVK had already made. Afterwards, BVK would exercise control over the leasing, construction, financing, pricing, and capital decisions at individual properties—all

of which were operational matters that BVK was under-equipped and not institutionally competent to handle.

4. Because of BVK's overreach, DF's ability to execute its asset-management responsibilities at the properties depended entirely on approvals and capital that only BVK could provide. From funding tenant improvements to executing leases to covering operating shortfalls, DF could not operate unilaterally. BVK overstepped its bounds, so it had to *act* to keep its portfolio afloat. But it did not do so. Instead, BVK methodically harmed its own investments by failing to approve operating budgets, maintenance and development measures, refinancing decisions, and proposed leases across all of its properties. Those failures may amount to an estimated €853 million in total losses across the BVK portfolio.

5. Eventually, BVK's staggering losses broke to the public, in no small part because of a lawsuit surrounding them, and the press ran with the story. BVK had to find cover immediately as anything revealing how active and inept it had been would have exposed conduct raising serious regulatory issues and tax consequences at home. Given its agreement to release DF's partner, Michael Shvo, from any associated liability, BVK's big idea was to construct a false, disparaging, and defamatory narrative that BVK was not an operationally active investor at all but merely a passive participant in funds managed by DF and that DF was the party responsible for the losses.

6. Amidst a sea of public statements—including statements to German regulatory authorities—peddling this defamatory story, an illustrative set of false statements occurred in an August 31, 2025 interview of BVK's CEO. In the interview, BVK's CEO referred to "[t]he fund manager Deutsche Finance," stated that "[t]he alternative investment fund manager of the target fund is responsible for selecting local business partners in these investments," and stated that he "clearly assume[d] that project partners who do not meet expectations will be parted with as quickly as possible." Those statements were not true. BVK made itself, not DF, responsible for selecting local business partners in the investments. And BVK, not DF, was the entity that utterly failed to meet expectations.

7. Over the ensuing months, BVK escalated this narrative, including by denying DF's statements correcting the record; by doubling down, on its Q&A webpage, that "the project partners did not meet the expectations placed on them"; and by stating in a March 21, 2026 interview that it was DF, rather than BVK, who "identified the individual investment properties" that ended up failing so badly.

8. That disparagement and defamation caused DF great harm. DF's entire business depends on the confidence of the institutions and investors that entrust it with capital and mandates. Once publicly smeared by a large institutional backer as incompetent and responsible for the loss of hundreds of millions of dollars, DF's

ability to raise and invest capital and continue its ongoing operations was, for all practical purposes, put to an end.

9. At the same time, and as is the subject of a pending arbitration in which BVK's counsel has acknowledged that DF could sue BVK separately, BVK used its financial leverage to strip DF of tens of millions of dollars in management fees that DF was contractually owed. On December 31, 2025, BVK's counsel demanded that DF exit the management structure of the Transamerica Pyramid in San Francisco "with immediate effect and without receiving any compensation payment" and advised that BVK would provide no further funding while DF remained. BVK then withheld fees already due until DF consented to a sale of the Transamerica Pyramid that BVK had negotiated without DF's knowledge or involvement. And after that sale triggered a bargained-for guarantee of $31,384,061 in fees to DF through 2028, BVK has refused to pay—despite paying a co-manager, under an identical termination-protection provision, the fees owed to him upon termination of his role.

10. Through this action, DF seeks to hold BVK accountable. It asserts claims for defamation, deceptive trade practices, breach of contractual non-disparagement obligations, and tortious interference with contract and with prospective business relations, and it seeks compensatory damages, interest, and costs. For those claims, DF demands a trial by jury.

## THE PARTIES AND RELEVANT NON-PARTIES

11. Plaintiff Deutsche Finance America LLC is a Delaware limited liability company and majority-owned subsidiary of Plaintiff DFG. Established in 2018, DFA functions as DFG's private equity platform for U.S. real estate: it sources, structures, and manages direct real estate investments in the U.S. on behalf of DFG's institutional client accounts and managed funds. Plaintiff DFA's principal place of business is in Denver, Colorado.

12. Plaintiff DF Deutsche Finance Holding AG is a Munich-based global investment management firm that specializes in private market real estate and infrastructure investments. DFG serves tens of thousands of German retail investors and insurance companies.

13. Defendant Bayerische Versorgungskammer is Germany's largest public-law pension group and an authority of the Free State of Bavaria, itself a political subdivision of the Federal Republic of Germany. BVK is the beneficial owner of the properties at issue in this suit, investing through non-parties Universal Investment-Luxembourg S.A. ("UIL"), Universal Investment-Gesellschaft mbH and its successor UI BVK KVG (collectively with UIL, "UI"), and BAYVK Immobilien-Dachfonds 1 SCS SICAV-SIF Subfonds Elektra 2 ("Elektra 2").

14. Non-party Elektra 2 is a closed-end special Alternative Investment Fund ("AIF") organized as a société en commandite simple under the laws of

Luxembourg. It serves as the central vehicle through which BVK's capital is deployed for selected international real estate investments, including in the properties at issue in this suit.

15. Non-party Universal Investment-Gesellschaft mbH is a regulated German Alternative Investment Fund Manager ("AIFM") that administered BVK's Special Master Fund—the intermediary vehicle through which BVK's pension capital flowed into Elektra 2. Under European Union Directive 2011/61/EU, AIFMs bear legal responsibility for the fund's investment decisions, risk management, and regulatory compliance in the EU.

16. Non-party UI BVK KVG is a licensed AIFM that replaced Non-party Universal Investment-Gesellschaft mbH as administrator of BVK's Special Master Fund in or around 2024.

17. Non-party UIL is the licensed AIFM in Luxembourg that formally manages Elektra 2.

**<u>JURISDICTION AND VENUE</u>**

18. BVK is a foreign state within the meaning of 28 U.S.C. § 1603 because it is a political subdivision of the Federal Republic of Germany. Accordingly, subject matter jurisdiction over this action, personal jurisdiction over BVK, and venue in this Court hinge on whether the Foreign Sovereign Immunities Act's ("FSIA") requirements are satisfied. *See* 28 U.S.C. §§ 1330(b), 1604; *Argentine*

*Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989) (holding that the FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts"); *CC/Devas (Mauritius) Ltd. v. Antrix Corp.*, 605 U.S. 223, 233 (2025) (under the FSIA, "subject matter jurisdiction plus service of process equals personal jurisdiction") (citation omitted). Due process restrictions on personal jurisdiction do not apply to BVK. *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 29 (2025) (Thomas, J., concurring in the judgment) (explaining, for personal jurisdiction purposes, that "foreign states are not entitled to the protections of the Due Process Clause," and collecting authorities) (citation omitted).

19. Subject matter and personal jurisdiction exist because BVK is not entitled to sovereign immunity under the FSIA with respect to the claims asserted in this action.

20. The FSIA's waiver exception applies. As outlined below, Elektra 2 is BVK's agent or alter ego. On September 11, 2024, BVK's alter ego, Elektra 2, signed a Term Sheet with DF governing BVK's U.S. investment properties out of which this case arises. The Term Sheet is governed by Delaware law. Agreeing that the law of a U.S. state should govern a dispute is an implied waiver of foreign sovereign immunity. H.R. Rep. No. 94-1487, at 18 (1976).

21. The FSIA's commercial-activity exception to sovereign immunity applies. 28 U.S.C. § 1605(a)(2). That exception provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case … in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

22. Commercial activity is defined as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). When this Complaint uses the term "commercial activity" under the FSIA, it refers to both "a regular course of commercial conduct" and individual "particular commercial transaction[s] or act[s]."

23. Plaintiffs' claims against BVK are "based upon" BVK's commercial activity carried on in the United States because their claims arise out of BVK's investments in U.S. real property, its mismanagement of those properties, its interference with Plaintiffs' contractual rights and business opportunities stemming from those same investments in U.S. real estate, and its defamatory statements relating to those properties. Investing in real estate and mismanaging those investments are things private actors routinely perform and are not uniquely sovereign activities.

24. Plaintiffs' claims against BVK are also "based upon" the above actions that BVK took in the United States in connection with its commercial activity in Germany—specifically, its management of investments for German pension funds.

25. Plaintiffs' claims against BVK are also "based upon" BVK's actions outside the United States to interfere with U.S. investments in connection with BVK's commercial activities in Germany, and these actions had a direct effect on the value of U.S. investments.

26. Plaintiffs' claims against BVK are also "based upon" BVK's defamation for commercial gain that reached U.S. media outlets and affected DF's asset management and investments in the U.S.

27. For the avoidance of doubt, Plaintiffs allege and incorporate herein all commercial activities alleged in this Complaint for purposes of satisfying all three clauses of the FSIA's commercial activity exception. BVK's personnel had repeated contacts for commercial purposes with the United States that were related to BVK's U.S. investments. All of BVK's actions had a direct effect on the value of its U.S. investments and on DF's ability to conduct business in the United States.

28. The FSIA does not impose any restrictions on venue for a complaint filed as an original matter in state court. BVK does not reside in any county in this State, and so venue is proper in this Court under Delaware law.

## FACTUAL ALLEGATIONS

### A. The Structure Of BVK's Investments

29. BVK is Germany's largest public-law pension group, managing pension capital for approximately 2.8 million individuals. In the mid-2010s, BVK

embarked on a multibillion-dollar push into international real estate. By 2020, BVK had invested approximately $2 billion in U.S. real property, which it considered its own crowning achievement. BVK deployed its capital through a chain of intermediary entities over which it exercised total control, with those intermediaries serving as alter egos or agents of BVK. This level of control is inconsistent with the role of an investor within an externally managed fund structure.

30. At the top of the chain, BVK's pension capital was held in a Special Master Fund administered by Universal Investment-Gesellschaft mbH. One step down the chain, that Special Master Fund invested BVK's consolidated real estate capital into Elektra 2, and UIL served as Elektra 2's AIFM, the regulated entity responsible for overseeing and approving all of Elektra 2's investments. Directive 2011/61/EU, Arts. 5-6; ESMA, Guidelines on Key Concepts of the AIFMD, ESMA/2013/611 (Aug. 13, 2013).

31. The relevant regulatory framework did not prohibit BVK from monitoring its investments or expressing investor views, but it did require that the AIFM—not BVK—retain and exercise the independent portfolio-management, risk-management, and decision-filtering role assigned to it by law. Specifically, German and EU law set out a distinct framework for BVK's real-estate investments and related tax privileges concerning income from such investments. Responsibility for, and decision-making authority regarding, all investment decisions, as well as

portfolio management and risk management, must reside with the fund's AIFM, not with investors like BVK. Beyond the formal structures, the legality of such investments also depends on BVK, as a functional, operational matter, limiting its role to that of an investor—without assuming project-level steering functions, which would otherwise usurp proper governance by external managers.

32. As set out below, BVK violated those rules. While maintaining a fig leaf of legal compliance, it overreached into operational matters that it was not equipped or competent to handle. BVK's personnel systematically influenced investment structuring, made investment decisions, directed capital commitments, negotiated fees, inspected properties, reviewed and approved proposed leases, and drove operational strategy across the portfolio—all without competently and reliably following through, while sidelining and, indeed, disabling the regulated fund managers who were meant to exercise independent portfolio-management, risk-management, and oversight functions.

33. DF, with its partner Michael Shvo, then served as the on-the-ground asset manager for BVK's U.S. properties—the entity responsible for the day-to-day work of operating, leasing, and maintaining the buildings. DF did not hold discretionary authority over the investments themselves. It did not have the power to select the investments in its own discretion, to make the binding investment decisions, or to commit or control BVK's capital. DF's role, along with Mr. Shvo's,

was just to manage the assets that BVK chose to acquire pursuant to contractual arrangements that BVK approved and for fees that BVK agreed to pay.

34. DF's ability to execute its management responsibilities at those properties depended entirely on approvals and capital that only BVK, because of its overreach, could provide. DF could not operate unilaterally, including as to matters such as funding tenant improvements, executing leases, and covering operating shortfalls. When BVK later withheld the necessary approvals and funding, DF could not simply go around it. And when BVK then blamed DF publicly for the resulting underperformance, it blamed DF for failures caused by BVK's own obstruction and mismanagement.

**B. BVK's Acquisition And Control Over Its U.S. Real Estate Investments**

35. As explained, BVK's actions show that it went beyond ordinary investor oversight and into project-level steering. When BVK entered the U.S. real estate market, it selected individual properties, approved each investment on a project-by-project basis, and deployed capital through intermediaries in a series of targeted commitments. Between 2018 and 2020, BVK invested in several properties at which non-party Michael Shvo and his entity SHVO Concept LLC served as the operating partner responsible for development and construction and DFA, along with Shvo, served as the asset manager. Mr. Shvo was introduced to BVK by Serdar

Bilgili, and from the outset, BVK engaged and vetted him—including through a Crumpton Group background check.

36. BVK exercised operational control over the portfolio from the beginning. For each of BVK's seven U.S. real estate acquisitions, the pattern was the same: before UI was even contacted, BVK's internal investment committee evaluated the property, approved the investment, and communicated its decision to DF and Shvo, who it knew was involved with all of the properties. UI was then informed after the fact and asked to handle the "administrative implementation" of a decision BVK had already made.

37. BVK's investment in the "685 Fifth Avenue" property in New York is illustrative. BVK personnel began evaluating the property with DF in February 2018. On April 17, 2018, BVK personnel confirmed by email that the investment would be proposed to others at BVK. No one from UI was involved. On April 19, 2018, DF confirmed to Shvo that BVK's investment committee had approved the investment in principle. UI was still not involved. On May 23, 2018, BVK personnel officially confirmed BVK's board decision to proceed with the 685 Fifth investment and then asked DF to contact UI to discuss "administrative implementation." UI was first contacted on May 24, 2018, three months after BVK had begun evaluating the transaction and more than a month after BVK's board had approved it.

38. The same pattern repeated for every subsequent acquisition.

39. For example, at the Raleigh Hotel in Miami, BVK personnel requested detailed construction cost information from DF in November 2018 to prepare a recommendation to BVK's investment committee. UI was not involved.

40. For 711 Fifth Avenue (the Coca-Cola building), BVK personnel wrote a "Proof of Funds" letter directly to Coca-Cola on behalf of BVK in May 2019, committing BVK to the purchase. UI did not appear in BVK's letter, although, as BVK's own fund manager, it should have been the entity making that commitment.

41. For the Transamerica Pyramid in San Francisco, when UI had not yet signed off on the capital payment in October 2020, BVK personnel told DF that if UI could not process the payment in time, "the money would have to go to the USA first without UI's signatures."

42. BVK was thus prepared to bypass its own licensed fund manager entirely rather than delay a transaction BVK had already decided to make.

43. UI's own personnel recognized that they were being excluded. On September 9, 2020, UI personnel wrote to DF asking about a deposit adjustment and closing timeline for 711 Fifth Avenue—a transaction that BVK and DF had already negotiated and agreed upon without UI's knowledge. UI asked DF to identify which BVK personnel had been involved, because UI itself did not know. UI was not

independently managing the fund. It was learning about BVK's decisions after they were made.

44. By the end of 2020, BVK had unilaterally committed approximately $2 billion of capital through Elektra 2 in seven U.S. properties, in each case approving the investment before notifying UI.

45. BVK's control extended beyond simply acquiring the various properties. It exerted direct influence over the operations and business of its investments.

46. For example, on March 6, 2020, BVK personnel personally authorized DFA's co-managing partner by direct email to lock in the interest rate on the debt financing for 711 Fifth Avenue.

47. This was not a passive investor reviewing a fund manager's recommendation. This was a BVK employee directly instructing the co-managing partner on a specific financing decision, with no UI involvement.

48. BVK personnel also regularly directed capital commitments and releases for individual properties.

49. For example, BVK personnel approved or withheld capital increases for the Transamerica Pyramid (multiple rounds from 2022 through 2024), the 9200 Wilshire property in Beverly Hills (the months-long delay described below), and 711 Fifth Avenue.

50. In each instance, UI processed the payments only after BVK had decided what to do.

51. On December 12, 2019, BVK's head of real estate investment management told DF that he would "release the investment without signatures from the investment committee, to not hold up the process"—BVK's head of real estate investment management thus unilaterally released capital without even his own board's formal sign-off.

52. BVK also weighed in on pricing, sales, and fee negotiations at the individual property level. BVK personnel were regularly updated on, and expressed views about, individual apartment sales at 685 Fifth Avenue in New York and 9200 Wilshire, specific rental rates at the Transamerica Pyramid, and the commercial terms of asset management fee arrangements across the portfolio.

53. Further, BVK had extensive contacts with its partners in the United States.

54. BVK personnel traveled to the United States repeatedly to inspect properties, tour construction sites, meet operating partners, and attend leasing presentations—in many cases without UI present.

55. For instance, on June 12, 2018, BVK personnel requested that their upcoming visit to 685 Fifth Avenue in New York include meetings with "Shvo's personnel, the broker, advisors, the general contractor, and prospective tenants."

56. BVK wanted to personally meet operationally active people on the project.

57. BVK personnel visited 685 Fifth Avenue on June 18, 2018, and met DFA's co-managing partner in person for the first time.

58. UI did not attend.

59. On November 19, 2018, BVK personnel visited the Raleigh Hotel. Again, UI did not attend or conduct its own on-site due diligence.

60. On April 12, 2019, the entire senior leadership of BVK traveled to Beverly Hills to inspect the 9200 Wilshire property and meet with DFA's co-managing partner in person. UI personnel attended this visit, but the visit was organized by BVK, and BVK's investment committee members conducted their own evaluation of the property.

61. On December 9, 2019, BVK leadership conducted a multi-day tour of properties in New York and Miami, meeting at the co-managing partner's offices in New York and visiting the Raleigh project in Miami.

62. UI did not attend.

63. In June 2022, BVK attended and collaborated on a five-day "U.S. Property Tour" spanning New York, Chicago, and San Francisco.

64. The tour included property visits to 685 Fifth Avenue, 711 Fifth Avenue, 530 Broadway, 333 South Wabash, and the Transamerica Pyramid; a capex

presentation with Foster + Partners at Transamerica; a leasing tour with the JLL leasing team; and a working lunch portfolio overview at the co-managing partner's office.

65. BVK's own CEO would eventually admit in public that BVK personnel had an "inappropriate proximity relationship" with parties in the U.S.

66. That admission was an understatement. The evidence shows that BVK personnel did not merely maintain relationships—they directed operations.

67. Accordingly, and as supported by hundreds of communications from 2018 through 2024, BVK personnel made investment decisions before UI was even informed, conducted on-site property inspections that UI did not attend, maintained direct operational relationships with U.S. parties, and exercised control over financing, pricing, capital, leasing, and fee decisions at the individual property level. UI—the entity that EU law required to independently manage BVK's investments in the Elektra 2 fund—was systematically excluded from substantive decision-making and reduced to an administrative processor of decisions BVK had already made. BVK crossed the legal line from the position of a passive investor within an externally managed fund structure into a functionally steering role that undermined the AIFM architecture and thereby exposed the tax assumptions underlying BVK's privileged status.

### C. BVK And Its Affiliates Tank The Investments

68. The same control that BVK exercised to acquire these properties meant that when market conditions deteriorated, only BVK could authorize the decisions necessary to protect them, but BVK refused to act.

69. Between 2020 and 2024, the U.S. commercial real estate market started to decline. BVK's portfolio was caught in this same current, and the crisis demanded active, decisive management from what should have been UI. Under applicable regulations, no refinancing could proceed, no additional capital could be called, and no strategic pivot could be executed without UI's consent. But BVK usurped UI's role, and as market conditions worsened, it proved unable or unwilling to make the timely decisions that its own dominant position demanded.

70. Instead, BVK's problematic relationship with German regulations and regulators led it, beginning at least as early as the start of 2024, to act underhandedly and even irrationally. In particular, although BVK improperly stepped into a steering role, it faltered in that role and systematically harmed its investments by failing to approve operating budgets, maintenance and development measures, refinancing decisions, and proposed leases across all of its properties.

71. BVK's failure to act on operating budgets, maintenance and development measures, refinancing decisions, proposed leases, and project-related actions was not occasional or inadvertent. It was systematic, spanned every property

in the BVK-DF portfolio, and interfered with many of DF's actual or proposed operations.

72. The first major obstruction arose at the 9200 Wilshire Boulevard property in Beverly Hills, a 54-unit luxury residential development.

73. A $200 million construction loan was set to mature on February 9, 2024.

74. DF identified the issue in October 2023 and requested that BVK approve the capital needed to refinance.

75. BVK personnel requested, reviewed, and commented on multiple business plan scenarios.

76. It had four months, all necessary information, and sole authority over the funding decision.

77. But rather than act, BVK sent DF through round after round of redundant memo revisions, sensitivity analyses, and approval requests. DF had no alternative but to comply with each request because only BVK could authorize the capital that would save the project.

78. BVK never intended to approve the funding. If it had, it would have acted on the answers it received. Instead, BVK ran out the clock.

79. On January 30, 2024, ten days before maturity, BVK responded to DF's Business Plan Update with "Looks good. I have no further comments."

80. No approval followed.

81. The loan defaulted.

82. By never formally refusing to fund or approving it, BVK ensured that when the loan defaulted there was no decision to point to, only DFA and its operating partner left holding the blame for losses that BVK's inaction caused.

83. In an attempt to salvage the situation, DF helped facilitate a $210 million replacement loan with JP Morgan, which assembled a lending group, completed its approval process, and was ready to close by June 2024.

84. The only step remaining was BVK's approval.

85. JP Morgan spent months waiting.

86. BVK provided no timeline and never gave assent.

87. By November 2024, JP Morgan informed DFA that it considered the relationship "closed."

88. Personal relationships of many years between DFA and the JP Morgan bankers involved were ruptured as a result.

89. The 9200 Wilshire property was thus surrendered to the lender through a deed in lieu of foreclosure in February 2025.

90. In Miami, BVK's inaction ruined a sale at 1757 James Avenue, a part of the Raleigh property.

91. DF had negotiated the deal and executed the contract with the buyer, pending investor approval.

92. BVK delayed this approval for months until the buyer walked away entirely.

93. Because of BVK's inaction, at 685 Fifth Avenue in New York, by mid-2024, nearly 50 of 65 condominium units remained unsold, and the project faced a potential default on its inventory loan, which the project partners had twice extended through forbearance agreements funded by their own emergency capital contributions, putting DFA at significant risk of insolvency.

94. At the Transamerica Pyramid in San Francisco, BVK obstructed multiple leases by refusing to give timely approvals, jeopardizing the success of the project and undermining its asset managers.

95. For instance, Morgan Lewis & Bockius LLP, one of the largest law firm tenancies in San Francisco and a critical anchor for the Transamerica Pyramid's repositioning, signed a letter of intent to lease on November 22, 2024.

96. That letter required a lease to be signed by December 18, 2024.

97. While Morgan Lewis was ready to finalize, that deadline passed because of BVK's delays. DFA's reputation was thus damaged, and Morgan Lewis threatened to sue DFA on February 18, 2025.

98. The lease was ultimately signed on March 6, 2025, thanks to DFA's efforts, and despite BVK's misbehavior.

99. BVK also refused to approve capital expenditure budgets across the portfolio.

100. At Transamerica, BVK ignored DF's repeated requests to approve the 2025 capital expenditure budget after DF updated and submitted its business plan seven times over six weeks: on April 23, 2025; May 5, 2025; May 12, 2025; May 19, 2025; May 28, 2025; June 2, 2025; and June 5, 2025. Seven submissions. Zero responses.

101. At 711 Fifth Avenue, the same pattern repeated.

102. DF sent memos requesting approved business plans on November 27, 2024, and December 8, 2024.

103. No approval was received.

104. Because the business plan was not approved, leasing activities at 711 Fifth Avenue were paused entirely on January 2, 2025.

105. DF continued and submitted budget memoranda to BVK to secure the required investor approval of the 2025 capital expenditure budget on June 2, 2025; July 14, 2025; July 17, 2025; and August 1, 2025.

106. Still no approval was received.

107. BVK's refusal to approve a budget did not merely delay leasing—it shut it down.

108. The obstruction was not limited to budgets.

109. Meanwhile, the 2023 audit for 9200 Wilshire (along with all subsequent audits) could not be completed because the investor funding was never provided.

110. Even routine, low-dollar operational approvals were met with silence.

111. BVK's poor management, along with challenging economic conditions, led to substantial underperformance across the investment portfolio.

112. Total losses across BVK's U.S. real estate portfolio may potentially reach an estimated €853 million.

113. BVK's investments failed largely because BVK's interference caused loan defaults, killed transactions, and blocked the leasing activity that its own asset managers needed to succeed. BVK's inaction, after years of exerting almost total control, was causing investments to fail.

114. But BVK could not come clean and tell the truth when that happened. Disclosing the facts of just how active and intrusive it had been would have blown the whistle on its noncompliance at home—exposing conduct that raised serious regulatory issues and corresponding tax consequences.

### D. BVK Scapegoats DF In The Press And Before The German Authorities For Its Own Investment Failures

115. Despite BVK's central role in (mis)managing the investment portfolio, that role was not widely known outside the investment structure.

116. That changed in June 2024 when a then-tenant of two of the portfolio's properties, Core Club, filed suit in New York Supreme Court against BVK, Shvo, and others, claiming approximately $600 million in damages.

117. Among other things, the complaint alleged that BVK exercised actual operational influence and control over the investments as the economically dominant, majority investor in the projects.

118. German media quickly picked up the story and began reporting about the lawsuit.

119. For BVK, a tax-exempt public pension authority whose privileged status depended on maintaining a passive investor role, the public exposure of its operational involvement was an existential threat.

120. That gave BVK a powerful motive to recharacterize its role and to find someone else to blame. And BVK's reaction was swift and dramatic.

121. On information and belief, BVK imposed an internal travel ban prohibiting employees from traveling to the United States.

122. On information and belief, BVK severed all direct communication with both DF and Shvo, cutting off the operational channels that had functioned for years.

123. BVK terminated or reassigned two senior officials who had been centrally involved in the U.S. investments, both of whom were subsequently accused of compliance violations.

124. And BVK began constructing a new (false) public narrative: BVK was not an operationally active investor at all. It rather was merely a passive participant in funds managed by DF and its alleged confidant, Shvo.

125. On September 9, 2024, Business Insider, a U.S. media outlet, published an article stating that a BVK "representative said in an email [to Business Insider] that '[BVK's] investment in [the 9200 Wilshire property] in question has been indirect[] and in accordance with the German regulations applicable to us for investments in foreign projects.'"

126. That statement was a lie, intended to shield BVK from scrutiny and imply that failures in the investment projects were DF's responsibility.

127. As explained above, BVK's actions were anything but "in accordance with the German regulations applicable to" it.

128. On September 26, 2024, a prominent German newspaper, Abendzeitung München ("AZ"), published a major investigative article about BVK's U.S. real estate losses.

129. The article repeated BVK's false assertions that it had "no influence over decisions taken on the ground" at its investments.

130. The article also inaccurately described the flow of funds from BVK, stating that money flows from “the pension authority[,] to the capital management company Universal Investment in Luxembourg, and is then allocated by the fund manager Deutsche Finance, based on Leopoldstrasse in Munich.”

131. This description positioned DF—not BVK—as the entity directing capital allocation, precisely the opposite of what actually happened.

132. Apart from those false statements, the article also chronicled the numerous trips, “some by private jet,” that BVK personnel took to the United States (including Las Vegas, where BVK did not invest in any property).

133. On July 29, 2025, a new article published by AZ signaled that BVK was seeking to separate from DF, “possibly prematurely.”

134. The article also contained non-public information about internal personnel changes at DF, characterized DF as “BVK’s investment vehicle,” and described at least three of BVK’s U.S. projects as failing.

135. On information and belief, that non-public information came from BVK.

136. Those statements implied that DF was responsible for failed investments, rather than BVK.

137. The next day, DFG’s Chief Investment Officer wrote an email to BVK’s CEO protesting that the article contained information, including non-public

information, "clearly attributable" to BVK and noting that Elektra 2 and BVK's own counsel at A&O Shearman had confirmed to DF in writing on July 17, 2025, that "no information would be provided to the public."

138. BVK broke that agreement within two weeks.

139. DF warned BVK that it would "no longer accept being used as a projection screen for [BVK's] internal or political conflicts" and expressly reserved the right to pursue legal claims based on BVK's public misstatements.

140. DF stated that BVK's characterization of DF's role, particularly regarding operational responsibility, structuring, and management of the investments, was "selective, one-sided, and in parts incorrect."

141. BVK did not change course. It escalated. Within days, the same narrative appeared in multiple trade publications on both sides of the Atlantic.

142. On information and belief, BVK or its agents supplied the information to the publications.

143. On August 7, 2025, the publication Bisnow publicly identified DF by name as the entity responsible for managing BVK's investments.

144. As reported in the article, "BVK has repeatedly said that it has no direct, contractual relationship with Shvo. Instead, its capital was put in a fund managed by Deutsche Finance America, alongside other German funds, which in turn is

invested in real estate projects." DFA does not sponsor, maintain, or manage any investment fund; it acts only as an asset manager.

145. The article quoted BVK as claiming that it was "not unusual to seek a separation [from partners], possibly prematurely, depending on the performance of an investment, the overall market, or the existing interest of third parties."

146. On the same day, Immobilien Zeitung, a prominent German real estate trade journal, published a parallel article describing DF as BVK's "Asset-Manager."

147. The article repeated BVK's "separation" language.

148. And as reported in the article, BVK stated: "It is generally not uncommon for a capital management company like Universal Investment to seek a separation depending on the development of an investment."

149. The article also discussed purported contractual agreements between DF and BVK: "Deutsche Finance's asset management contract with BVK for US real estate runs until 2028 – but perhaps even shorter."

150. The Real Deal, a U.S. media outlet, thereafter repeated, on August 8, 2025, that BVK's capital sat in a "fund managed by Deutsche Finance America."

151. This public repositioning was a lie. DFA does not sponsor, maintain, or manage any investment fund, and it was BVK's own employees who had conducted on-site inspections, attended project meetings, held independent

discussions with financing banks, requested and reviewed alternative business plan scenarios, and directed the structuring of the investment vehicles.

152. But the Core Club lawsuit had exposed the gap between BVK's formal posture and its actual conduct, and BVK tried to close that gap by rewriting history and leaving DF with the fallout.

153. The next step in BVK's strategy was a sustained public campaign to shift blame onto DFA by expressly lying to the media, German authorities, and others that DFA caused the portfolio's underperformance, and that BVK played no part in the portfolio's management.

## E. BVK Publicly Defames And Disparages DF

154. BVK had been seeding the narrative, after which BVK made a batch of false public statements on August 31, 2025, in an interview of BVK's CEO by Welt am Sonntag ("WAMS"), a national German outlet. The relevant part of the interview states:

> WAMS: This was not the only reason why the four projects have problems. Her business partner in the USA seems a bit dubious. After all, it is not an unwritten page in terms of tax law.
>
> [BVK CEO]: **The alternative investment fund manager of the target fund is responsible for selecting local business partners in these investments.** There are formal review procedures for this, which also include trustworthiness and have not revealed any objections.
>
> WAMS: The name of the U.S. real estate developer you're talking about is Michael Shvo. Did your house have direct contact with him?

[BVK CEO]: I personally met him briefly once during a property inspection at the end of 2023. As I said, **Mr. Shvo's selection was not made via BVK. We have made our contributions through the capital management company, which in turn invests in the target funds.** After the first press reports about a lawsuit, this is an occasion for us to take a closer look. We have launched an in-depth investigation, which also involves external auditors. Result: There were violations. We therefore immediately drew conclusions. The signal is clear: such situations will not be tolerated.

…

WAMS: Security is a good keyword. The Bavarian state parliament dealt with some special investments of your company. Why did you invest more than 800 million euros in four dubious, poorly performing real estate projects in the USA?

[BVK CEO]**:** Firstly, we have been investing in US real estate for around 20 years – with success. Secondly, we are talking about 0.7 per cent of our total capital under management. Thirdly, it is not clear to me what is "dubious" about investing in real estate projects in attractive locations. These investments were made before the pandemic, the Ukraine war and the interest rate turnaround. These are developments that no one could have foreseen, they have affected the entire industry. But I don't want to sugarcoat anything here. These projects did not meet our expectations. In the United States, we immediately initiated internal investigations. We take such processes very seriously.

WAMS: What does that mean in concrete terms?

[BVK CEO]: Violations of compliance by external experts have been identified. **They give indications of what we consider to be an inappropriate proximity relationship. We are pursuing something like this hard and it leads to immediate consequences**. In addition, we ourselves informed the public prosecutor's office – not under pressure from third parties, but proactively. We ensure maximum clarification here. It is not possible to say at present whether this is relevant under criminal law.

> WAMS: Let's get down to business: The investments you've gambled away with are in attractive locations such as Miami Beach, San Francisco or New York. Have there been meetings between BVK employees and Mr. Shvo that were attended by family members, friends or other close people and that sound more like a pleasure trip?
>
> …
>
> [BVK CEO]: We are invested in almost all of these projects together with other institutional investors. **The fund manager Deutsche Finance** has also invested in many of the properties itself through retail funds, so that numerous private investors have also contributed capital.
>
> WAMS: Your story is reminiscent of "Stupid German Money" and the banking crisis of 2008, when German financial institutions put their money into US subprime real estate they had no idea about because of low interest rates.
>
> [BVK CEO]: No, it's not comparable. We are talking about a very small part of our total assets – 0.7 percent as of today. **There have been mistakes, yes, and we are learning from them. An example: I clearly assume that project partners who do not meet expectations will be parted with as quickly as possible.** Here you have to put your finger in the wound, and rightly so.

(emphasis added).

155. Those statements were false and implied additional false statements of fact.

156. BVK made itself, not an AIFM or DF, "responsible for selecting local business partners in these investments."

157. BVK was intimately involved in selecting Mr. Shvo, and, on information and belief, BVK's CEO had met him on several occasions.

158. And DF was not the entity that failed to meet expectations. BVK dropped the ball.

159. Following on those false statements, on December 12, 2025, BVK issued a press release that publicly quantified BVK's equity exposure "with Deutsche Finance and SHVO" at approximately €1.6 billion, reported €163 million in write-downs with further exposure bringing the potential total to approximately €853 million, asserted that compliance violations had occurred, and announced tightened partner and know-your-customer measures.

160. The losses BVK quantified were losses that BVK caused its U.S. real-estate portfolio, and the "compliance violations" it asserted were BVK's own improper involvement in investments.

161. But the obvious, undeniable, and false implication of this press release, especially when coupled with its interview and press campaign, was that the losses were caused by DF and that DF committed the violations. Again, that was not true.

162. On January 5, 2026, in response to BVK's false narrative, DF issued a press release to the media correcting the record.

163. DF explained that it had not selected the U.S. investments and had not made the investment decisions; no DF entity was an underlying-fund manager or held authority to select, direct, or approve the investments—those were BVK's decisions.

164. Notwithstanding DF's statement, on January 19, 2026, BVK sent a letter to its members telling them that U.S. losses were attributable in part to "project partners" that "have not fulfilled the expectations placed in them," and that "compliance violations" had been "uncovered."

165. The letter directed members to BVK's website for further detail.

166. Again, that was false. The losses were BVK's fault, not DF's. And the compliance violations were its own doing.

167. The next month, on February 5, 2026, BVK, on information and belief, issued a similar false statement to Immobilien Zeitung. The publication states:

> BVK itself presents itself as a passive, indirect investor without decision-making authority: "BVK only indirectly holds shares in a fund, which in turn invests indirectly passively and together with other investors in the corresponding properties via various target funds. The investment decisions in these target funds and the selection of the service providers involved were mainly made by the AIFM in cooperation with Deutsche Finance. There is no participation in the management of this fund for legal and regulatory reasons."

Like the previous statements in the same vein, those statements were false.

168. Also in February 2026, BVK updated its Q&A webpage with false information.

169. Regarding its U.S. investments, BVK stated that the AIFM "selects … the investment objects, is responsible for the examination and ultimately the specific investment, in this case the respective property."

170. That statement was false. BVK selected the investments and was responsible for the specific investment of all the properties.

171. When discussing the causes of "losses in US real estate investments with Deutsche Finance and SHVO," BVK claimed that one "reason is that the project partners have not fulfilled the expectations placed in them."

172. That statement again falsely blamed DF for its losses in a communication addressed to 2.8 million pension beneficiaries of BVK.

173. These statements were intended and understood to refer to DF.

174. DF and Shvo are named nine times on that webpage, including in four question headings.

175. Next, on March 21, 2026—more than two months after DF had publicly corrected the record—BVK's CEO repeated and escalated the false narrative in a question-and-answer interview published in Münchner Merkur initially and in other outlets shortly thereafter.

176. Asked whether BVK saw itself as a "victim," BVK's CEO said that BVK "had project partners who did not meet our expectations."

177. Although he prefaced the remark by claiming he would "explicitly not nam[e] any names," the interview identified DF by name throughout.

178. BVK's refusal to name DF was thus an empty formalism, born of a guilty conscience and designed to avoid liability. It was clear that all comments were directed at DF.

179. When the interviewer put DF's own position to him—that DF "had nothing to do with the selection of the projects"—BVK's CEO rejected DF's claim.

180. He told readers that DF's statement "irritates us very much," invoking the adage that "success has many fathers, failure only one" and asserting that DF "was significantly involved in the investments in various roles."

181. He incorrectly told readers that "Deutsche Finance and Shvo had already identified the individual investment properties in advance," while dishonestly casting BVK as a passive investor that had merely "invested in US real estate … via a fund of funds structure" and had "no direct contractual relations."

182. Again, these statements were all lies, designed to mislead the German pensioners that BVK had failed and shield BVK's officers from accountability for their disastrous governance.

### F. BVK Lies To German Authorities To Distance Itself From Its U.S. Real Estate Investments

183. In addition to those public false statements, BVK and its officers lied to the German authorities responsible for regulating it, including in a series of public parliamentary statements designed to shield them from accountability, mislead German pensioners, and blame DF.

184. DF includes these statements in this Complaint for purposes of proving BVK's malice and intended meaning behind its public statements.

185. In response to parliamentary inquiries, the Bavarian State Ministry of the Interior ("StMI"), which directly controls and runs BVK, falsely represented to Parliament that BVK played no operational role in the U.S. investments. When making those false statements, the StMI was relying on false information supplied to it by BVK.

186. First, on October 13, 2025, the second parliamentary inquiry into BVK's investment decisions was published as part of the Bavarian Official Record Drs. 19/8108. The inquiry's title captured its subject: "Bayerische Versorgungskammer: Who controls the inspectors?"

187. In this inquiry, the StMI represented this time that "[a]n instruction [for the StMI] to terminate the contracts is legally not possible, ***as the pension funds are not contractual partners of the fund managers***, but the respective capital management company." (emphasis added).

188. In other words, the StMI told Parliament that it could not control BVK's fund managers because not even BVK had such a contractual relationship with the fund manager—while BVK, in practice, already exercised control to retain, and terminate, fund managers.

189. Again, that statement was false.

190. Second, on October 20, 2025, the third parliamentary inquiry into BVK's investment decisions was published as part of the Bavarian Official Record Drs. 19/8140.

191. The StMI at this point, in articulating the passive role of BVK in its US real estate investments, stated: "In the case of such indirect investments, there is also no possibility for investors such as the pension institutions in this case to actively participate in the operational activities on site — ***including construction and leasing activities as well as tenant matters.***" (emphasis added).

192. That statement was false. As set forth herein, BVK's own personnel participated in precisely those activities—construction decisions, leasing approvals, tenant negotiations—for years.

193. BVK's reporting to StMI also framed the matter as "real estate investments by Deutsche Finance." That characterization was calculated to shift ownership of the investment failures from BVK to DF.

194. The StMI, again relying on information supplied by BVK, also represented that "the respective management of the properties is currently involved in numerous rental initiatives in order to conclude further leases ***as quickly as possible***." (emphasis added).

195. That was a lie too. At the very time BVK made that representation, it was withholding the budget approvals that DF needed in order to execute those leasing initiatives—as described above.

196. Third, on November 18, 2025, the fourth parliamentary inquiry into BVK's investment decisions was published as part of the Bavarian Official Record Drs. 19/8521. The inquiry revealed that a preliminary investigation by the Munich I Public Prosecutor's Office was focused on "whether there is an initial suspicion of criminal offences, in particular embezzlement."

197. Fourth, in a parliamentary answer provided on March 23, 2026, the StMI stated that in its relationship with DF, BVK "acted merely as a fund investor" and that "[t]he investment decisions in these target funds were taken principally via the Alternative Investment Fund Manager (AIFM), with the participation of the Deutsche Finance Group." The answer likewise provided that "[t]he investment decisions in these target funds, as well as the selection of the service providers involved, were, according to information from [BVK] effected principally via the respective AIFM with the participation of the Deutsche Finance Group or companies affiliated with it," and "[a]ccording to its own information, [BVK] was not involved in matters of the operational day-to-day business of the real estate management of the target funds."

198. For the reasons stated above, those statements were false.

199. BVK's misrepresentations to the Bavarian Parliament were not merely an exercise in blame shifting. Every statement BVK made to Parliament—that it had no involvement in construction, leasing, or tenant matters; that the investments were "Deutsche Finance's"; that BVK's role was limited—was calculated to build a public record that BVK could later point to if German tax authorities or other authorities questioned whether BVK had crossed the line from passive investor to active manager.

200. BVK's campaign extended beyond Parliament to a second arm of the German state. Beginning on or about August 13, 2025, and continuing through additional submissions in early 2026, BVK wrote to the German Federal Financial Supervisory Authority (Bundesanstalt für Finanzdienstleistungsaufsicht, or "BaFin") and urged the regulator to open a supervisory investigation directed at DF.

201. In its submissions to the regulator, BVK asserted that DF—not BVK—controlled the investment structures, and suggested that DF had exploited that control to create self-serving and effectively interminable fee arrangements and to engage in undisclosed self-dealing at investors' expense.

202. Those assertions were false.

203. As set forth above, it was BVK, not DF, that controlled the investments: DF did not select the properties, did not make the investment decisions, and did not control BVK's capital. BVK knew as much when it made these representations, yet

it made them anyway—to a German financial regulator—in order to recast DF as the party responsible for BVK's own losses.

204. That BVK was willing to press this false narrative, including before a financial regulator, confirms that its conduct was neither inadvertent nor isolated; it was a deliberate campaign to deflect responsibility onto DF and to damage DF before every audience that mattered.

**G. The U.S. And Foreign Press Repeat BVK's False Narrative**

205. Numerous publications all over the world, including in the United States, picked up on and repeated as fact BVK's false narrative.

206. On September 4, 2025, the Real Deal again repeated that BVK's capital sat in a "fund managed by Deutsche Finance America." As previously noted, DFA does not sponsor, maintain, or manage any investment fund.

207. On December 16, 2025, Institutional Money reported on BVK's December 2025 press release.

208. On December 18, 2025, BVK's false December 12, 2025 press release was reproduced in English for an international audience by European Pensions.

209. On January 28, 2026, BVK's false member letter from January 19 blaming "project partners" was carried into the U.S. market by the San Francisco Standard.

210. On February 2, 2026, the U.S. financial press picked up BVK's narrative when Bloomberg described the approximately €1.6 billion of equity BVK had invested in U.S. real estate "with Deutsche Finance and Shvo" and reported that, "according to BVK," the losses on those investments reflected not only the post-pandemic market but also "project partners" that were "not meeting expectations." To Bloomberg's U.S. readership of investors and real-estate professionals, that statement conveyed that DF was a responsible partner in, and a cause of, the losses on those investments.

211. On February 3, 2026, a Bisnow article repeated much of the same story. So too did the Promote, an English-language real-estate newsletter, the next day. As did the San Francisco Standard on February 25, 2026.

212. Also on February 5, 2026, the German outlet New York Aktuell incorrectly reported, based on the false statements in the August 2025 interview of BVK's CEO, that DF selected Shvo to manage assets. Though that was a technical misquote, it demonstrates the clear implications of BVK's false narrative.

213. On May 13, 2026, in an article reporting that BVK had "lost $1B on a risky U.S. real estate bet," the Real Deal carried into the United States the March 2026 false statement by BVK's CEO that DF and Shvo had "identified the [investment] properties in advance of BVK's investment."

214. DF put the Ministry of the Interior as the supervisory body of BVK and the Budget and Finance Committee on written notice by letters of April 30 and May 18, 2026, identifying the false statements. BVK's Q&A nonetheless remained unchanged, still naming DF among the causes of the losses. Meanwhile, BVK's Co-CEO privately acknowledged to DF that BVK—not DF—had decided to execute the Transamerica sale even as BVK publicly distanced itself.

215. Over the course of this entire time span, DF received numerous press inquiries, including from many U.S. outlets, regarding BVK and its U.S. investments.

* * *

216. The narrative BVK presented to the public and regulatory authorities was false. BVK was not a passive investor. It was the primary decision-maker over its U.S. real estate investments—from the initial acquisition of each property through the ongoing management of the portfolio. The voluminous documentary record shows that BVK personnel made investment decisions before UI was even informed, conducted on-site property inspections that UI did not attend, maintained direct operational relationships with the co-managing partner that BVK later denied existed, and exercised control over financing, pricing, capital, and fee decisions at the individual property level. DF reserves the right to plead additional facts to establish any of these points.

### H. BVK's Campaign Inflicted Direct And Lasting Harm On DF's Business And Reputation

217. DF's business is the sponsorship and management of private-market real estate investments, and its livelihood depends on the confidence of the institutions and investors that entrust it with capital and mandates. Those constituencies include the pension funds, insurers, and other institutional investors that commit large mandates; the tens of thousands of retail investors to whom DFG markets its funds; the distribution partners and placement agents through which those funds are sold; the lenders that finance the assets DF manages; and the consultants and gatekeepers who screen managers before capital is committed.

218. In an industry in which reputation is the principal asset, a manager publicly branded by a marquee institutional backer as incompetent and responsible for the loss of hundreds of millions of dollars is, as a practical matter, disqualified in the eyes of the allocators and gatekeepers on whom its business depends.

219. As alleged, BVK did not confine its false narrative to a private dispute. It published that narrative to the world. BVK's narrative appeared in the German, European, and United States real estate and financial trade press that DF's investors, distribution partners, and financing counterparties read and rely upon—including Immobilien Zeitung, a leading German real estate trade journal that identified DF by name as BVK's "Asset-Manager," and Bisnow, a leading U.S. real estate publication that identified DF by name as the entity responsible for managing BVK's

investments, as well as Bloomberg. BVK broadcast the same message to a national German audience through Welt am Sonntag and Münchner Merkur, communicated it directly to its 2.8 million pension beneficiaries through its own website, and ensured that more media outlets would pick up the story by repeating it in parliamentary inquiries.

220. The audiences BVK chose were not incidental; they were DF's market.

221. The messages those audiences received were unmistakable and damaging: that DF had mismanaged billions of dollars of investments while BVK stood passively by, and that BVK—DF's most prominent institutional client—was severing its relationship with DF, "possibly prematurely," because of DF's failures.

222. Repeated across multiple outlets on both sides of the Atlantic—and reinforced by BVK's public suggestion that DF's management contract, though nominally running through 2028, might end sooner—the statements signaled to DF's entire market that its flagship institutional backer regarded it as incompetent and was terminating it for cause.

223. No institutional allocator, distribution partner, or financing counterparty could read that message and remain indifferent to it.

224. The consequences were concrete. Before BVK's campaign began in the fall of 2024, DF and its affiliates maintained an established and ongoing fundraising and business-development franchise, having successfully sponsored,

placed, and managed a series of real estate funds and investment mandates. After BVK launched and escalated its campaign, DF and its affiliates were unable to raise new capital and win new mandates in the ordinary course of business.

225. For instance, in the United States, a financing relationship with JP Morgan, the largest U.S. commercial bank, was lost. Similarly, the IF24 Austin Logistics fund was in active placement for DF in late 2025, but in the immediate environment of the 2025 statements, and due to the BVK controversy, only a fraction of the target volume was raised. The public portrayal of DF in the United States likewise undermined a partner's confidence in a 2025 partnership for Austin Logistics.

226. In Europe, DFG's asset-manager rating was placed under review for possible downgrade and was ultimately withdrawn, and major distribution partners, including listed companies and banks, curtailed or withheld business pending resolution of the BVK matter, with DFG's retail distribution declining in step with BVK's public statements and in several instances explicitly because of them.

227. This harm is distinct from, and in addition to, the project-level losses that BVK's operational obstruction caused. It did not flow from market conditions or from the performance of any individual property; it flowed from BVK's false public statements about DF's competence and responsibility. The timing confirms the causal link: DF's fundraising and business-development difficulties followed

the onset of BVK's campaign in the fall of 2024 and tracked its escalation across outlets and audiences thereafter.

228. The harm is also continuing. DF's capital-raising franchise remains impaired, and DF has been forced to divert resources to responding to and containing BVK's false narrative among its investors, distribution partners, financing counterparties, and other institutional stakeholders.

### I. BVK Attempts To Strip DF Of Its Contractually Guaranteed Management Fees

229. Against this backdrop of systematic obstruction across multiple properties and public scapegoating of DF, BVK escalated to try to force DF out of the management of various properties in the investment structure. Specifically, it sought to deprive DF of its contractually owed management fees for the Transamerica Pyramid.

230. In October 2020, DFA (through an affiliate) entered into an Asset Management Agreement with non-party BHSD Pyramid JVCo LLC to serve as asset manager for the Transamerica Pyramid. Under that agreement, DFA's management obligations were advisory in nature: it was to "recommend, advise and assist" the joint venture on leasing, construction, financing, and operational matters. For these services, DFA would be paid a "Management Fee." Under a separate agreement executed the same day, DFA's co-manager, Shvo, was also entitled to receive (until

his later termination) a management fee, leasing fee, property management fee, and construction fee for related services at the Transamerica Pyramid.

231. In September 2024, DFA, Elektra 2, and other non-parties amended this agreement. In a new "Term Sheet," DF agreed to receive substantially less in fees across the portfolio by terminating its management of certain properties and making other management agreements terminable in years to come. In return, DF insisted on a critical fee protection for its management of the Transamerica Pyramid: If DF's affiliate, the "Transamerica Managing Member," was "terminated before December 31, 2028," which would in the ordinary course deprive DF of its ability to collect fees, DF would nonetheless "be entitled to receive … all fees that would have been payable to DF through December 31, 2028 had such termination not occurred … and during such time DF shall be deemed a consultant entitled to be paid for such fees."

232. Over a year later, on December 31, 2025, BVK's counsel sent DFA an Information Notice stating that the "Fund's investor" "will not provide any further funding" to the Transamerica investment while DFA remains in the management structure. It demanded that, within five days, DF exit "with immediate effect and without receiving any compensation payment." DF declined.

233. By January 2026, the Transamerica Pyramid had also accumulated approximately $8 million in overdue construction payables (the majority 60-90 days

past due); multiple contractors were threatening liens; a tenant had issued a Payment Notice; and critical vendors were threatening to reduce staffing.

234. By the end of 2025, the property owed $4.8 million in unsecured debts, which continued to increase in January 2026.

235. In addition, a $3.2 million debt service payment was due on February 10, 2026, and failure to make that payment would constitute an event of default under the loan, putting the entire project, including a DF-managed retail investment of more than $100 million, at risk of total loss.

236. Without consulting DFA, on January 27, 2026, BVK, through Elektra 2, together with its advisor and a co-managing partner, negotiated the sale of the Transamerica Pyramid.

237. BVK, through its affiliates, then withheld the management fees that became due on January 1, 2026, until DF consented to the Purchase and Sale Agreement of the property on February 11, 2026.

238. That sale had critical import for DFA under the Term Sheet. The sale resulted in the termination of DF's affiliate, the Transamerica Managing Member, from its managing role. The Purchase and Sale Agreement does not allow for the Transamerica Managing Member to maintain its position after the sale. Accordingly, this termination triggered the Term Sheet's provision that "DF shall be

entitled to receive … all fees that would have been payable to DF through December 31, 2028 had such termination not occurred."

239. Those total fees amount to $31,384,061.

240. But BVK has fought tooth and nail to prevent DF from receiving its fees under the Term Sheet. Through its counsel, BVK demanded that DFA exit the management role without any fees, and it threatened to withhold all funding until it did so. In an email on February 4, 2026, BVK's counsel also asked all relevant parties for consent for the sale's escrow agent to send proceeds directly to upper-tier investors, including entities controlled by Elektra 2, thereby bypassing the entity within the Transamerica Pyramid investment structure that was responsible for paying DF. DF did not consent.

241. In the end, the parties agreed that all funds could be held by a third party pending an arbitration between Elektra 2 and DF of the parties' various claims to these funds.

242. That arbitral proceeding is ongoing. But BVK is not a party to it and has refused to produce documents or witnesses relating to the arbitration.

### J. Elektra 2 Acted As BVK's Agent And Alter Ego In The Transactions At Issue

243. Elektra 2 is not an independent economic actor. It is the vehicle that BVK created, funded, staffed at the decision-making level, and controlled in order to hold and deploy BVK's capital in U.S. real estate. Throughout the events

described above, Elektra 2 acted as BVK's agent, with BVK's authority and at BVK's direction, in making the investment decisions at issue and in negotiating, executing, and refusing to perform the Term Sheet. In the alternative, BVK so dominated Elektra 2 and so disregarded its separate existence that Elektra 2 was BVK's alter ego.

244. Elektra 2 carries BVK's name. Its full legal name is BAYVK Immobilien-Dachfonds 1 SCS SICAV-SIF Subfonds Elektra 2. The "BAYVK" in that name stands for Bayerische Versorgungskammer. Elektra 2 is a sub-fund of BAYVK Immobilien-Dachfonds 1, a fund organized to hold BVK's capital, and BVK is the only investor in that fund.

245. Elektra 2 exists for one purpose: to deploy BVK's pension capital into the international real estate investments BVK selects. On information and belief, Elektra 2 has no other line of business, no independent investment program, no third-party capital, and no employees, offices, or operations of its own. The administrative functions nominally performed at the fund level were carried out by UI, which as alleged above acted only after BVK had decided what would be done.

246. BVK bore the entire economics of Elektra 2's investments in the properties at issue. BVK supplied the equity, BVK was entitled to the distributions, and BVK absorbed the losses. When the Transamerica Pyramid was sold in March 2026, the sale proceeds ran to BVK. Elektra 2 was, as a matter of economic

substance, a conduit for enriching BVK and, when the investments failed, a conduit for BVK's losses.

247. Most tellingly, BVK staffs and chairs the organ through which Elektra 2's investment decisions are made. Andre Heimrich, BVK's Chief Investment Officer, is the Chairman of Elektra 2's Investment Committee. The written decision recommendations of that Investment Committee were the instrument by which the investments at issue were authorized, and Mr. Heimrich executed them in Munich, at BVK's seat. For example, on or about December 6, 2019, the Investment Committee of "BAYVK Real Estate Fund of Funds 1 — Elektra 2" issued a written recommendation authorizing an equity increase of approximately $206.3 million for the acquisition of 530 Broadway in New York. The vote was executed by "Heimrich (Chairman)" at "Munich" and returned to UI in Luxembourg for processing.

248. BVK itself did not distinguish between its own decisions and Elektra 2's. BVK described an investment authorization issued by Elektra 2's Investment Committee concerning the Transamerica Pyramid as a "positive vote from BVK."

249. UI treated BVK, rather than Elektra 2 or itself, as the party whose approval was required before the fund could act. In December 2024, UI reported that "Universal expects formal approval from BVK by December 18, 2024, allowing them to sign the subscription agreement." The regulated manager could not execute the fund's subscription documents until BVK signed off.

250. BVK did not merely accept or reject proposals put to it. It dictated the terms on which the fund would invest. In February 2024, in connection with the refinancing of 9200 Wilshire, BVK's personnel instructed DF that "BVK's approval is subject to" DF and Shvo first injecting $13 million of their own capital, the subordination of DF's and Shvo's preferred equity to BVK's preferred equity, and a guarantee that BVK's Investment Committee would regard as "rock solid" and capable of being "easily … enforced and encashed." Those are the demands of a principal setting deal terms, not the observations of a passive limited partner.

251. When the formal chain of authority was inconvenient, BVK went around it. As alleged above, BVK issued a proof-of-funds letter directly to a seller committing BVK to a purchase, told DF that funds "would have to go to the USA first without UI's signatures," instructed an operating partner by direct email to lock in the interest rate on project financing, and released capital without obtaining the signatures of its own investment committee. Elektra 2 and UI conformed to each of those decisions after the fact.

252. Moreover, in the first half of 2025, BVK, acting through Elektra 2, required the partnership holding four of BVK's properties to assume payment obligations to Mr. Shvo arising under a February 28, 2025 agreement to which neither the partnership nor its manager—a DF affiliate—was a party and into which neither had any insight. Shortly after DF's affiliate declined to release the payment,

the partnership was renamed and the DF affiliate was replaced by Elektra 2 Investment GP SARL (the "Elektra 2 General Partner")—an entity whose sole corporate purpose, fixed a month earlier, was to serve as general partner of this partnership and whose registered office is the address of BVK's AIFM in Luxembourg. On July 30, 2025, the Elektra 2 General Partner caused the partnership to accede to the February 28 agreement, and an $85.3 million payment to Mr. Shvo followed.

253. DF's contemporaneous documents were addressed to BVK as the principal, because BVK was the principal. DF submitted investment and refinancing memoranda addressed "To: BVK Anlageausschuss." In June 2024, DF's senior executives wrote directly to three BVK officials about the 9200 Wilshire refinancing, described institutional tenants then negotiating to lease space "in one of your buildings," and expressly distinguished between "BVK's internal real estate team" and "its AIFM, Universal Investment."

254. The AIFM structure did not operate as an independent check on BVK. BVK required a recommendation from UI as a procedural predicate to BVK's own decision, and no investment, refinancing, capital call, disposition, or lease at issue in this Complaint was ever authorized over BVK's objection or without BVK's approval. Elektra 2 never took a position contrary to a decision BVK had made.

255. BVK's control extended to the Term Sheet itself. BVK negotiated the Term Sheet, on behalf of its alter ego, Elektra 2. After execution, BVK's own counsel, rather than counsel for Elektra 2, communicated the fund's positions to DF, including the December 31, 2025 Information Notice demanding that DF exit the Transamerica management structure without compensation and the February 4, 2026 request to reroute sale proceeds around the entity obligated to pay DF.

256. BVK likewise directed the conduct that terminated DF's role. Without consulting DFA, BVK, through Elektra 2, negotiated the sale of the Transamerica Pyramid, and BVK's Co-CEO privately acknowledged to DF that BVK—not DF and not Elektra 2—had decided to execute that sale.

257. BVK accepted and retained the benefits of the Term Sheet, including DF's agreement to relinquish fees and to make certain management agreements terminable across the portfolio. BVK thereby authorized and ratified Elektra 2's execution of the Term Sheet.

258. For all of these reasons, Elektra 2 acted as BVK's agent, with BVK's actual authority, in the transactions and agreements at issue, and BVK is bound by and responsible for Elektra 2's acts and undertakings.

259. In the alternative, Elektra 2 was BVK's alter ego for the same reasons, and observing the fiction of separateness would work an injustice: It would permit BVK to take the benefits of contracts made in the United States and of U.S. property

held for its exclusive economic account, while disclaiming the obligations those contracts impose and publicly denying to regulators, to the press, and to its own beneficiaries the very relationship through which it directed them.

## CLAIMS FOR RELIEF

### COUNT I
### Breach Of Contract

260. Plaintiffs incorporate and re-allege each preceding paragraph as if fully set forth herein.

261. In September 2024, DFA and Elektra 2 signed a Term Sheet governing the management of the properties out of which this claim arises.

262. Plaintiff DFA is a party to the Term Sheet. Plaintiff DFG is entitled to enforce the Non-Disparagement Clause quoted below, which by its terms protects each party's "Affiliates," and DFG is an Affiliate of DFA.

263. That Term Sheet contains a "Non-Disparagement Clause," which provides, in full:

> Each party agrees not to disparage any other party, or any other party's attorneys, directors, managers, partners, employees, agents and Affiliates, in relation to the transactions contemplated by this Term Sheet in any manner likely to be harmful to them or their business, business reputation or personal reputation; provided that any party may respond accurately and fully to any question, inquiry or request for information when required by legal process, regulation or governmental inquiry.

264. As alleged above, BVK breached that clause by making multiple defamatory statements about DF. This public campaign by BVK conveyed that DF had mismanaged billions of dollars in investments while BVK stood passively by, and that BVK was now distancing itself from DF because of those failures.

265. That breach injured DF, and DF's injury is continuing and is not limited to the lost business already identified. DF has incurred, and continues to incur, additional costs to respond to and contain BVK's campaign among its investors, distribution partners, financing sources, and other institutional stakeholders, and DF's capital-raising franchise remains impaired going forward. DF is entitled to recover these actual damages in an amount to be determined at trial.

266. That contractual breach is imputed to BVK. As alleged above, Elektra 2 acted as BVK's agent, with BVK's authority, in negotiating and executing the Term Sheet; BVK negotiated the agreement; and BVK authorized and ratified it and accepted its benefits. In the alternative, Elektra 2 was BVK's alter ego. Under either theory, BVK is bound by the Term Sheet's Non-Disparagement Clause and is liable for its breach.

267. Finally, BVK, through Elektra 2, breached its contractual duties to pay DF its fees owed upon termination of the agreement. This Complaint does not seek to litigate this separate breach, which is being litigated in the pending arbitration against Elektra 2. But upon conclusion of the arbitration, DF reserves the right to

amend the Complaint to seek enforcement of any arbitration award that issues against BVK under an alter ego, agent, or other theory.

**COUNT II**
**Defamation**

268. Plaintiffs incorporate and re-allege each preceding paragraph as if fully set forth herein.

269. As alleged above, BVK made multiple defamatory statements about DF. This public campaign by BVK conveyed a single, false message to industry readers: that DF had mismanaged billions of dollars in investments while BVK stood passively by, and that BVK was now distancing itself from DF because of those failures.

270. These statements were false and defamatory. BVK—not DF—was the primary decision-maker over its U.S. real estate investments and it exercised direct control over every aspect of its holdings. BVK was responsible for its own investment failures, not DF.

271. BVK made these statements knowing that they were false, or with reckless disregard for their truth or falsity. BVK's own personnel selected the properties, approved each investment, directed capital commitments, and controlled leasing, financing, and pricing decisions, so BVK knew that its public attribution of those decisions to DF was false when it made it. DF further put BVK on written notice that the statements were false—publicly on January 5, 2026, and by letters of

April 30 and May 18, 2026—and BVK persisted. At a minimum, BVK acted negligently, and to the extent DF is treated as a limited-purpose public figure, BVK acted with actual malice.

272. These defamatory statements were published in widely read journals and platforms all over the world, including in the United States. And they referred to DF explicitly and by name.

273. Readers understood the defamatory character of these statements. That is why the statements caused fundraising to dry up for DF.

274. BVK's statements are defamatory per se. They do not concern an isolated error in a single transaction; they impugn DF's basic integrity, honesty, and competence in the very conduct of its trade and business by falsely charging DF with general incompetence and unfitness as an asset manager and with responsibility for the mismanagement of billions of dollars of investments. Such statements, directed at a professional asset manager in the exercise of its profession, are actionable without proof of special damages, and injury to DF is presumed.

275. Beyond the injury that the law presumes, DF suffered substantial actual harm as alleged above.

276. DF's injury is continuing and is not limited to the lost business already identified. DF has incurred, and continues to incur, additional costs to respond to and contain BVK's campaign among its investors, distribution partners, financing

sources, and other institutional stakeholders, and DF's capital-raising franchise remains impaired going forward.

277. DF is entitled to recover these actual damages in an amount to be determined at trial.

## COUNT III
## Deceptive Trade Practices Under The Delaware Deceptive Trade Practices Act

278. Plaintiffs incorporate and re-allege each preceding paragraph as if fully set forth herein.

279. In the course of explaining its business—specifically, the underperformance of its investments—BVK made multiple false statements of fact about DF. As alleged above, they conveyed a false message that DF mismanaged billions of dollars in investments while BVK stood passively by and that BVK was now distancing itself from DF because of those failures.

280. These false statements disparaged the asset management services of DF: claiming that DF performed work it did not do, and that it was responsible for failings attributable instead to BVK.

281. BVK's violations were willful. BVK knew, or should have known, that the conduct described above was of the nature prohibited by the Act. 6 *Del. C.* § 2533(b), (e).

282. As a result of these false statements, DF lost business and suffered reputational injury. DF is a person likely to be damaged by BVK's continuing deceptive trade practices and is entitled to reasonable attorneys' fees under 6 *Del. C.* § 2533(b) and to trebling of any damages awarded on its common-law claims under 6 *Del. C.* § 2533(c).

**COUNT IV**
**Tortious Interference With Contract (By DFA Only)**

283. Plaintiffs incorporate and re-allege each preceding paragraph as if fully set forth herein. This Count is alleged in the alternative if this Court were to find that Elektra 2 was not BVK's agent or alter ego.

284. DFA has a binding contract—the Term Sheet—with non-party Elektra 2 and other non-parties that entitles it to management, leasing, property, and construction fees. Specifically, the Term Sheet guarantees that if the "Transamerica Managing Member" was "terminated before December 31, 2028," DF would "be entitled to receive … all fees that would have been payable to DF through December 31, 2028 had such termination not occurred." The sale of the Transamerica Pyramid on March 27, 2026, terminated the Transamerica Managing Member. And DF is owed the fees that it would have received through December 31, 2028.

285. Defendant BVK knew of this contract. The Term Sheet was signed by non-party Elektra 2, BVK's central vehicle for capital investments, and BVK's

attorney referenced the agreement in a December 31, 2025 letter to DF asking it to exit the management role without payment.

286. BVK intentionally acted in such a way as to cause Elektra 2 to violate the Term Sheet and prevent DF from obtaining its fees. Specifically, BVK's attorney demanded that DF exit the management of the Transamerica Pyramid without any fee payments, and through Elektra 2, it refused to offer any more funds to the project while DF remained. And in an email on February 4, 2026, BVK's counsel sought to reroute funds payable to DF to entities controlled by Elektra 2, essentially guaranteeing that DF would not receive payment. These actions were a significant factor in causing Elektra 2 to repudiate its obligations under the Term Sheet and claim, in a March 9, 2026 letter, that DF would not receive any fees after the sale of the Transamerica Pyramid.

287. BVK had no legitimate reason to interfere with DF's contractually owed payments. Instead, consistent with its own false narrative, BVK sought to scapegoat DF as the cause for the substantial underperformance of BVK's investments. Tellingly, BVK did not try to block Elektra 2 from paying Michael Shvo $45,063,452 for the same categories of fees (along with carried interest) under an identical termination-protection provision covering the termination of his role in the management of the Transamerica Pyramid.

288. BVK's interference with DFA's contractual rights has prevented DFA from receiving the $31,384,061 in fees it is entitled to under the Term Sheet.

289. BVK tortiously interfered with DFA's contract rights in bad faith. BVK arranged for Elektra 2 to pay Shvo $45,063,452 for the same categories of fees (plus carried interest) under an identical termination-protection provision, while insisting DF exit for nothing. There is no good faith basis to treat the two parties any differently.

## COUNT V
## Tortious Interference With Prospective Business Relations

290. Plaintiffs incorporate and re-allege each preceding paragraph as if fully set forth herein.

291. DF had a reasonable probability of entering into and continuing specific business relationships, including its financing relationship with JP Morgan; the placement of the IF24 Austin Logistics fund, which was in active placement in late 2025; a 2025 partnership for Austin Logistics; and mandates and allocations from the institutional investors, distribution partners, placement agents, consultants, gatekeepers, and lenders identified above.

292. BVK intentionally interfered with DF's business opportunities by deliberately delaying approval and obstructing business decisions to thwart any chance of success.

293. BVK also intentionally interfered with those prospective relationships by publishing the false statements described above to the very audiences on which DF's business depends—institutional allocators, distribution partners, placement agents, consultants, and lenders. BVK knew of those prospective relationships, and its interference was wrongful and without justification.

294. BVK made its intentional interference perfectly clear in its demand that DFA exit the management structure—without any payment of applicable fees: It would use its control over the portfolio to squeeze DF for funds until it complied.

295. As a result of BVK's actions, DFA lost substantial revenue. DFA also lost valuable goodwill and personal relationships that are critical to DFA's long-term operational viability and success.

**PRAYER FOR RELIEF**

Plaintiffs respectfully demand a trial by a jury of twelve persons and request entry of judgment in favor of Plaintiffs and against Defendant, and that the Court grant the following relief:

a. a money judgment awarding Plaintiffs compensatory damages in an amount to be determined at trial;

b. trebling, under 6 *Del. C.* § 2533(c), of the damages awarded to Plaintiffs on their common-law claims;

c. pre-judgment interest as permitted by law, accruing from the date each of Plaintiffs' claims arose, and post-judgment interest;

d. Plaintiffs' costs of suit and reasonable attorneys' fees, including under 6 *Del. C.* § 2533(b); and

e. such other and further relief as the Court deems just and proper.

*/s/ Michael A. Barlow*
Michael A. Barlow (#3928)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
500 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 302-4000
michaelbarlow@quinnemanuel.com

*Attorneys for Plaintiffs Deutsche Finance America LLC and DF Deutsche Finance Holding AG d/b/a Deutsche Finance Group*

OF COUNSEL:

Alex H. Loomis
QUINN EMANUEL URQUHART & SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, Massachusetts 02199
(617) 712-7100

Derek L. Shaffer
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 13th Street NW, Suite 600
Washington, D.C. 20004
(202) 538-8000

Dated: September 15, 2026

EFiled: Sep 15 2026 06:29PM EDT
Transaction ID 80651787
Case No. N26C-08-455 KMM CCLD

# EXHIBIT A

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| DEUTSCHE FINANCE AMERICA LLC and DF DEUTSCHE FINANCE HOLDING AG d/b/a DEUTSCHE FINANCE GROUP, | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. N26C-08-455 KMM CCLD |
| BAYERISCHE VERSORGUNGSKAMMER, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) | |

**AMENDED COMPLAINT**

Plaintiffs Deutsche Finance America LLC and DF Deutsche Finance Holding AG d/b/a Deutsche Finance Group, by and through their undersigned counsel, bring this Complaint against Defendant and allege as follows:

**NATURE OF THE ACTION**

1. This case is about a sophisticated institutional investor that made bad investments and then tried to save face and mislead its beneficiaries by disparaging and defaming its partner. Defendant Bayerische Versorgungskammer ("BVK"), Germany's largest public-law pension group, mismanaged and ruined its multibillion-dollar portfolio of investments in U.S. real estate. In late 2024, BVK's misconduct came to light, and because its actions not only betrayed severe incompetence but also violated German law, BVK looked for others to take the fall.

Its chosen scapegoats were Plaintiffs Deutsche Finance America LLC ("DFA") and DF Deutsche Finance Holding AG d/b/a Deutsche Finance Group ("DFG") (collectively, "DF"), the asset managers for BVK's investments. In statements to the press, the Bavarian Parliament, regulatory authorities, and its millions of beneficiaries, BVK falsely branded DF as responsible for failures that BVK itself had caused. DF now seeks to hold BVK accountable.

2. As stated, BVK is Germany's largest public-law pension group, managing pension capital for approximately 2.8 million individuals. Starting in the mid-2010s, BVK invested nearly $2 billion in U.S. real estate. Under applicable German law, BVK's tax status did not permit it to control those investments directly—that was the job of various managers. Yet unbeknownst to regulators, the public, or its beneficiaries, BVK systematically and purposefully violated those rules by excluding the entities required by German law to control the investments and exerting direct control over the investments at every level.

3. The pattern was consistent across all of BVK's U.S. acquisitions: BVK would evaluate the properties, approve investments, and negotiate fees without its managers and then communicate its decision to those who should have been in charge so they could handle the administrative implementation of a decision BVK had already made. Afterwards, BVK would exercise control over the leasing, construction, financing, pricing, and capital decisions at individual properties—all

of which were operational matters that BVK was under-equipped and not institutionally competent to handle.

4. Because of BVK's overreach, DF's ability to execute its asset-management responsibilities at the properties depended entirely on approvals and capital that only BVK could provide. From funding tenant improvements to executing leases to covering operating shortfalls, DF could not operate unilaterally. BVK overstepped its bounds, so it had to *act* to keep its portfolio afloat. But it did not do so. Instead, BVK methodically harmed its own investments by failing to approve operating budgets, maintenance and development measures, refinancing decisions, and proposed leases across all of its properties. Those failures may amount to an estimated €853 million in total losses across the BVK portfolio.

5. Eventually, BVK's staggering losses broke to the public, in no small part because of a lawsuit surrounding them, and the press ran with the story. BVK had to find cover immediately as anything revealing how active and inept it had been would have exposed conduct raising serious regulatory issues and tax consequences at home. Given its agreement to release DF's partner, Michael Shvo, from any associated liability, BVK's big idea was to construct a false, disparaging, and defamatory narrative that BVK was not an operationally active investor at all but merely a passive participant in funds managed by DF and that DF was the party responsible for the losses.

6. Amidst a sea of public statements—including statements to German

regulatory authorities—peddling this defamatory story, an illustrative set of false statements occurred in an August 31, 2025 interview of BVK's CEO. In the interview, BVK's CEO referred to "[t]he fund manager Deutsche Finance," stated that "[t]he alternative investment fund manager of the target fund is responsible for selecting local business partners in these investments," and stated that he "clearly assume[d] that project partners who do not meet expectations will be parted with as quickly as possible." Those statements were not true. BVK made itself, not DF, responsible for selecting local business partners in the investments. And BVK, not DF, was the entity that utterly failed to meet expectations.

7. Over the ensuing months, BVK escalated this narrative, including by denying DF's statements correcting the record; by doubling down, on its Q&A webpage, that "the project partners did not meet the expectations placed on them"; and by stating in a March 21, 2026 interview that it was DF, rather than BVK, who "identified the individual investment properties" that ended up failing so badly.

8. That disparagement and defamation caused DF great harm. DF's entire business depends on the confidence of the institutions and investors that entrust it with capital and mandates. Once publicly smeared by a large institutional backer as incompetent and responsible for the loss of hundreds of millions of dollars, DF's ability to raise and invest capital and continue its ongoing operations was, for all practical purposes, put to an end.

9. At the same time, and as is the subject of a pending arbitration in which

BVK's counsel has acknowledged that DF could sue BVK separately, BVK used its financial leverage to strip DF of tens of millions of dollars in management fees that DF was contractually owed. On December 31, 2025, BVK's counsel demanded that DF exit the management structure of the Transamerica Pyramid in San Francisco "with immediate effect and without receiving any compensation payment" and advised that BVK would provide no further funding while DF remained. BVK then withheld fees already due until DF consented to a sale of the Transamerica Pyramid that BVK had negotiated without DF's knowledge or involvement. And after that sale triggered a bargained-for guarantee of $31,384,061 in fees to DF through 2028, BVK has refused to pay—despite paying a co-manager, under an identical termination-protection provision, the fees owed to him upon termination of his role.

10. Through this action, DF seeks to hold BVK accountable. It asserts claims for defamation, deceptive trade practices, breach of contractual non-disparagement obligations, and tortious interference with contract and with prospective business relations, and it seeks compensatory damages, interest, and costs. For those claims, DF demands a trial by jury.

## THE PARTIES AND RELEVANT NON-PARTIES

11. Plaintiff Deutsche Finance America LLC is a Delaware limited liability company and majority-owned subsidiary of Plaintiff DFG. Established in 2018, DFA functions as DFG's private equity platform for U.S. real estate: it sources, structures, and manages direct real estate investments in the U.S. on behalf of DFG's

institutional client accounts and managed funds. Plaintiff DFA's principal place of business is in Denver, Colorado.

12. Plaintiff DF Deutsche Finance Holding AG is a Munich-based global investment management firm that specializes in private market real estate and infrastructure investments. DFG serves tens of thousands of German retail investors and insurance companies.

13. Defendant Bayerische Versorgungskammer is Germany's largest public-law pension group and an authority of the Free State of Bavaria, itself a political subdivision of the Federal Republic of Germany. BVK is the beneficial owner of the properties at issue in this suit, investing through non-parties Universal Investment-Luxembourg S.A. ("UIL"), Universal Investment-Gesellschaft mbH and its successor UI BVK KVG (collectively with UIL, "UI"), and BAYVK Immobilien-Dachfonds 1 SCS SICAV-SIF Subfonds Elektra 2 ~~SCS SICAV-FIS~~ ("Elektra 2").

14. Non-party Elektra 2 is a closed-end special Alternative Investment Fund ("AIF") organized as a société en commandite simple under the laws of Luxembourg. It serves as the central vehicle through which BVK's capital is deployed for selected international real estate investments, including in the properties at issue in this suit.

15. Non-party Universal Investment-Gesellschaft mbH is a regulated German Alternative Investment Fund Manager ("AIFM") that administered BVK's Special Master Fund—the intermediary vehicle through which BVK's pension

capital flowed into Elektra 2. Under ~~the~~ European Union Directive 2011/61/EU, AIFMs bear legal responsibility for the fund's investment decisions, risk management, and regulatory compliance in the EU.

16. Non-party UI BVK KVG is a licensed AIFM that replaced Non-party Universal Investment-Gesellschaft mbH as administrator of BVK's Special Master Fund in or around 2024.

17. Non-party UIL is the licensed AIFM in Luxembourg that formally manages Elektra 2.

## JURISDICTION AND VENUE

18. BVK is a foreign state within the meaning of 28 U.S.C. § 1603 because it is a political subdivision of the Federal Republic of Germany. Accordingly, subject matter jurisdiction over this action, personal jurisdiction over BVK, and venue in this Court hinge on whether the Foreign Sovereign Immunities Act's ("FSIA") requirements are satisfied. *See* 28 U.S.C. §§ 1330(b), 1604; *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989) (holding that the FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts"); *CC/Devas (Mauritius) Ltd. v. Antrix Corp.*, 605 U.S. 223, 233 (2025) (under the FSIA, "subject matter jurisdiction plus service of process equals personal jurisdiction") (citation omitted). Due process restrictions on personal jurisdiction do not apply to BVK. *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 29 (2025) (Thomas, J., concurring in the judgment) (explaining, for personal jurisdiction

purposes, that "foreign states are not entitled to the protections of the Due Process Clause," and collecting authorities) (citation omitted).

19. ~~Subject-matter~~Subject matter and personal jurisdiction exist because BVK is not entitled to sovereign immunity under the FSIA with respect to the claims asserted in this action.

20. The FSIA's waiver exception applies. As outlined below, Elektra 2 is BVK's agent or alter ego. On September 11, 2024, BVK's alter ego, Elektra 2, signed a Term Sheet with DF governing BVK's U.S. investment properties out of which this case arises. The Term Sheet is governed by Delaware law. Agreeing that the law of a U.S. state should govern a dispute is an implied waiver of foreign sovereign immunity. H.R. Rep. No. 94-1487, at 18 (1976).

21. The FSIA's commercial-activity exception to sovereign immunity applies. 28 U.S.C. § 1605(a)(2). That exception provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case … in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

22. Commercial activity is defined as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). When this Complaint uses the term "commercial activity" under the

FSIA, it refers to both "a regular course of commercial conduct" and individual "particular commercial transaction[s] or act[s]."

23. Plaintiffs' claims against BVK are "based upon" BVK's commercial activity carried on in the United States because their claims arise out of BVK's investments in U.S. real property, its mismanagement of those properties, its interference with Plaintiffs' contractual rights and business opportunities stemming from those same investments in U.S. real estate, and its defamatory statements relating to those properties. Investing in real estate and mismanaging those investments are things private actors routinely perform and are not uniquely sovereign activities.

24. Plaintiffs' claims against BVK are also "based upon" the above actions that BVK took in the United States in connection with its commercial activity in Germany—specifically, its management of investments for German pension funds.

25. Plaintiffs' claims against BVK are also "based upon" BVK's actions outside the United States to interfere with U.S. investments in connection with BVK's commercial activities in Germany, and these actions had a direct effect on the value of U.S. investments.

26. Plaintiffs' claims against BVK are also "based upon" BVK's defamation for commercial gain that reached U.S. media outlets and affected DF's asset management and investments in the U.S.

27. For the avoidance of doubt, Plaintiffs allege and incorporate herein all

commercial activities alleged in this Complaint for purposes of satisfying all three clauses of the FSIA's commercial activity exception. BVK's personnel had repeated contacts for commercial purposes with the United States that were related to BVK's U.S. investments. All of BVK's actions had a direct effect on the value of its U.S. investments and on DF's ability to conduct business in the United States.

28. The FSIA does not impose any restrictions on venue for a complaint filed as an original matter in state court. BVK does not reside in any county in this State, and so venue is proper in this Court under Delaware law.

## FACTUAL ALLEGATIONS

### A. The Structure Of BVK's Investments

29. BVK is Germany's largest public-law pension group, managing pension capital for approximately 2.8 million individuals. In the mid-2010s, BVK embarked on a multibillion-dollar push into international real estate. By 2020, BVK had invested approximately $2 billion in U.S. real property, which it considered its own crowning achievement. BVK deployed its capital through a chain of intermediary entities over which it exercised total control, with those intermediaries serving as alter egos or agents of BVK. This level of control is inconsistent with the role of an investor within an externally managed fund structure.

30. At the top of the chain, BVK's pension capital was held in a Special Master Fund administered by Universal Investment-Gesellschaft mbH. One step down the chain, that Special Master Fund invested BVK's consolidated real estate

capital into Elektra 2, and UIL served as Elektra 2's AIFM, the regulated entity responsible for overseeing and approving all of Elektra 2's investments. Directive 2011/61/EU, Arts. 5-6; ESMA, Guidelines on Key Concepts of the AIFMD, ESMA/2013/611 (Aug. 13, 2013).

31. The relevant regulatory framework did not prohibit BVK from monitoring its investments or expressing investor views, but it did require that the AIFM—not BVK—retain and exercise the independent portfolio-management, risk-management, and decision-filtering role assigned to it by law. Specifically, German and EU law set out a distinct framework for BVK's real-estate investments and related tax privileges concerning income from such investments. Responsibility for, and decision-making authority regarding, all investment decisions, as well as portfolio management and risk management, must reside with the fund's AIFM, not with investors like BVK. Beyond the formal structures, the legality of such investments also depends on BVK, as a functional, operational matter, limiting its role to that of an investor—without assuming project-level steering functions, which would otherwise usurp proper governance by external managers.

32. As set out below, BVK violated those rules. While maintaining a fig leaf of legal compliance, it overreached into operational matters that it was not equipped or competent to handle. BVK's personnel systematically influenced investment structuring, made investment decisions, directed capital commitments, negotiated fees, inspected properties, reviewed and approved proposed leases, and

drove operational strategy across the portfolio—all without competently and reliably following through, while sidelining and, indeed, disabling the regulated fund managers who were meant to exercise independent portfolio-management, risk-management, and oversight functions.

33. DF, with its partner Michael Shvo, then served as the on-the-ground asset manager for BVK's U.S. properties—the entity responsible for the day-to-day work of operating, leasing, and maintaining the buildings. DF did not hold discretionary authority over the investments themselves. It did not have the power to select the investments in its own discretion, to make the binding investment decisions, or to commit or control BVK's capital. DF's role, along with Mr. Shvo's, was just to manage the assets that BVK chose to acquire pursuant to contractual arrangements that BVK approved and for fees that BVK agreed to pay.

34. DF's ability to execute its management responsibilities at those properties depended entirely on approvals and capital that only BVK, because of its overreach, could provide. DF could not operate unilaterally, including as to matters such as funding tenant improvements, executing leases, and covering operating shortfalls. When BVK later withheld the necessary approvals and funding, DF could not simply go around it. And when BVK then blamed DF publicly for the resulting underperformance, it blamed DF for failures caused by BVK's own obstruction and mismanagement.

**B. BVK's Acquisition And Control Over Its U.S. Real Estate**

**Investments**

35. As explained, BVK's actions show that it went beyond ordinary investor oversight and into project-level steering. When BVK entered the U.S. real estate market, it selected individual properties, approved each investment on a project-by-project basis, and deployed capital through intermediaries in a series of targeted commitments. Between 2018 and 2020, BVK invested in several properties at which non-party Michael Shvo and his entity SHVO Concept LLC served as the operating partner responsible for development and construction and DFA, along with Shvo, served as the asset manager. Mr. Shvo was introduced to BVK by Serdar Bilgili, and from the outset, BVK engaged and vetted him—including through a Crumpton Group background check.

36. BVK exercised operational control over the portfolio from the beginning. For each of BVK's seven U.S. real estate acquisitions, the pattern was the same: before UI was even contacted, BVK's internal investment committee evaluated the property, approved the investment, and communicated its decision to DF and Shvo, who it knew was involved with all of the properties. UI was then informed after the fact and asked to handle the "administrative implementation" of a decision BVK had already made.

37. BVK's investment in the "685 Fifth Avenue" property in New York is illustrative. BVK personnel began evaluating the property with DF in February 2018. On April 17, 2018, BVK personnel confirmed by email that the investment

would be proposed to others at BVK. No one from UI was involved. On April 19, 2018, DF confirmed to Shvo that BVK's investment committee had approved the investment in principle. UI was still not involved. On May 23, 2018, BVK personnel officially confirmed BVK's board decision to proceed with the 685 Fifth investment and then asked DF to contact UI to discuss "administrative implementation." UI was first contacted on May 24, 2018, three months after BVK had begun evaluating the transaction and more than a month after BVK's board had approved it.

38. The same pattern repeated for every subsequent acquisition.

39. For example, at the Raleigh Hotel in Miami, BVK personnel requested detailed construction cost information from DF in November 2018 to prepare a recommendation to BVK's investment committee. UI was not involved.

40. For 711 Fifth Avenue (the Coca-Cola building), BVK personnel wrote a "Proof of Funds" letter directly to Coca-Cola on behalf of BVK in May 2019, committing BVK to the purchase. UI did not appear in BVK's letter, although, as BVK's own fund manager, it should have been the entity making that commitment.

41. For the Transamerica Pyramid in San Francisco, when UI had not yet signed off on the capital payment in October 2020, BVK personnel told DF that if UI could not process the payment in time, "the money would have to go to the USA first without UI's signatures."

42. BVK was thus prepared to bypass its own licensed fund manager

entirely rather than delay a transaction BVK had already decided to make.

43. UI's own personnel recognized that they were being excluded. On September 9, 2020, UI personnel wrote to DF asking about a deposit adjustment and closing timeline for 711 Fifth Avenue—a transaction that BVK and DF had already negotiated and agreed upon without UI's knowledge. UI asked DF to identify which BVK personnel had been involved, because UI itself did not know. UI was not independently managing the fund. It was learning about BVK's decisions after they were made.

44. By the end of 2020, BVK had unilaterally committed approximately $2 billion of capital through Elektra 2 in seven U.S. properties, in each case approving the investment before notifying UI.

45. BVK's control extended beyond simply acquiring the various properties. It exerted direct influence over the operations and business of its investments.

46. For example, on March 6, 2020, BVK personnel personally authorized DFA's co-managing partner by direct email to lock in the interest rate on the debt financing for 711 Fifth Avenue.

47. This was not a passive investor reviewing a fund manager's recommendation. This was a BVK employee directly instructing the co-managing partner on a specific financing decision, with no UI involvement.

48. BVK personnel also regularly directed capital commitments and

releases for individual properties.

49. For example, BVK personnel approved or withheld capital increases for the Transamerica Pyramid (multiple rounds from 2022 through 2024), the 9200 Wilshire property in Beverly Hills (the months-long delay described below), and 711 Fifth Avenue.

50. In each instance, UI processed the payments only after BVK had decided what to do.

51. On December 12, 2019, BVK's head of real estate investment management told DF that he would "release the investment without signatures from the investment committee, to not hold up the process"—BVK's head of real estate investment management thus unilaterally released capital without even his own board's formal sign-off.

52. BVK also weighed in on pricing, sales, and fee negotiations at the individual property level. BVK personnel were regularly updated on, and expressed views about, individual apartment sales at 685 Fifth Avenue in New York and 9200 Wilshire, specific rental rates at the Transamerica Pyramid, and the commercial terms of asset management fee arrangements across the portfolio.

53. Further, BVK had extensive contacts with its partners in the United States.

54. BVK personnel traveled to the United States repeatedly to inspect properties, tour construction sites, meet operating partners, and attend leasing

presentations—in many cases without UI present.

55. For instance, on June 12, 2018, BVK personnel requested that their upcoming visit to 685 Fifth Avenue in New York include meetings with "Shvo's personnel, the broker, advisors, the general contractor, and prospective tenants."

56. BVK wanted to personally meet operationally active people on the project.

57. BVK personnel visited 685 Fifth Avenue on June 18, 2018, and met DFA's co-managing partner in person for the first time.

58. UI did not attend.

59. On November 19, 2018, BVK personnel visited the Raleigh Hotel. Again, UI did not attend or conduct its own on-site due diligence.

60. On April 12, 2019, the entire senior leadership of BVK traveled to Beverly Hills to inspect the 9200 Wilshire property and meet with DFA's co-managing partner in person. UI personnel attended this visit, but the visit was organized by BVK, and BVK's investment committee members conducted their own evaluation of the property.

61. On December 9, 2019, BVK leadership conducted a multi-day tour of properties in New York and Miami, meeting at the co-managing partner's offices in New York and visiting the Raleigh project in Miami.

62. UI did not attend.

63. In June 2022, BVK attended and collaborated on a five-day "U.S.

Property Tour" spanning New York, Chicago, and San Francisco.

64. The tour included property visits to 685 Fifth Avenue, 711 Fifth Avenue, 530 Broadway, 333 South Wabash, and the Transamerica Pyramid; a capex presentation with Foster + Partners at Transamerica; a leasing tour with the JLL leasing team; and a working lunch portfolio overview at the co-managing partner's office.

65. BVK's own CEO would eventually admit in public that BVK personnel had an "inappropriate proximity relationship" with parties in the U.S.

66. That admission was an understatement. The evidence shows that BVK personnel did not merely maintain relationships—they directed operations.

67. Accordingly, and as supported by hundreds of communications from 2018 through 2024, BVK personnel made investment decisions before UI was even informed, conducted on-site property inspections that UI did not attend, maintained direct operational relationships with U.S. parties, and exercised control over financing, pricing, capital, leasing, and fee decisions at the individual property level. UI—the entity that EU law required to independently manage BVK's investments in the Elektra 2 fund—was systematically excluded from substantive decision-making and reduced to an administrative processor of decisions BVK had already made. BVK crossed the legal line from the position of a passive investor within an externally managed fund structure into a functionally steering role that undermined the AIFM architecture and thereby exposed the tax assumptions underlying BVK's

privileged status.

### C. BVK And Its Affiliates Tank The Investments

68. The same control that BVK exercised to acquire these properties meant that when market conditions deteriorated, only BVK could authorize the decisions necessary to protect them, but BVK refused to act.

69. Between 2020 and 2024, the U.S. commercial real estate market started to decline. BVK's portfolio was caught in this same current, and the crisis demanded active, decisive management from what should have been UI. Under applicable regulations, no refinancing could proceed, no additional capital could be called, and no strategic pivot could be executed without UI's consent. But BVK usurped UI's role, and as market conditions worsened, it proved unable or unwilling to make the timely decisions that its own dominant position demanded.

70. Instead, BVK's problematic relationship with German regulations and regulators led it, beginning at least as early as the start of 2024, to act underhandedly and even irrationally. In particular, although BVK improperly stepped into a steering role, it faltered in that role and systematically harmed its investments by failing to approve operating budgets, maintenance and development measures, refinancing decisions, and proposed leases across all of its properties.

71. BVK's failure to act on operating budgets, maintenance and development measures, refinancing decisions, proposed leases, and project-related actions was not occasional or inadvertent. It was systematic, spanned every property

in the BVK-DF portfolio, and interfered with many of DF's actual or proposed operations.

72. The first major obstruction arose at the 9200 Wilshire Boulevard property in Beverly Hills, a 54-unit luxury residential development.

73. A $200 million construction loan was set to mature on February 9, 2024.

74. DF identified the issue in October 2023 and requested that BVK approve the capital needed to refinance.

75. BVK personnel requested, reviewed, and commented on multiple business plan scenarios.

76. It had four months, all necessary information, and sole authority over the funding decision.

77. But rather than act, BVK sent DF through round after round of redundant memo revisions, sensitivity analyses, and approval requests. DF had no alternative but to comply with each request because only BVK could authorize the capital that would save the project.

78. BVK never intended to approve the funding. If it had, it would have acted on the answers it received. Instead, BVK ran out the clock.

79. On January 30, 2024, ten days before maturity, BVK responded to DF's Business Plan Update with "Looks good. I have no further comments."

80. No approval followed.

81. The loan defaulted.

82. By never formally refusing to fund or approving it, BVK ensured that when the loan defaulted there was no decision to point to, only DFA and its operating partner left holding the blame for losses that BVK's inaction caused.

83. In an attempt to salvage the situation, DF helped facilitate a $210 million replacement loan with JP Morgan, which assembled a lending group, completed its approval process, and was ready to close by June 2024.

84. The only step remaining was BVK's approval.

85. JP Morgan spent months waiting.

86. BVK provided no timeline and never gave assent.

87. By November 2024, JP Morgan informed DFA that it considered the relationship "closed."

88. Personal relationships of many years between DFA and the JP Morgan bankers involved were ruptured as a result.

89. The 9200 Wilshire property was thus surrendered to the lender through a deed in lieu of foreclosure in February 2025.

90. In Miami, BVK's inaction ruined a sale at 1757 James Avenue, a part of the Raleigh property.

91. DF had negotiated the deal and executed the contract with the buyer, pending investor approval.

92. BVK delayed this approval for months until the buyer walked away entirely.

93. Because of BVK's inaction, at 685 Fifth Avenue in New York, by mid-2024, ~~46~~nearly 50 of 65 condominium units remained unsold, and the project faced a potential default on its inventory loan, which the project partners had twice extended through forbearance agreements funded by their own emergency capital contributions, putting DFA at significant risk of insolvency.

94. At the Transamerica Pyramid in San Francisco, BVK obstructed multiple leases by refusing to give timely approvals, jeopardizing the success of the project and undermining its asset managers.

95. For instance, Morgan Lewis & Bockius LLP, one of the largest law firm tenancies in San Francisco and a critical anchor for the Transamerica Pyramid's repositioning, signed a letter of intent to lease on November 22, 2024.

96. That letter required a lease to be signed by December 18, 2024.

97. While Morgan Lewis was ready to finalize, that deadline passed because of BVK's delays. DFA's reputation was thus damaged, and Morgan Lewis threatened to sue DFA on February 18, 2025.

98. The lease was ultimately signed on March 6, 2025, thanks to DFA's efforts, and despite BVK's misbehavior.

99. BVK also refused to approve capital expenditure budgets across the portfolio.

100. At Transamerica, BVK ignored DF's repeated requests to approve the 2025 capital expenditure budget after DF updated and submitted its business plan seven times over six weeks: on April 23, 2025; May 5, 2025; May 12, 2025; May 19, 2025; May 28, 2025; June 2, 2025; and June 5, 2025. Seven submissions. Zero responses.

101. At 711 Fifth Avenue, the same pattern repeated.

102. DF sent memos requesting approved business plans on November 27, 2024, and December 8, 2024.

103. No approval was received.

104. Because the business plan was not approved, leasing activities at 711 Fifth Avenue were paused entirely on January 2, 2025.

105. DF continued and submitted budget memoranda to BVK to secure the required investor approval of the 2025 capital expenditure budget on June 2, 2025; July 14, 2025; July 17, 2025; and August 1, 2025.

106. Still no approval was received.

107. BVK's refusal to approve a budget did not merely delay leasing—it shut it down.

108. The obstruction was not limited to budgets.

109. Meanwhile, the 2023 audit for 9200 Wilshire (along with all subsequent audits) could not be completed because the investor funding was never provided.

110. Even routine, low-dollar operational approvals were met with silence.

111. BVK's poor management, along with challenging economic conditions, led to substantial underperformance across the investment portfolio.

112. Total losses across BVK's U.S. real estate portfolio may potentially reach an estimated €853 million.

113. BVK's investments failed largely because BVK's interference caused loan defaults, killed transactions, and blocked the leasing activity that its own asset managers needed to succeed. BVK's inaction, after years of exerting almost total control, was causing investments to fail.

114. But BVK could not come clean and tell the truth when that happened. Disclosing the facts of just how active and intrusive it had been would have blown the whistle on its noncompliance at home—exposing conduct that raised serious regulatory issues and corresponding tax consequences.

**D. BVK Scapegoats DF In The Press And Before The German Authorities For Its Own Investment Failures**

115. Despite BVK's central role in (mis)managing the investment portfolio, that role was not widely known outside the investment structure.

116. That changed in June 2024 when a then-tenant of two of the portfolio's properties, Core Club, filed suit in New York Supreme Court against BVK, Shvo, and others, claiming approximately $600 million in damages.

117. Among other things, the complaint alleged that BVK exercised actual operational influence and control over the investments as the economically

dominant, majority investor in the projects.

118. German media quickly picked up the story and began reporting about the lawsuit.

119. For BVK, a tax-exempt public pension authority whose privileged status depended on maintaining a passive investor role, the public exposure of its operational involvement was an existential threat.

120. That gave BVK a powerful motive to recharacterize its role and to find someone else to blame. And BVK's reaction was swift and dramatic.

121. On information and belief, BVK imposed an internal travel ban prohibiting employees from traveling to the United States.

122. On information and belief, BVK severed all direct communication with both DF and Shvo, cutting off the operational channels that had functioned for years.

123. BVK terminated or reassigned two senior officials who had been centrally involved in the U.S. investments, both of whom were subsequently accused of compliance violations.

124. And BVK began constructing a new (false) public narrative: BVK was not an operationally active investor at all. It rather was merely a passive participant in funds managed by DF and its alleged confidant, Shvo.

125. On September 9, 2024, Business Insider, a U.S. media outlet, published an article stating that a BVK "representative said in an email [to Business Insider] that '[BVK's] investment in [the 9200 Wilshire property] in question has been

indirect[] and in accordance with the German regulations applicable to us for investments in foreign projects.'"

126. That statement was a lie, intended to shield BVK from scrutiny and imply that failures in the investment projects were DF's responsibility.

127. As explained above, BVK's actions were anything but "in accordance with the German regulations applicable to" it.

128. On September 26, 2024, a prominent German newspaper, Abendzeitung München ("AZ"), published a major investigative article about BVK's U.S. real estate losses.

129. The article repeated BVK's false assertions that it had "no influence over decisions taken on the ground" at its investments.

130. The article also inaccurately described the flow of funds from BVK, stating that money flows from "the pension authority[,] to the capital management company Universal Investment in Luxembourg, and is then allocated by the fund manager Deutsche Finance, based on Leopoldstrasse in Munich."

131. This description positioned DF—not BVK—as the entity directing capital allocation, precisely the opposite of what actually happened.

132. Apart from those false statements, the article also chronicled the numerous trips, "some by private jet," that BVK personnel took to the United States (including Las Vegas, where BVK did not invest in any property).

133. On July 29, 2025, a new article published by AZ signaled that BVK

was seeking to separate from DF, "possibly prematurely."

134. The article also contained non-public information about internal personnel changes at DF, characterized DF as "BVK's investment vehicle," and described at least three of BVK's U.S. projects as failing.

135. On information and belief, that non-public information came from BVK.

136. Those statements implied that DF was responsible for failed investments, rather than BVK.

137. The next day, DFG's Chief Investment Officer wrote an email to BVK's CEO protesting that the article contained information, including non-public information, "clearly attributable" to BVK and noting that Elektra 2 and BVK's own counsel at A&O Shearman had confirmed to DF in writing on July 17, 2025, that "no information would be provided to the ~~press~~public."

138. BVK broke that agreement within two weeks.

139. DF warned BVK that it would "no longer accept being used as a projection screen for [BVK's] internal or political conflicts" and expressly reserved the right to pursue legal claims based on BVK's public misstatements.

140. DF stated that BVK's characterization of DF's role, particularly regarding operational responsibility, structuring, and management of the investments, was "selective, one-sided, and in parts incorrect."

141. BVK did not change course. It escalated. Within days, the same

narrative appeared in multiple trade publications on both sides of the Atlantic.

142. On information and belief, BVK or its agents supplied the information to the publications.

143. On August 7, 2025, the publication Bisnow publicly identified DF by name as the entity responsible for managing BVK's investments.

144. As reported in the article, "BVK has repeatedly said that it has no direct, contractual relationship with Shvo. Instead, its capital was put in a fund managed by Deutsche Finance America, alongside other German funds, which in turn is invested in real estate projects." DFA does not sponsor, maintain, or manage any investment fund; it acts only as an asset manager.

145. The article quoted BVK as claiming that it was "not unusual to seek a separation [from partners], possibly prematurely, depending on the performance of an investment, the overall market, or the existing interest of third parties."

146. On the same day, Immobilien Zeitung, a prominent German real estate trade journal, published a parallel article describing DF as BVK's "Asset-Manager."

147. The article repeated BVK's "separation" language.

148. And as reported in the article, BVK stated: "It is generally not uncommon for a capital management company like Universal Investment to seek a separation depending on the development of an investment."

149. The article also discussed purported contractual agreements between DF and BVK: "Deutsche Finance's asset management contract with BVK for US

real estate runs until 2028 – but perhaps even shorter."

150. The Real Deal, a U.S. media outlet, thereafter repeated, on August 8, 2025, that BVK's capital sat in a "fund managed by Deutsche Finance America."

151. This public repositioning was a lie. DFA does not sponsor, maintain, or manage any investment fund, and it was BVK's own employees who had conducted on-site inspections, attended project meetings, held independent discussions with financing banks, requested and reviewed alternative business plan scenarios, and directed the structuring of the investment vehicles.

152. But the Core Club lawsuit had exposed the gap between BVK's formal posture and its actual conduct, and BVK tried to close that gap by rewriting history and leaving DF with the fallout.

153. The next step in BVK's strategy was a sustained public campaign to shift blame onto DFA by expressly lying to the media, German authorities, and others that DFA caused the portfolio's underperformance, and that BVK played no part in the portfolio's management.

**E. BVK Publicly Defames And Disparages DF**

154. BVK had been seeding the narrative, after which BVK made a batch of false public statements on August 31, 2025, in an interview of BVK's CEO by Welt am Sonntag ("WAMS"), a national German outlet. The relevant part of the interview states:

WAMS: This was not the only reason why the four projects have

problems. Her business partner in the USA seems a bit dubious. After all, it is not an unwritten page in terms of tax law.

[BVK CEO]: **The alternative investment fund manager of the target fund is responsible for selecting local business partners in these investments.** There are formal review procedures for this, which also include trustworthiness and have not revealed any objections.

WAMS: The name of the U.S. real estate developer you're talking about is Michael Shvo. Did your house have direct contact with him?

[BVK CEO]: I personally met him briefly once during a property inspection at the end of 2023. As I said, **Mr. Shvo's selection was not made via BVK. We have made our contributions through the capital management company, which in turn invests in the target funds.** After the first press reports about a lawsuit, this is an occasion for us to take a closer look. We have launched an in-depth investigation, which also involves external auditors. Result: There were violations. We therefore immediately drew conclusions. The signal is clear: such situations will not be tolerated.

…

WAMS: Security is a good keyword. The Bavarian state parliament dealt with some special investments of your company. Why did you invest more than 800 million euros in four dubious, poorly performing real estate projects in the USA?

[BVK CEO]**:** Firstly, we have been investing in US real estate for around 20 years – with success. Secondly, we are talking about 0.7 per cent of our total capital under management. Thirdly, it is not clear to me what is "dubious" about investing in real estate projects in attractive locations. These investments were made before the pandemic, the Ukraine war and the interest rate turnaround. These are developments that no one could have foreseen, they have affected the entire industry. But I don't want to sugarcoat anything here. These projects did not meet our expectations. In the United States, we immediately initiated internal investigations. We take such processes very seriously.

WAMS: What does that mean in concrete terms?

[BVK CEO]: Violations of compliance by external experts have been

> identified. **They give indications of what we consider to be an inappropriate proximity relationship. We are pursuing something like this hard and it leads to immediate consequences**. In addition, we ourselves informed the public prosecutor's office – not under pressure from third parties, but proactively. We ensure maximum clarification here. It is not possible to say at present whether this is relevant under criminal law.
>
> WAMS: Let's get down to business: The investments you've gambled away with are in attractive locations such as Miami Beach, San Francisco or New York. Have there been meetings between BVK employees and Mr. Shvo that were attended by family members, friends or other close people and that sound more like a pleasure trip?
>
> …
>
> [BVK CEO]: We are invested in almost all of these projects together with other institutional investors. **The fund manager Deutsche Finance** has also invested in many of the properties itself through retail funds, so that numerous private investors have also contributed capital.
>
> WAMS: Your story is reminiscent of "Stupid German Money" and the banking crisis of 2008, when German financial institutions put their money into US subprime real estate they had no idea about because of low interest rates.
>
> [BVK CEO]: No, it's not comparable. We are talking about a very small part of our total assets – 0.7 percent as of today. **There have been mistakes, yes, and we are learning from them. An example: I clearly assume that project partners who do not meet expectations will be parted with as quickly as possible.** Here you have to put your finger in the wound, and rightly so.

(emphasis added).

155. Those statements were false and implied additional false statements of fact.

156. BVK made itself, not an AIFM or DF, "responsible for selecting local business partners in these investments."

157. BVK was intimately involved in selecting Mr. Shvo, and, on information and belief, BVK's CEO had met him on several occasions.

158. And DF was not the entity that failed to meet expectations. BVK dropped the ball.

159. Following on those false statements, on December 12, 2025, BVK issued a press release that publicly quantified BVK's equity exposure "with Deutsche Finance and SHVO" at approximately €1.6 billion, reported €163 million in write-downs with further exposure bringing the potential total to approximately €853 million, asserted that compliance violations had occurred, and announced tightened partner and know-your-customer measures.

160. The losses BVK quantified were losses that BVK caused its U.S. real-estate portfolio, and the "compliance violations" it asserted were BVK's own improper involvement in investments.

161. But the obvious, undeniable, and false implication of this press release, especially when coupled with its interview and press campaign, was that the losses were caused by DF and that DF committed the violations. Again, that was not true.

162. On January 5, 2026, in response to BVK's false narrative, DF issued a press release to the media correcting the record.

163. DF explained that it had not selected the U.S. investments and had not made the investment decisions; no DF entity was an underlying-fund manager or held authority to select, direct, or approve the investments—those were BVK's

decisions.

164. Notwithstanding DF's statement, on January 19, 2026, BVK sent a letter to its members telling them that U.S. losses were attributable in part to "project partners" that "have not fulfilled the expectations placed in them," and that "compliance violations" had been "uncovered."

165. The letter directed members to BVK's website for further detail.

166. Again, that was false. The losses were BVK's fault, not DF's. And the compliance violations were its own doing.

167. The next month, on February 5, 2026, BVK, on information and belief, issued a similar false statement to Immobilien Zeitung. The publication states:

> BVK itself presents itself as a passive, indirect investor without decision-making authority: "BVK only indirectly holds shares in a fund, which in turn invests indirectly passively and together with other investors in the corresponding properties via various target funds. The investment decisions in these target funds and the selection of the service providers involved were mainly made by the AIFM in cooperation with Deutsche Finance. There is no participation in the management of this fund for legal and regulatory reasons."

Like the previous statements in the same vein, those statements were false.

168. Also in February 2026, BVK updated its Q&A webpage with false information.

169. Regarding its U.S. investments, BVK stated that the AIFM "selects … the investment objects, is responsible for the examination and ultimately the specific investment, in this case the respective property."

170. That statement was false. BVK selected the investments and was responsible for the specific investment of all the properties.

171. When discussing the causes of "losses in US real estate investments with Deutsche Finance and SHVO," BVK claimed that one "reason is that the project partners have not fulfilled the expectations placed in them."

172. That statement again falsely blamed DF for its losses in a communication addressed to 2.8 million pension beneficiaries of BVK.

173. These statements were intended and understood to refer to DF.

174. DF and Shvo are named nine times on that webpage, including in four question headings.

175. Next, on March 21, 2026—more than two months after DF had publicly corrected the record—BVK's CEO repeated and escalated the false narrative in a question-and-answer interview published in Münchner Merkur initially and in other outlets shortly thereafter.

176. Asked whether BVK saw itself as a "victim," BVK's CEO said that BVK "had project partners who did not meet our expectations."

177. Although he prefaced the remark by claiming he would "explicitly not nam[e] any names," the interview identified DF by name throughout.

178. BVK's refusal to name DF was thus an empty formalism, born of a guilty conscience and designed to avoid liability. It was clear that all comments were directed at DF.

179. When the interviewer put DF's own position to him—that DF "had nothing to do with the selection of the projects"—BVK's CEO rejected DF's claim.

180. He told readers that DF's statement "irritates us very much," invoking the adage that "success has many fathers, failure only one" and asserting that DF "was significantly involved in the investments in various roles."

181. He incorrectly told readers that "Deutsche Finance and Shvo had already identified the individual investment properties in advance," while dishonestly casting BVK as a passive investor that had merely "invested in US real estate … via a fund of funds structure" and had "no direct contractual relations."

182. Again, these statements were all lies, designed to mislead the German pensioners that BVK had failed and shield BVK's officers from accountability for their disastrous governance.

### F. BVK Lies To German Authorities To Distance Itself From Its U.S. Real Estate Investments

183. In addition to those public false statements, BVK and its officers lied to the German authorities responsible for regulating it, including in a series of public parliamentary statements designed to shield them from accountability, mislead German pensioners, and blame DF.

184. DF includes these statements in this Complaint for purposes of proving BVK's malice and intended meaning behind its public statements.

185. In response to parliamentary inquiries, the Bavarian State Ministry of

the Interior ("StMI"), which directly controls and runs BVK, falsely represented to Parliament that BVK played no operational role in the U.S. investments. When making those false statements, the StMI was relying on false information supplied to it by BVK.

186. First, on October 13, 2025, the second parliamentary inquiry into BVK's investment decisions was published as part of the Bavarian Official Record Drs. 19/8108. The inquiry's title captured its subject: "Bayerische Versorgungskammer: Who controls the inspectors?"

187. In this inquiry, the StMI represented this time that "[a]n instruction [for the StMI] to terminate the contracts is legally not possible, ***as the pension funds are not contractual partners of the fund managers***, but the respective capital management company." (emphasis added).

188. In other words, the StMI told Parliament that it could not control BVK's fund managers because not even BVK had such a contractual relationship with the fund manager—while BVK, in practice, already exercised control to retain, and terminate, fund managers.

189. Again, that statement was false.

190. Second, on October 20, 2025, the third parliamentary inquiry into BVK's investment decisions was published as part of the Bavarian Official Record Drs. 19/8140.

191. The StMI at this point, in articulating the passive role of BVK in its US

real estate investments, stated: "In the case of such indirect investments, there is also no possibility for investors such as the pension institutions in this case to actively participate in the operational activities on site — ***including construction and leasing activities as well as tenant matters.*** " (emphasis added).

192. That statement was false. As set forth herein, BVK's own personnel participated in precisely those activities—construction decisions, leasing approvals, tenant negotiations—for years.

193. BVK's reporting to StMI also framed the matter as "real estate investments by Deutsche Finance." That characterization was calculated to shift ownership of the investment failures from BVK to DF.

194. The StMI, again relying on information supplied by BVK, also represented that "the respective management of the properties is currently involved in numerous rental initiatives in order to conclude further leases ***as quickly as possible***." (emphasis added).

195. That was a lie too. At the very time BVK made that representation, it was withholding the budget approvals that DF needed in order to execute those leasing initiatives—as described above.

196. Third, on November 18, 2025, the fourth parliamentary inquiry into BVK's investment decisions was published as part of the Bavarian Official Record Drs. 19/8521. The inquiry revealed that a preliminary investigation by the Munich I Public Prosecutor's Office was focused on "whether there is an initial suspicion of

criminal offences, in particular embezzlement."

197. Fourth, in a parliamentary answer provided on March 23, 2026, the StMI stated that in its relationship with DF, BVK "acted merely as a fund investor" and that "[t]he investment decisions in these target funds were taken principally via the Alternative Investment Fund Manager (AIFM), with the participation of the Deutsche Finance Group." The answer likewise provided that "[t]he investment decisions in these target funds, as well as the selection of the service providers involved, were, according to information from [BVK] effected principally via the respective AIFM with the participation of the Deutsche Finance Group or companies affiliated with it," and "[a]ccording to its own information, [BVK] was not involved in matters of the operational day-to-day business of the real estate management of the target funds."

198. For the reasons stated above, those statements were false.

199. BVK's misrepresentations to the Bavarian Parliament were not merely an exercise in blame shifting. Every statement BVK made to Parliament—that it had no involvement in construction, leasing, or tenant matters; that the investments were "Deutsche Finance's"; that BVK's role was limited—was calculated to build a public record that BVK could later point to if German tax authorities or other authorities questioned whether BVK had crossed the line from passive investor to active manager.

200. BVK's campaign extended beyond Parliament to a second arm of the

German state. Beginning on or about August 13, 2025, and continuing through additional submissions in early 2026, BVK wrote to the German Federal Financial Supervisory Authority (Bundesanstalt für Finanzdienstleistungsaufsicht, or "BaFin") and urged the regulator to open a supervisory investigation directed at DF.

201. In its submissions to the regulator, BVK asserted that DF—not BVK—controlled the investment structures, and suggested that DF had exploited that control to create self-serving and effectively interminable fee arrangements and to engage in undisclosed self-dealing at investors' expense.

202. Those assertions were false.

203. As set forth above, it was BVK, not DF, that controlled the investments: DF did not select the properties, did not make the investment decisions, and did not control BVK's capital. BVK knew as much when it made these representations, yet it made them anyway—to a German financial regulator—in order to recast DF as the party responsible for BVK's own losses.

204. That BVK was willing to press this false narrative, including before a financial regulator, confirms that its conduct was neither inadvertent nor isolated; it was a deliberate campaign to deflect responsibility onto DF and to damage DF before every audience that mattered.

**G. The U.S. And Foreign Press Repeat BVK's False Narrative**

205. Numerous publications all over the world, including in the United States, picked up on and repeated as fact BVK's false narrative.

206. On September 4, 2025, the Real Deal again repeated that BVK's capital sat in a "fund managed by Deutsche Finance America." As previously noted, DFA does not sponsor, maintain, or manage any investment fund.

207. On December 16, 2025, Institutional Money reported on BVK's December 2025 press release.

208. On December 18, 2025, BVK's false December 12, 2025 press release was reproduced in English for an international audience by European Pensions.

209. On January 28, 2026, BVK's false member letter from January 19 blaming "project partners" was carried into the U.S. market by the San Francisco Standard.

210. On February 2, 2026, the U.S. financial press picked up BVK's narrative when Bloomberg described the approximately €1.6 billion of equity BVK had invested in U.S. real estate "with Deutsche Finance and Shvo" and reported that, "according to BVK," the losses on those investments reflected not only the post-pandemic market but also "project partners" that were "not meeting expectations." To Bloomberg's U.S. readership of investors and real-estate professionals, that statement conveyed that DF was a responsible partner in, and a cause of, the losses on those investments.

211. On February 3, 2026, a Bisnow article repeated much of the same story. So too did the Promote, an English-language real-estate newsletter, the next day. As did the San Francisco Standard on February 25, 2026.

212. Also on February ~~25~~5, 2026, the German outlet New York Aktuell incorrectly reported, based on the false statements in the August 2025 interview of BVK's CEO, that DF selected Shvo to manage assets. Though that was a technical misquote, it demonstrates the clear implications of BVK's false narrative.

213. On May 13, 2026, in an article reporting that BVK had "lost $1B on a risky U.S. real estate bet," the Real Deal carried into the United States the March 2026 false statement by BVK's CEO that DF and Shvo had "identified the [investment] properties in advance of BVK's investment."

214. DF put the Ministry of the Interior as the supervisory body of BVK and the Budget and Finance Committee on written notice by letters of April 30 and May 18, 2026, identifying the false statements. BVK's Q&A nonetheless remained unchanged, still naming DF among the causes of the losses. Meanwhile, BVK's Co-CEO privately acknowledged to DF that BVK—not DF—had decided to execute the Transamerica sale even as BVK publicly distanced itself.

215. Over the course of this entire time span, DF received numerous press inquiries, including from many U.S. outlets, regarding BVK and its U.S. investments.

* * *

216. The narrative BVK presented to the public and regulatory authorities was false. BVK was not a passive investor. It was the primary decision-maker over its U.S. real estate investments—from the initial acquisition of each property through

the ongoing management of the portfolio. The voluminous documentary record shows that BVK personnel made investment decisions before UI was even informed, conducted on-site property inspections that UI did not attend, maintained direct operational relationships with the co-managing partner that BVK later denied existed, and exercised control over financing, pricing, capital, and fee decisions at the individual property level. DF reserves the right to plead additional facts to establish any of these points.

### H. BVK's Campaign Inflicted Direct And Lasting Harm On DF's Business And Reputation

217. DF's business is the sponsorship and management of private-market real estate investments, and its livelihood depends on the confidence of the institutions and investors that entrust it with capital and mandates. Those constituencies include the pension funds, insurers, and other institutional investors that commit large mandates; the tens of thousands of retail investors to whom DFG markets its funds; the distribution partners and placement agents through which those funds are sold; the lenders that finance the assets DF manages; and the consultants and gatekeepers who screen managers before capital is committed.

218. In an industry in which reputation is the principal asset, a manager publicly branded by a marquee institutional backer as incompetent and responsible for the loss of hundreds of millions of dollars is, as a practical matter, disqualified in the eyes of the allocators and gatekeepers on whom its business depends.

219. As alleged, BVK did not confine its false narrative to a private dispute. It published that narrative to the world. BVK's narrative appeared in the German, European, and United States real estate and financial trade press that DF's investors, distribution partners, and financing counterparties read and rely upon—including Immobilien Zeitung, a leading German real estate trade journal that identified DF by name as BVK's "Asset-Manager," and Bisnow, a leading U.S. real estate publication that identified DF by name as the entity responsible for managing BVK's investments, as well as Bloomberg. BVK broadcast the same message to a national German audience through Welt am Sonntag and Münchner Merkur, communicated it directly to its 2.8 million pension beneficiaries through its own website, and ensured that more media outlets would pick up the story by repeating it in parliamentary inquiries.

220. The audiences BVK chose were not incidental; they were DF's market.

221. The messages those audiences received were unmistakable and damaging: that DF had mismanaged billions of dollars of investments while BVK stood passively by, and that BVK—DF's most prominent institutional client—was severing its relationship with DF, "possibly prematurely," because of DF's failures.

222. Repeated across multiple outlets on both sides of the Atlantic—and reinforced by BVK's public suggestion that DF's management contract, though nominally running through 2028, might end sooner—the statements signaled to DF's entire market that its flagship institutional backer regarded it as incompetent and was

terminating it for cause.

223. No institutional allocator, distribution partner, or financing counterparty could read that message and remain indifferent to it.

224. The consequences were concrete. Before BVK's campaign began in the fall of 2024, DF and its affiliates maintained an established and ongoing fundraising and business-development franchise, having successfully sponsored, placed, and managed a series of real estate funds and investment mandates. After BVK launched and escalated its campaign, DF and its affiliates were unable to raise new capital and win new mandates in the ordinary course of business.

225. For instance, in the United States, a financing relationship with JP Morgan, the largest U.S. commercial bank, was lost. Similarly, the IF24 Austin Logistics fund was in active placement for DF in late 2025, but in the immediate environment of the 2025 statements, and due to the BVK controversy, only a fraction of the target volume was raised. The public portrayal of DF in the United States likewise undermined a partner's confidence in a 2025 partnership for Austin Logistics.

226. In Europe, DFG's asset-manager rating was placed under review for possible downgrade and was ultimately withdrawn, and major distribution partners, including listed companies and banks, curtailed or withheld business pending resolution of the BVK matter, with DFG's retail distribution declining in step with BVK's public statements and in several instances explicitly because of them.

227. This harm is distinct from, and in addition to, the project-level losses that BVK's operational obstruction caused. It did not flow from market conditions or from the performance of any individual property; it flowed from BVK's false public statements about DF's competence and responsibility. The timing confirms the causal link: DF's fundraising and business-development difficulties followed the onset of BVK's campaign in the fall of 2024 and tracked its escalation across outlets and audiences thereafter.

228. The harm is also continuing. DF's capital-raising franchise remains impaired, and DF has been forced to divert resources to responding to and containing BVK's false narrative among its investors, distribution partners, financing counterparties, and other institutional stakeholders.

### I. BVK Attempts To Strip DF Of Its Contractually Guaranteed Management Fees

229. Against this backdrop of systematic obstruction across multiple properties and public scapegoating of DF, BVK escalated to try to force DF out of the management of various properties in the investment structure. Specifically, it sought to deprive DF of its contractually owed management fees for the Transamerica Pyramid.

230. In October 2020, DFA (through an affiliate) entered into an Asset Management Agreement with non-party BHSD Pyramid JVCo LLC to serve as asset manager for the Transamerica Pyramid. Under that agreement, DFA's management

obligations were advisory in nature: it was to "recommend, advise and assist" the joint venture on leasing, construction, financing, and operational matters. For these services, DFA would be paid a "Management Fee." Under a separate agreement executed the same day, DFA's co-manager, Shvo, was also entitled to receive (until his later termination) a management fee, leasing fee, property management fee, and construction fee for related services at the Transamerica Pyramid.

231. In September 2024, DFA, Elektra 2, and other non-parties amended this agreement. In a new "Term Sheet," DF agreed to receive substantially less in fees across the portfolio by terminating its management of certain properties and making other management agreements terminable in years to come. In return, DF insisted on a critical fee protection for its management of the Transamerica Pyramid: If DF's affiliate, the "Transamerica Managing Member," was "terminated before December 31, 2028," which would in the ordinary course deprive DF of its ability to collect fees, DF would nonetheless "be entitled to receive … all fees that would have been payable to DF through December 31, 2028 had such termination not occurred … and during such time DF shall be deemed a consultant entitled to be paid for such fees."

232. Over a year later, on December 31, 2025, BVK's counsel sent DFA an Information Notice stating that the "Fund's investor" "will not provide any further funding" to the Transamerica investment while DFA remains in the management structure. It demanded that, within five days, DF exit "with immediate effect and without receiving any compensation payment." DF declined.

233. By January 2026, the Transamerica Pyramid had also accumulated approximately $8 million in overdue construction payables (the majority 60-90 days past due); multiple contractors were threatening liens; a tenant had issued a Payment Notice; and critical vendors were threatening to reduce staffing.

234. By the end of 2025, the property owed $4.8 million in unsecured debts, which continued to increase in January 2026.

235. In addition, a $3.2 million debt service payment was due on February 10, 2026, and failure to make that payment would constitute an event of default under the loan, putting the entire project, including a DF-managed retail investment of more than $100 million, at risk of total loss.

236. Without consulting DFA, on January 27, 2026, BVK, through Elektra 2, together with its advisor and a co-managing partner, negotiated the sale of the Transamerica Pyramid.

237. BVK, through its affiliates, then withheld the management fees that became due on January 1, 2026, until DF consented to the Purchase and Sale Agreement of the property on February 11, 2026.

238. That sale had critical import for DFA under the Term Sheet. The sale resulted in the termination of DF's affiliate, the Transamerica Managing Member, from its managing role. The Purchase and Sale Agreement does not allow for the Transamerica Managing Member to maintain its position after the sale. Accordingly, this termination triggered the Term Sheet's provision that "DF shall be

entitled to receive … all fees that would have been payable to DF through December 31, 2028 had such termination not occurred."

239. Those total fees amount to $31,384,061.

240. But BVK has fought tooth and nail to prevent DF from receiving its fees under the Term Sheet. Through its counsel, BVK demanded that DFA exit the management role without any fees, and it threatened to withhold all funding until it did so. In an email on February 4, 2026, BVK's counsel also asked all relevant parties for consent for the sale's escrow agent to send proceeds directly to upper-tier investors, including entities controlled by Elektra 2, thereby bypassing the entity within the Transamerica Pyramid investment structure that was responsible for paying DF. DF did not consent.

241. In the end, the parties agreed that all funds could be held by a third party pending an arbitration between Elektra 2 and DF of the parties' various claims to these funds.

242. That arbitral proceeding is ongoing. But BVK is not a party to it and has refused to produce documents or witnesses relating to the arbitration.

### J. Elektra 2 Acted As BVK's Agent And Alter Ego In The Transactions At Issue

243. Elektra 2 is not an independent economic actor. It is the vehicle that BVK created, funded, staffed at the decision-making level, and controlled in order to hold and deploy BVK's capital in U.S. real estate. Throughout the events

described above, Elektra 2 acted as BVK's agent, with BVK's authority and at BVK's direction, in making the investment decisions at issue and in negotiating, executing, and refusing to perform the Term Sheet. In the alternative, BVK so dominated Elektra 2 and so disregarded its separate existence that Elektra 2 was BVK's alter ego.

244. Elektra 2 carries BVK's name. Its full legal name is BAYVK Immobilien-Dachfonds 1 SCS SICAV-SIF Subfonds Elektra 2~~ SCS SICAV-FIS~~. The "BAYVK" in that name stands for Bayerische Versorgungskammer. Elektra 2 is a sub-fund of BAYVK Immobilien-Dachfonds 1, a fund organized to hold BVK's capital, and BVK is the only investor in that fund.

245. Elektra 2 exists for one purpose: to deploy BVK's pension capital into the international real estate investments BVK selects. On information and belief, Elektra 2 has no other line of business, no independent investment program, no third-party capital, and no employees, offices, or operations of its own. The administrative functions nominally performed at the fund level were carried out by UI, which as alleged above acted only after BVK had decided what would be done.

246. BVK bore the entire economics of Elektra 2's investments in the properties at issue. BVK supplied the equity, BVK was entitled to the distributions, and BVK absorbed the losses. When the Transamerica Pyramid was sold in March 2026, the sale proceeds ran to BVK. Elektra 2 was, as a matter of economic substance, a conduit for enriching BVK and, when the investments failed, a conduit

for BVK's losses.

247. Most tellingly, BVK staffs and chairs the organ through which Elektra 2's investment decisions are made. Andre Heimrich, BVK's Chief Investment Officer, is the Chairman of Elektra 2's Investment Committee. The written decision recommendations of that Investment Committee were the instrument by which the investments at issue were authorized, and Mr. Heimrich executed them in Munich, at BVK's seat. For example, on or about December 6, 2019, the Investment Committee of "BAYVK Real Estate Fund of Funds 1 — Elektra 2" issued a written recommendation authorizing an equity increase of approximately $206.3 million for the acquisition of 530 Broadway in New York. The vote was executed by "Heimrich (Chairman)" at "Munich" and returned to UI in Luxembourg for processing.

248. BVK itself did not distinguish between its own decisions and Elektra 2's. BVK described an investment authorization issued by Elektra 2's Investment Committee concerning the Transamerica Pyramid as a "positive vote from BVK."

249. UI treated BVK, rather than Elektra 2 or itself, as the party whose approval was required before the fund could act. In December 2024, UI reported that "Universal expects formal approval from BVK by December 18, 2024, allowing them to sign the subscription agreement." The regulated manager could not execute the fund's subscription documents until BVK signed off.

250. BVK did not merely accept or reject proposals put to it. It dictated the terms on which the fund would invest. In February 2024, in connection with the

refinancing of 9200 Wilshire, BVK's personnel instructed DF that "BVK's approval is subject to" DF and Shvo first injecting $13 million of their own capital, the subordination of DF's and Shvo's preferred equity to BVK's preferred equity, and a guarantee that BVK's Investment Committee would regard as "rock solid" and capable of being "easily … enforced and encashed." Those are the demands of a principal setting deal terms, not the observations of a passive limited partner.

251. When the formal chain of authority was inconvenient, BVK went around it. As alleged above, BVK issued a proof-of-funds letter directly to a seller committing BVK to a purchase, told DF that funds "would have to go to the USA first without UI's signatures," instructed an operating partner by direct email to lock in the interest rate on project financing, and released capital without obtaining the signatures of its own investment committee. Elektra 2 and UI conformed to each of those decisions after the fact.

252. Moreover, in the first half of 2025, BVK, acting through Elektra 2, required the partnership holding four of BVK's properties to assume payment obligations to Mr. Shvo arising under a February 28, 2025 agreement to which neither the partnership nor its manager—a DF affiliate—was a party and into which neither had any insight. Shortly after DF's affiliate declined to release the payment, the partnership was renamed and the DF affiliate was replaced by Elektra 2 Investment GP SARL (the "Elektra 2 General Partner")—an entity whose sole corporate purpose, fixed a month earlier, was to serve as general partner of this

partnership and whose registered office is the address of BVK's AIFM in Luxembourg. On July 30, 2025, the Elektra 2 General Partner caused the partnership to accede to the February 28 agreement, and an $85.3 million payment to Mr. Shvo followed.

253. DF's contemporaneous documents were addressed to BVK as the principal, because BVK was the principal. DF submitted investment and refinancing memoranda addressed "To: BVK Anlageausschuss." In June 2024, DF's senior executives wrote directly to three BVK officials about the 9200 Wilshire refinancing, described institutional tenants then negotiating to lease space "in one of your buildings," and expressly distinguished between "BVK's internal real estate team" and "its AIFM, Universal Investment."

254. The AIFM structure did not operate as an independent check on BVK. BVK required a recommendation from UI as a procedural predicate to BVK's own decision, and no investment, refinancing, capital call, disposition, or lease at issue in this Complaint was ever authorized over BVK's objection or without BVK's approval. Elektra 2 never took a position contrary to a decision BVK had made.

255. BVK's control extended to the Term Sheet itself. BVK negotiated the Term Sheet, on behalf of its alter ego, Elektra 2. After execution, BVK's own counsel, rather than counsel for Elektra 2, communicated the fund's positions to DF, including the December 31, 2025 Information Notice demanding that DF exit the Transamerica management structure without compensation and the February 4, 2026

request to reroute sale proceeds around the entity obligated to pay DF.

256. BVK likewise directed the conduct that terminated DF's role. Without consulting DFA, BVK, through Elektra 2, negotiated the sale of the Transamerica Pyramid, and BVK's Co-CEO privately acknowledged to DF that BVK—not DF and not Elektra 2—had decided to execute that sale.

257. BVK accepted and retained the benefits of the Term Sheet, including DF's agreement to relinquish fees and to make certain management agreements terminable across the portfolio. BVK thereby authorized and ratified Elektra 2's execution of the Term Sheet.

258. For all of these reasons, Elektra 2 acted as BVK's agent, with BVK's actual authority, in the transactions and agreements at issue, and BVK is bound by and responsible for Elektra 2's acts and undertakings.

259. In the alternative, Elektra 2 was BVK's alter ego for the same reasons, and observing the fiction of separateness would work an injustice: It would permit BVK to take the benefits of contracts made in the United States and of U.S. property held for its exclusive economic account, while disclaiming the obligations those contracts impose and publicly denying to regulators, to the press, and to its own beneficiaries the very relationship through which it directed them.

## CLAIMS FOR RELIEF

### COUNT I
### Breach Of Contract

260. Plaintiffs incorporate and re-allege each preceding paragraph as if fully set forth herein.

261. In September 2024, DFA and Elektra 2 signed a Term Sheet governing the management of the properties out of which this claim arises.

262. Plaintiff DFA is a party to the Term Sheet. Plaintiff DFG is entitled to enforce the Non-Disparagement Clause quoted below, which by its terms protects each party's "Affiliates," and DFG is an Affiliate of DFA.

263. That Term Sheet contains a "Non-Disparagement Clause," which provides, in full:

> Each party agrees not to disparage any other party, or any other party's attorneys, directors, managers, partners, employees, agents and Affiliates, in relation to the transactions contemplated by this Term Sheet in any manner likely to be harmful to them or their business, business reputation or personal reputation; provided that any party may respond accurately and fully to any question, inquiry or request for information when required by legal process, regulation or governmental inquiry.

264. As alleged above, BVK breached that clause by making multiple defamatory statements about DF. This public campaign by BVK conveyed that DF had mismanaged billions of dollars in investments while BVK stood passively by, and that BVK was now distancing itself from DF because of those failures.

265. That breach injured DF, and DF's injury is continuing and is not limited to the lost business already identified. DF has incurred, and continues to incur, additional costs to respond to and contain BVK's campaign among its investors, distribution partners, financing sources, and other institutional stakeholders, and

DF's capital-raising franchise remains impaired going forward. DF is entitled to recover these actual damages in an amount to be determined at trial.

266. That contractual breach is imputed to BVK. As alleged above, Elektra 2 acted as BVK's agent, with BVK's authority, in negotiating and executing the Term Sheet; BVK negotiated the agreement; ~~a BVK executive executed it on Elektra 2's behalf;~~ and BVK authorized and ratified it and accepted its benefits. In the alternative, Elektra 2 was BVK's alter ego. Under either theory, BVK is bound by the Term Sheet's Non-Disparagement Clause and is liable for its breach.

267. Finally, BVK, through Elektra 2, breached its contractual duties to pay DF its fees owed upon termination of the agreement. This Complaint does not seek to litigate this separate breach, which is being litigated in the pending arbitration against Elektra 2. But upon conclusion of the arbitration, DF reserves the right to amend the Complaint to seek enforcement of any arbitration award that issues against BVK under an alter ego, agent, or other theory.

**COUNT II**
**Defamation**

268. Plaintiffs incorporate and re-allege each preceding paragraph as if fully set forth herein.

269. As alleged above, BVK made multiple defamatory statements about DF. This public campaign by BVK conveyed a single, false message to industry readers: that DF had mismanaged billions of dollars in investments while BVK stood

passively by, and that BVK was now distancing itself from DF because of those failures.

270. These statements were false and defamatory. BVK—not DF—was the primary decision-maker over its U.S. real estate investments and it exercised direct control over every aspect of its holdings. BVK was responsible for its own investment failures, not DF.

271. BVK made these statements knowing that they were false, or with reckless disregard for their truth or falsity. BVK's own personnel selected the properties, approved each investment, directed capital commitments, and controlled leasing, financing, and pricing decisions, so BVK knew that its public attribution of those decisions to DF was false when it made it. DF further put BVK on written notice that the statements were false—publicly on January 5, 2026, and by letters of April 30 and May 18, 2026—and BVK persisted. At a minimum, BVK acted negligently, and to the extent DF is treated as a limited-purpose public figure, BVK acted with actual malice.

272. These defamatory statements were published in widely read journals and platforms all over the world, including in the United States. And they referred to DF explicitly and by name.

273. Readers understood the defamatory character of these statements. That is why the statements caused fundraising to dry up for DF.

274. BVK's statements are defamatory per se. They do not concern an

isolated error in a single transaction; they impugn DF's basic integrity, honesty, and competence in the very conduct of its trade and business by falsely charging DF with general incompetence and unfitness as an asset manager and with responsibility for the mismanagement of billions of dollars of investments. Such statements, directed at a professional asset manager in the exercise of its profession, are actionable without proof of special damages, and injury to DF is presumed.

275. Beyond the injury that the law presumes, DF suffered substantial actual harm as alleged above.

276. DF's injury is continuing and is not limited to the lost business already identified. DF has incurred, and continues to incur, additional costs to respond to and contain BVK's campaign among its investors, distribution partners, financing sources, and other institutional stakeholders, and DF's capital-raising franchise remains impaired going forward.

277. DF is entitled to recover these actual damages in an amount to be determined at trial.

## COUNT III
## Deceptive Trade Practices Under The Delaware Deceptive Trade Practices Act

278. Plaintiffs incorporate and re-allege each preceding paragraph as if fully set forth herein.

279. In the course of explaining its business—specifically, the underperformance of its investments—BVK made multiple false statements of fact

about DF. As alleged above, they conveyed a false message that DF mismanaged billions of dollars in investments while BVK stood passively by and that BVK was now distancing itself from DF because of those failures.

280. These false statements disparaged the asset management services of DF: claiming that DF performed work it did not do, and that it was responsible for failings attributable instead to BVK.

281. BVK's violations were willful. BVK knew, or should have known, that the conduct described above was of the nature prohibited by the Act. 6 *Del. C.* § 2533(b), (e).

282. As a result of these false statements, DF lost business and suffered reputational injury. DF is a person likely to be damaged by BVK's continuing deceptive trade practices and is entitled to reasonable attorneys' fees under 6 *Del. C.* § 2533(b) and to trebling of any damages awarded on its common-law claims under 6 *Del. C.* § 2533(c).

**COUNT IV**
**Tortious Interference With Contract (By DFA Only)**

283. Plaintiffs incorporate and re-allege each preceding paragraph as if fully set forth herein. This Count is alleged in the alternative if this Court were to find that Elektra 2 was not BVK's agent or alter ego.

284. DFA has a binding contract—the Term Sheet—with non-party Elektra 2 and other non-parties that entitles it to management, leasing, property, and

construction fees. Specifically, the Term Sheet guarantees that if the "Transamerica Managing Member" was "terminated before December 31, 2028," DF would "be entitled to receive … all fees that would have been payable to DF through December 31, 2028 had such termination not occurred." The sale of the Transamerica Pyramid on March ~~26~~27, 2026, terminated the Transamerica Managing Member. And DF is owed the fees that it would have received through December 31, 2028.

285. Defendant BVK knew of this contract. The Term Sheet was signed by non-party Elektra 2, BVK's central vehicle for capital investments, and BVK's attorney referenced the agreement in a December 31, 2025 letter to DF asking it to exit the management role without payment.

286. BVK intentionally acted in such a way as to cause Elektra 2 to violate the Term Sheet and prevent DF from obtaining its fees. Specifically, BVK's attorney demanded that DF exit the management of the Transamerica Pyramid without any fee payments, and through Elektra 2, it refused to offer any more funds to the project while DF remained. And in an email on February 4, 2026, BVK's counsel sought to reroute funds payable to DF to entities controlled by Elektra 2, essentially guaranteeing that DF would not receive payment. These actions were a significant factor in causing Elektra 2 to repudiate its obligations under the Term Sheet and claim, in a March 9, 2026 letter, that DF would not receive any fees after the sale of the Transamerica Pyramid.

287. BVK had no legitimate reason to interfere with DF's contractually

owed payments. Instead, consistent with its own false narrative, BVK sought to scapegoat DF as the cause for the substantial underperformance of BVK's investments. Tellingly, BVK did not try to block Elektra 2 from paying Michael Shvo $45,063,452 for the same categories of fees (along with carried interest) under an identical termination-protection provision covering the termination of his role in the management of the Transamerica Pyramid.

288. BVK's interference with DFA's contractual rights has prevented DFA from receiving the $31,384,061 in fees it is entitled to under the Term Sheet.

289. BVK tortiously interfered with DFA's contract rights in bad faith. BVK arranged for Elektra 2 to pay Shvo $45,063,452 for the same categories of fees (plus carried interest) under an identical termination-protection provision, while insisting DF exit for nothing. There is no good faith basis to treat the two parties any differently.

**COUNT V**
**Tortious Interference With Prospective Business Relations**

290. Plaintiffs incorporate and re-allege each preceding paragraph as if fully set forth herein.

291. DF had a reasonable probability of entering into and continuing specific business relationships, including its financing relationship with JP Morgan; the placement of the IF24 Austin Logistics fund, which was in active placement in late 2025; a 2025 partnership for Austin Logistics; and mandates and allocations from

the institutional investors, distribution partners, placement agents, consultants, gatekeepers, and lenders identified above.

292. BVK intentionally interfered with DF's business opportunities by deliberately delaying approval and obstructing business decisions to thwart any chance of success.

293. BVK also intentionally interfered with those prospective relationships by publishing the false statements described above to the very audiences on which DF's business depends—institutional allocators, distribution partners, placement agents, consultants, and lenders. BVK knew of those prospective relationships, and its interference was wrongful and without justification.

294. BVK made its intentional interference perfectly clear in its demand that DFA exit the management structure—without any payment of applicable fees: It would use its control over the portfolio to squeeze DF for funds until it complied.

295. As a result of BVK's actions, DFA lost substantial revenue. DFA also lost valuable goodwill and personal relationships that are critical to DFA's long-term operational viability and success.

## PRAYER FOR RELIEF

Plaintiffs respectfully demand a trial by a jury of twelve persons and request entry of judgment in favor of Plaintiffs and against Defendant, and that the Court grant the following relief:

a. a money judgment awarding Plaintiffs compensatory damages in an

amount to be determined at trial;

b. trebling, under 6 *Del. C.* § 2533(c), of the damages awarded to Plaintiffs on their common-law claims;

c. pre-judgment interest as permitted by law, accruing from the date each of Plaintiffs' claims arose, and post-judgment interest;

d. Plaintiffs' costs of suit and reasonable attorneys' fees, including under 6 *Del. C.* § 2533(b); and

e. such other and further relief as the Court deems just and proper.

*/s/ Michael A. Barlow*
Michael A. Barlow (#3928)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
500 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 302-4000
michaelbarlow@quinnemanuel.com

*Attorneys for Plaintiffs Deutsche Finance America LLC and DF Deutsche Finance Holding AG d/b/a Deutsche Finance Group*

OF COUNSEL:

Alex H. Loomis
QUINN EMANUEL URQUHART & SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, Massachusetts 02199
(617) 712-7100

Derek L. Shaffer
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 13th Street NW, Suite 600
Washington, D.C. 20004
(202) 538-8000

Dated: ~~August 31~~September 15, 2026

# EXHIBIT 3

EFiled: Sep 17 2026 04:08PM EDT
Transaction ID 80664998
Case No. N26C-08-455 KMM CCLD

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | |
|---|---|
| DEUTSCHE FINANCE AMERICA LLC and DF DEUTSCHE FINANCE HOLDING AG d/b/a DEUTSCHE FINANCE GROUP,<br><br>Plaintiffs,<br><br>v.<br><br>BAYERISCHE VERSORGUNGSKAMMER,<br><br>Defendant. | Case No. N26C-08-455 KMM (CCLD) |

## ENTRY OF APPEARANCE

PLEASE ENTER THE APPEARANCE of Lauren K. Neal of Morris, Nichols, Arsht & Tunnell LLP on behalf of Defendant Bayerische Versorgungskammer in the above-captioned action.

MORRIS, NICHOLS, ARSHT
& TUNNELL LLP

*/s/ Lauren K. Neal*
Lauren K. Neal (#5940)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
lneal@morrisnichols.com

*Counsel for Bayerische Versorgungskammer*

September 17, 2026

# EXHIBIT 4

EFiled: Sep 17 2026 04:08PM EDT
Transaction ID 80664998
Case No. N26C-08-455 KMM CCLD

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

DEUTSCHE FINANCE AMERICA LLC and DF DEUTSCHE FINANCE HOLDING AG d/b/a DEUTSCHE FINANCE GROUP,

Plaintiffs,

v.

BAYERISCHE VERSORGUNGSKAMMER,

Defendant.

Case No. N26C-08-455 KMM (CCLD)

**JOINT STIPULATION AND [PROPOSED] ORDER**
**REGARDING RESPONSE TO AMENDED COMPLAINT**

**WHEREAS,** on August 31, 2026, Plaintiffs Deutsche Finance America LLC and DF Deutsche Finance Holding AG d/b/a Deutsche Finance Group (collectively, "Deutsche Finance") filed a Complaint in the above-captioned action and moved for appointment of a special process server pursuant to Superior Court Civil Rule 4;

**WHEREAS**, on September 15, 2026, Deutsche Finance filed an Amended Complaint in the above-captioned action;

**IT IS HEREBY STIPULATED AND AGREED**, by and between the undersigned counsel for Deutsche Finance and Defendant Bayerische Versorgungskammer ("BVK"), subject to the approval of the Court, as follows:

1. In lieu of Deutsche Finance effecting service through the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, BVK agrees to accept service of the Summons, the Complaint and the Amended Complaint effective Thursday, September 17, 2026.

2. BVK's time to answer, move to dismiss, or otherwise respond to the Amended Complaint in the above-captioned action is extended by 120 days from the effective date of service—*i.e.*, up to and including Friday, January 15, 2027.

3. Notwithstanding its time to respond to the Amended Complaint, BVK may file a notice of removal pursuant to 28 U.S.C. §§ 1330, 1441, and 1446 within 30 days of the effective date of service—*i.e.*, by Friday, October 16, 2026.

4. BVK waives any objection to insufficient service of process in the above-captioned action. BVK expressly reserves all other rights, privileges, immunities, defenses, and objections, including, without limitation, all rights and remedies under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602–1611. By filing this Stipulation, BVK does not concede that jurisdiction, venue, or the forum are proper, or that the allegations in the Amended Complaint state a valid claim under any applicable law.

5. Should this case ultimately be removed to federal court, the parties agree to file a substantively similar stipulation in federal court (i) setting forth a briefing schedule on any motion to remand (should removal be contested); and (ii)

extending BVK's time to answer, move to dismiss or otherwise respond to the Amended Complaint to the later of January 15, 2027, or 60 days after an order resolving any motion to remand.

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

*/s/ Michael A. Barlow*
Michael A. Barlow (#3928)
500 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 302-4000
michaelbarlow@quinnemauel.com

**OF COUNSEL**:

Alex H. Loomis
Quinn Emanuel Urquhart & Sullivan, LLP
111 Huntington Avenue, Suite 520
Boston, Massachusetts 02199
(617) 712-7100

Derek L. Shaffer
Quinn Emanuel Urquhart & Sullivan, LLP
555 13th Street NW, Suite 600
Washington, D.C. 20004
(202) 538-8000

*Counsel for Deutsche Finance America LLC and DF Deutsche Finance Holding AG d/b/a Deutsche Finance Group*

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Lauren K. Neal*
Lauren K. Neal (#5940)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
(302) 658-3989 (fax)
lneal@morrisnichols.com

**OF COUNSEL**:

**LINKLATERS LLP**
Patrick Ashby
Nicole Jerry
Jake E. Struebing
Adam Gould
1290 Avenue of the Americas
New York, NY 10104
(212) 903-9000

*Counsel for Bayerische Versorgungskammer*

IT IS SO ORDERED this ____ day of ___, 2026

______________________________
The Honorable Kathleen M. Miller

# EXHIBIT 5

Granted
/s/ Kathleen M Miller Sep 17, 2026

EFiled: Sep 17 2026 05:26PM EDT
Transaction ID 80672678
Case No. N26C-08-455 KMM CCLD

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | |
|---|---|
| DEUTSCHE FINANCE AMERICA LLC and DF DEUTSCHE FINANCE HOLDING AG d/b/a DEUTSCHE FINANCE GROUP,<br><br>Plaintiffs,<br><br>v.<br><br>BAYERISCHE VERSORGUNGSKAMMER,<br><br>Defendant. | Case No. N26C-08-455 KMM (CCLD) |

**JOINT STIPULATION AND [PROPOSED] ORDER**
**REGARDING RESPONSE TO AMENDED COMPLAINT**

**WHEREAS,** on August 31, 2026, Plaintiffs Deutsche Finance America LLC and DF Deutsche Finance Holding AG d/b/a Deutsche Finance Group (collectively, "Deutsche Finance") filed a Complaint in the above-captioned action and moved for appointment of a special process server pursuant to Superior Court Civil Rule 4;

**WHEREAS**, on September 15, 2026, Deutsche Finance filed an Amended Complaint in the above-captioned action;

**IT IS HEREBY STIPULATED AND AGREED**, by and between the undersigned counsel for Deutsche Finance and Defendant Bayerische Versorgungskammer ("BVK"), subject to the approval of the Court, as follows:

1. In lieu of Deutsche Finance effecting service through the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, BVK agrees to accept service of the Summons, the Complaint and the Amended Complaint effective Thursday, September 17, 2026.

2. BVK's time to answer, move to dismiss, or otherwise respond to the Amended Complaint in the above-captioned action is extended by 120 days from the effective date of service—*i.e.*, up to and including Friday, January 15, 2027.

3. Notwithstanding its time to respond to the Amended Complaint, BVK may file a notice of removal pursuant to 28 U.S.C. §§ 1330, 1441, and 1446 within 30 days of the effective date of service—*i.e.*, by Friday, October 16, 2026.

4. BVK waives any objection to insufficient service of process in the above-captioned action. BVK expressly reserves all other rights, privileges, immunities, defenses, and objections, including, without limitation, all rights and remedies under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602–1611. By filing this Stipulation, BVK does not concede that jurisdiction, venue, or the forum are proper, or that the allegations in the Amended Complaint state a valid claim under any applicable law.

5. Should this case ultimately be removed to federal court, the parties agree to file a substantively similar stipulation in federal court (i) setting forth a briefing schedule on any motion to remand (should removal be contested); and (ii)

extending BVK's time to answer, move to dismiss or otherwise respond to the Amended Complaint to the later of January 15, 2027, or 60 days after an order resolving any motion to remand.

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

*/s/ Michael A. Barlow*
Michael A. Barlow (#3928)
500 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 302-4000
michaelbarlow@quinnemauel.com

**OF COUNSEL**:

Alex H. Loomis
Quinn Emanuel Urquhart
& Sullivan, LLP
111 Huntington Avenue, Suite 520
Boston, Massachusetts 02199
(617) 712-7100

Derek L. Shaffer
Quinn Emanuel Urquhart
& Sullivan, LLP
555 13th Street NW, Suite 600
Washington, D.C. 20004
(202) 538-8000

*Counsel for Deutsche Finance America LLC and DF Deutsche Finance Holding AG d/b/a Deutsche Finance Group*

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Lauren K. Neal*
Lauren K. Neal (#5940)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
(302) 658-3989 (fax)
lneal@morrisnichols.com

**OF COUNSEL**:

**LINKLATERS LLP**
Patrick Ashby
Nicole Jerry
Jake E. Struebing
Adam Gould
1290 Avenue of the Americas
New York, NY 10104
(212) 903-9000

*Counsel for Bayerische Versorgungskammer*

IT IS SO ORDERED this ____ day of ___, 2026

__________________________________

The Honorable Kathleen M. Miller